Appeal No. 2015-1215, -1226

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### ARIOSA DIAGNOSTICS,

*Appellant*,

v.

### VERINATA HEALTH, INC.,

*Appellee*.

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2013-00276 and IPR2013-00277**

### BRIEF OF APPELLEE VERINATA HEALTH, INC.

Edward R. Reines
Derek C. Walter
Anant N. Pradhan
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood City, CA 94065
(650) 802-3000

Michael Rosato
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue
Suite 5100
Seattle, WA 98104
(206) 883-2529

*Attorneys for Appellee*

## CERTIFICATE OF INTEREST

Counsel for Appellee Verinata Health, Inc. certifies as follows:

1.     The full name of every party or amicus represented by us is:

Verinata Health, Inc.

2.     The name of the real party in interest represented by us is:

Verinata Health, Inc.

3.     All parent corporations and any public companies that own 10 percent or more of the stock of the parties represented by us are:

Formerly known as Artemis Health, Inc., Verinata Health, Inc., is a wholly owned subsidiary of Illumina, Inc.  Illumina, Inc. is traded under symbol "ILMN."

4.     The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

Edward R. Reines, Derek C. Walter, Anant N. Pradhan, Weil, Gotshal & Manges LLP

Michael Rosato, Maya Skubatch, Steve Parmelee, Wilson, Sonsini, Goodrich & Rosati

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF RELATED CASES ...................................................................1

PRELIMINARY STATEMENT ..........................................................................2

STATEMENT OF ISSUES PRESENTED............................................................5

STATEMENT OF THE CASE..............................................................................5

I.      The '430 Patent ........................................................................................5

II.     The Trial ..................................................................................................10

        A.      Ariosa's References.......................................................................10

                1.      Dhallan ...............................................................................11

                2.      Shoemaker...........................................................................12

                3.      Binladen ..............................................................................15

        B.      Ariosa's Obviousness Case ..........................................................16

III.    The Board's Final Written Decision........................................................17

SUMMARY OF THE ARGUMENT ..................................................................19

ARGUMENT ......................................................................................................20

I.      Standard of Review.................................................................................20

II.     The '430 Patent Is Novel and Nonobvious.............................................21

        A.      Ariosa's References Are Distant From The '430 Patent....................21

        B.      Ariosa Could Not Present A Legally Cognizable Obviousness
                Case Based on Dhallan, Binladen, and Shoemaker ...........................24

                1.      Ariosa Failed To Analyze The Claims As A Whole ...............25

                2.      Ariosa's Art Could Not Be Combined To Achieve The
                        Claimed Invention...................................................................29

3.    One Of Skill In The Art Would Not Be Motivated To Combine Ariosa's References....................................................32

4.    Ariosa's Obviousness Analysis Was Infected With Improper Hindsight...................................................................36

III.    Ariosa's Arguments On Appeal Do Not Warrant Reversal Or Remand.......41

A.    The Board Did Not Err By Failing To Adopt Ariosa's Treatment Of The Level Of Ordinary Skill........................................41

1.    The Board Considered And Rejected The Indexing Approach Of Shoemaker.............................................................42

2.    The Board Considered The State Of The Art Of DNA Indexing .................................................................................47

B.    The Board Did Not Apply An Erroneous Obviousness Standard.......54

C.    The Board Adequately Articulated Its Reasoning .............................58

D.    Substantial Evidence Supports The Board's Conclusion That Dhallan And Binladen Cannot Be Combined .....................................61

CONCLUSION ...................................................................................................63

CERTIFICATE OF COMPLIANCE ....................................................................64

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## Cases

*ActiveVideo Networks v. Verizon Communications*,
    694 F. 3d 1312 (Fed. Cir. 2012)....................................................... 36, 37

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008)...............................................................54

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) .............................................................................20

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009)..............................................................36

*Graham et al. v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966) .................................................................................17

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
    Case No. 14-cv-01921 (N.D. Cal. filed April 24, 2014)........................1

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
    No. 2014-1815 (Fed. Cir. filed September 15, 2014)...........................1

*In re Kahn*,
    441 F.3d 977 (Fed.Cir.2006)............................................ 3, 57, 58, 59

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000)..............................................................20

*In re Lovin*,
    652 F.3d 1349 (Fed. Cir. 2011)..............................................................53

*In re Sang Su Lee*,
    277 F.3d 1338 (Fed. Cir. 2002)................................................... 58, 59

*In re Watts*,
    354 F.3d 1362 (Fed. Cir. 2004)..............................................................21

*InTouch Techs., Inc. v. VGo Comms.*,
    751 F.3d 1327 (Fed. Cir. 2014)..............................................................55

*K/S Himpp v. Hear-Wear Technologies, LLC*,
    751 F.3d 1362 (Fed. Cir. 2014)................................................... 20, 57

iv

*Leo Pharm. Products, Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013)..........................................................20

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012)..........................................................56

*Plantronics, Inc. v. Aliph, Inc.*,
724 F.3d 1343 (Fed. Cir. 2013)..........................................................56

*Power-One, Inc. v. Artesyn Technologies, Inc.*,
599 F.3d 1343 (Fed. Cir. 2010)..........................................................31

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013)..........................................................20

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013)..........................................................51

*Rexnord Indus., LLC v. Kappos*,
705 F.3d 1347 (Fed. Cir. 2013)..........................................................21

*Shinseki v. Sanders*,
556 U.S. 396 (2009)...........................................................................21

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
407 F.3d 1371 (Fed. Cir. 2005)..........................................................35

*The Board of Trustees of the Leland Stanford Junior University v. Ariosa Diagnostics, Inc.*,
No. 2015-1413 (Fed. Cir. filed March 4, 2015)....................................2

*Verinata Health, Inc. et al. v. Ariosa Diagnostics, Inc. et al.*,
Case No. 3:12-cv-05501 (N.D. Cal. filed October 25, 2012)................1

**Statutes**

35 U.S.C. § 316(e) ...............................................................................20

37 CFR § 41.37 ....................................................................................53

37 CFR § 42.104(b)(5)..........................................................................52

37 CFR § 42.23(b) ...............................................................................52

77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2012) ......................................52

## STATEMENT OF RELATED CASES

This is a consolidated appeal of Docket Nos. 2015-1215 and 2015-1226. Both are appeals from *inter partes* review proceedings before the Patent Trial and Appeal Board ("the Board") in which the Board ruled that Ariosa failed to meet its burden of showing that the claims of U.S. Patent No. 8,318,430 ("the '430 patent") are invalid as obvious.

The '430 patent is the subject of district court litigation in the Northern District of California between Verinata and Ariosa. *See Verinata Health, Inc. et al. v. Ariosa Diagnostics, Inc. et al.*, Case No. 3:12-cv-05501 (N.D. Cal. filed October 25, 2012). This district court matter has been consolidated with another case in the Northern District of California between Illumina, Inc. and Ariosa. *See Illumina, Inc. v. Ariosa Diagnostics, Inc.*, Case No. 14-cv-01921 (N.D. Cal. filed April 24, 2014). Currently pending before this Court is Illumina's appeal of the district court's denial of Illumina's motion to compel arbitration of Ariosa's breach of contract counterclaims in that action. *See Illumina, Inc. v. Ariosa Diagnostics, Inc.*, No. 2014-1815 (Fed. Cir. filed September 15, 2014).

Also currently pending before this Court is The Board of Trustees of the Leland Stanford Junior University's appeal of the Board's decision in IPR2013-00308 regarding U.S. Patent No. 8,296,076, which is one of the patents-in-suit in the consolidated district court litigation. *See The Board of Trustees of the Leland*

*Stanford Junior University v. Ariosa Diagnostics, Inc.*, No. 2015-1413 (Fed. Cir. filed March 4, 2015). The consolidated district court litigation is currently stayed pending resolution of the three appeals currently pending before this Court.

Verinata adopts the same citation convention as Ariosa did in its brief. Specifically, because the consolidated IPR proceedings are substantially identical, for the sake of simplicity references herein are to IPR2013-00276 (challenging claims 1-18), but apply equally to IPR2013-00277 (challenging claims 19-30).

## PRELIMINARY STATEMENT

Ariosa's appeal is based on quibbles with the depth of the Board's analysis about peripheral issues.

Ariosa's obviousness case required an awkward combination of three unrelated references: Dhallan, Binladen, and Shoemaker. Ariosa's expert admitted that each of these three disparate references failed to disclose ***at least*** five of the six elements of the independent claims. This undisputed fact alone helps to explain why the Board concluded that Ariosa failed to carry its burden of proving obviousness.

Starting from a faulty foundation of art, Ariosa failed to present a credible obviousness case, both from a legal and factual standpoint. Legally, Ariosa assumed it could prove obviousness simply by showing that the different concepts used in the claimed invention were independently disclosed in its three references.

As the Board explained, Ariosa's case ignored the essential ingredients of

obviousness under *KSR* and this Court's precedent:

> Although the Petition and accompanying Declarations point to disparate elements of the three references, and attempt to map them to elements of the challenged claims, virtually no effort is made to explain how or where the references differ from the challenged claims, how one of ordinary skill in the art would go about combining their disparate elements, or what modifications one of ordinary skill in the art would necessarily have made in order to combine the disparate elements. ***What is lacking in the Petition and accompanying Declarations is an "articulated reason[] with some rational underpinning to support the legal conclusion of obviousness."*** *Kahn*, 441 F.3d at 988.

A16.[1]

Ariosa's case was just as flawed from a factual perspective.  It is physically

impossible to combine Ariosa's references to achieve the claimed invention.

Further, one of ordinary skill in the art would be ***dissuaded*** from even trying to do

so due to perceived unacceptable performance characteristics.   Again, Ariosa's

own experts acknowledged both of these points on cross-examination.

Having presented a fundamentally flawed obviousness case, Ariosa took

extreme measures in its Reply to try to cure these shortcomings.  Rather than rely

on Dhallan, Binladen, and Shoemaker, Ariosa's Reply pivoted to a new

obviousness combination based on two references (the Daines reference and an

Illumina product brochure) that were never mentioned in Ariosa's Petition.  A1474,

---

[1] Emphasis supplied unless otherwise noted.

A1482, A1484.  Likewise, Ariosa attempted for the first time to introduce a reason to combine the elements of the references to prove obviousness.  The following demonstrative from the oral hearing shows the before and after picture of Ariosa's case and reveals just how deficient Ariosa's obviousness case was:



A2304; *see also* A2305.  The Board's final written decision rightly rejected Ariosa's attempt to substitute a new case on reply.  A17-19.

The instant appeal is yet another belated pivot by Ariosa.  Having had its first two obviousness positions rejected, Ariosa rewrites the record to suggest that it relied upon the Shoemaker reference far more centrally than it truly did, and it erroneously faults the Board for having not paid enough attention to this fragment of its case.  Likewise, Ariosa faults the Board for allegedly having ignored the

level of skill in the art as it pertains to indexing, even though the Board addressed in detail the Binladen reference that Ariosa expressly pointed to as exemplifying the state of the art of this technique.  Ariosa's latest pivot does not cure the gross defects in its case that the Board documented in its final written decision.

## STATEMENT OF ISSUES PRESENTED

Whether the Board committed clear error in its fact finding or otherwise committed a legal error when it determined that Ariosa failed to meet its burden of proving that the claims of the '430 patent are obvious.

## STATEMENT OF THE CASE

### I.    THE '430 PATENT

Down syndrome is the most common genetic birth defect.  It is caused by the presence of an extra copy of chromosome 21 in the fetal genome.  It is so common that prenatal screening for Down syndrome has become standard for nearly every pregnancy.  *See, e.g.*, A856[Chiu et al., Trends in Genetics 2009] ("Identification of trisomy 21 is the most common reason why women opt for prenatal diagnosis.").

For years, the state of the art screening test combined ultrasound observation of the fetus with measurements of various proteins in the mother's blood stream. A828[Chiu et al., PNAS 2008].  This combined screening method had only limited accuracy, leaving substantial uncertainty as to the health of the fetus, particularly

for high-risk mothers. *Id.*; *see also* A856[Chiu et al., Trends in Genetics 2009] ("The sensitivity and specificity profile of these tests is suboptimal....").

This state of affairs changed in 2011 with the emergence of tests based on the analysis of fetal DNA found in the mother's blood. Specifically, these new tests rely on the analysis of "cell-free fetal DNA." Cell-free fetal DNA refers to small fragments of fetal DNA that circulate freely in the mother's bloodstream alongside fragments of maternal DNA. The fetal DNA generally makes up less than 10% of the total DNA fragments present in the mother's bloodstream. A132['430 patent](1:25-27).

Although cell-free fetal DNA in the mother's blood had been identified as a potential source of genetic information about the fetus since 1997, it was not until the last few years that a highly accurate aneuploidy screen based on the analysis of cell-free fetal DNA emerged. This was because in the decade following the discovery of cell-free fetal DNA, those in the art believed that such a test would require distinguishing and/or separating fetal DNA in the mother's bloodstream from the maternal DNA. For instance, a 2009 publication described detection of aneuploidy as a "challenging puzzle" due to the "high maternal DNA background." A856[Chiu et al., Trends in Genetics 2009].

To overcome this, researchers attempted to identify "molecular signatures that are present in maternal plasma but are contributed almost completely by the

fetus." *Id.* The Dhallan and Shoemaker references that are central to Ariosa's position are exemplary of such prior techniques that sought to focus on fetal DNA. *See infra* pp. 11-15. These approaches did not find widespread use. *See, e.g.*, A856[Chiu et al., Trends in Genetics 2009] ("These approaches enable the direct detection of fetal chromosomal aneuploidies, but they are only applicable to fetuses with certain genotypes.").

Starting in 2008, researchers at Verinata began developing techniques that were both a philosophical and technological departure from the prior art in that they did ***not*** rely upon distinguishing between the fetal and maternal DNA in the mother's blood. These efforts resulted in the claimed invention of the '430 patent, which offers an aneuploidy screen that is not just highly accurate, but also highly efficient and economical.

In the claimed invention of the '430 patent, massively parallel DNA sequencing techniques are used to analyze selected fragments of DNA in the mother's bloodstream. Although the claims are open-ended and the method does not preclude using a fetal-specific signal in some way, the claimed invention of the '430 patent is a breakaway from the prior art in that it does not rely exclusively upon distinguishing fetal and maternal DNA (by, for example, identifying fetal alleles). A132['430 patent](1:23-25); A136['430 patent](10:27-47); A1390[Butte Decl.] ¶¶ 79-80; A1406-11[Butte Decl.] ¶¶ 131-47; A1049[Shoemaker] ¶ 140 ("In

rare instances all three alleles may coincide and the locus will not be informative for that individual patient.").

The number of DNA fragments that come from both the chromosome that is being tested and one or more "reference chromosomes" are counted, and both of these numbers are then used to assess the presence of a genetic abnormality. A138['430 patent](13:59-64).  For instance, in a normal pregnancy, the ratio of fragments from the chromosome being tested, such as chromosome 21, relative to the number of fragments from the "reference chromosome" takes on a typical value.  *Id.* at 13:63-64 (describing the use of enumerated sequences from a "control region").

Yet, in an abnormal pregnancy—where the fetus carries an extra copy of the chromosome being tested—the ratio will be elevated by a tiny, but perceptible, amount due to the presence of the extra chromosome in the fetal genome.  For example, as Ariosa explains in its technical publications, a "sample containing 4% DNA from a T21 [Downs] fetus should exhibit a 2% increase in the proportion of reads from chromosome 21 (chr21) as compared to a normal fetus."  A2259.  That is, one would be looking for a signal change of just 2%.  A2052:11-2054:10.

Unfortunately, as the '430 patent explains, the amount of DNA sequencing that is needed to count sufficient fragments to identify this slight elevation indicative of an abnormal pregnancy with statistical significance can be costly.

A132(1:27-28) ("Sequencing a large number of polynucleotides to generate sufficient data for fetal aneuploidy detection can be expensive."); *see also* A2261[Sparks et al., AJOG 2013] ("Distinguishing these 2 scenarios with high confidence requires a large number (>93,000) of chr21 observations…[in] MPSS…~6.3 million uniquely mapped reads are required to ensure sufficient chr21 counts.").

The '430 patent solves this problem in an innovative way that enables broad adoption of this important genetic test technology.  Prior to the DNA sequencing step, cell-free DNA from a pregnant woman is first "selectively enriched" for specific fragments that come from the chromosome that is being tested and the "reference chromosome."  A134(6:52-53) ("This enrichment can reduce the cost of aneuploidy determination.").  For instance, the patent describes "hotspot" and "chromosome walk" approaches for carrying out the enrichment.  *See* A138(14:61)-A142(21:2).  These approaches identify genomic loci less susceptible to biases from sample preparation by, for instance, analyzing frequencies with which loci appear in sequence data.  A135 at 7:15-40.

Each "selectively enriched" fragment of DNA is then appended with a short non-natural fragment of DNA called an "index," which serves to identify the fragment as having come from a specific pregnant woman.  The "indexed" samples from multiple women are then "pooled" and sequenced on the sequencing machine

9

at the same time by the batch.  Even though all the samples were mixed up prior to sequencing, the sequence of the "index" can be used to match every DNA fragment back to the woman from which it came, which allows this test to be scaled.  A142(22:9-19).  By limiting the test only to DNA fragments that will be involved in the aneuploidy analysis and then using indexing to sequence multiple samples at once, the '430 patent provided—for the first time—a highly economical and highly accurate aneuploidy screen based on the use of cell-free fetal DNA.

Notably, as Verinata noted in its Patent Owner's Response, *see* A2367-70, Ariosa's marketing literature and technical publications repeatedly praised these features of the '430 patent.  For instance, the foundational technical article regarding Ariosa's infringing product describes how "chromosome-specific assays" offers a "substantive advantage" by increasing the number of samples that can be analyzed in a single sequencing run from roughly 4-6 to 96.  A2263.  As another example, Ariosa boasts that "[c]ompared to random sequencing, directed cfDNA analysis is simpler, less costly, and more precise."  A2268.

## II.    THE TRIAL

### A.    Ariosa's References

Ariosa and its experts, Drs. Cynthia Morton and Robert Nussbaum, relied upon a combination of three unrelated references: Dhallan, Shoemaker, and Binladen.

### 1.    Dhallan

The Dhallan reference proposes a technique for aneuploidy screening based on cell-free fetal DNA. Other than this similarity, Dhallan has nothing in common with the '430 patent. Dhallan does not properly disclose a single element of any claim of the '430 patent. *See* A1389-1421.

In Dhallan, cell-free fetal DNA is first collected. A1135(31:44-51). Unlike the claims of the '430 patent, Dhallan relies exclusively on identifying markers known as single nucleotide polymorphisms ("SNPs") to distinguish between maternally and paternally inherited DNA, as the failed prior art had been attempting to do for a decade. Alleles are variants of particular genes. SNPs are chromosomal loci, generally within an allele, that are known to vary by a single base pair in the DNA sequence. A1123(7:17-18); A1136-37(34:63-35:6).

For a given individual, the SNPs within an allele may or may not be the same on the two copies of each chromosome in that person's genome. That is, a given person may have the same alleles on both copies of a given chromosome (a homozygous genotype), or may have different alleles on each copy of that chromosome (a heterozygous genotype). A1134(29:21-32). In cases where the fetus has inherited from the father a version of the SNP different from what is present in the mother, Dhallan explains that the SNP may be used as a "beacon" for the fetal DNA. A1198(157:1-12); A1218(197:23-25).

11

Once SNPs have been used to identify the fetal-specific DNA, aneuploidy is assessed by looking at a large number of alleles to see if the ratio of allele intensities reflects aneuploidy. *See, e.g.*, A1246(253:54-59) ("As discussed above, the expected ratio of allele 1 to allele 2 is used to determine the presence or absence of a chromosomal abnormality. If the maternal genome is homozygous at SNP X (A/A), and the plasma DNA is heterozygous at SNP X (A/G), then the G represents the distinct fetal signal.").

Thus, while the claimed invention of the '430 patent is a chromosome-based approach, Dhallan is an allele-based approach that analyzes the fetal signal. The two methods look at different distributions of DNA, and thus conduct different types of analyses. Dhallan does not disclose any other aspects of the claims of the '430 patent either. For instance, it is undisputed that Dhallan does not disclose any techniques to perform massively parallel sequencing, indexing, or pooling of samples.

### 2.    Shoemaker

Like Dhallan, and like the failures in the prior art, Shoemaker relies upon distinguishing fetal DNA from maternal DNA. For example, Shoemaker seeks to take advantage of the observation that intact fetal ***cells*** are present in the bloodstream of pregnant women. *See* A1037 ¶ 4 ("The presence of fetal cells within the blood of pregnant women offers the opportunity to develop a prenatal

12

diagnostic that replaces amniocentesis and thereby eliminates the risk of today's invasive diagnostics"). This approach shares little in common with the '430 patent. In fact, the Dhallan reference relied upon by Ariosa criticizes cell-based approaches as unreliable, time consuming, laborious, and difficult to implement in high throughput fashion. A1122(5:31-37).

In the cited disclosure of Shoemaker, rare fetal cells are first isolated, and then the fetal DNA within the fetal cells is analyzed to assess the presence of aneuploidy. A1042 ¶ 71; A1046 ¶ 109; A1046 ¶ 114. Briefly, the sample of fetal cells is "split" into locations (*e.g.*, wells in a microtiter plate) such that "each site includes 0 or 1 fetal cells." A1045 ¶ 110. Using PCR amplification, a number of alleles of DNA in the fetal cells are then tagged with an index, which is used to identify the location where the fetal cell was placed after the splitting process. A1046-47 ¶ 114. After DNA sequencing, the sequencing reads are sorted according to location (*i.e.*, the individual cell from which they originated):

> In. step 412, wells with rare cells/alleles (e.g., fetal alleles) are identified. The locator elements of each tag can be used to sort the reads (~200,000 sequence reads) into 'bins' which correspond to the individual wells of the microliter plates (~500 bins). The sequence reads from each of the bins (~400 reads per bin) are then separated into the different genomic DNA region groups, (e.g. STR loci,) using standard sequence alignment algorithms. The aligned sequences from each of the bins are used to identify rare (e.g., non-maternal) alleles.

A1049 ¶ 138; *see also* A2149:7-A2150:4.  These cells are all from the same individual.  A2155:24-A2156:1.  The ratio of alleles within the fetal DNA can then be analyzed to assess whether aneuploidy is present:

> In a normal fetus, a given STR will have 1:1 ratio of the maternal to paternal alleles with approximately 16 sequence reads corresponding to each allele (normal diallelic).  In a trisomic fetus, three doses of an STR marker will be detected either as three alleles with a 1:1:1 ratio (trisomic triallelic) or two alleles with a ratio of 2:1 (trisomic diallelic).

A1049 ¶ 140.

Since Shoemaker is only analyzing a single fetal cell, the presence of trisomy causes a 100% increase in the amount of DNA from an allele.  That is, rather than observing a normal 1:1 allele ratio, one observes either a 2:1 ratio (double the amount of one allele) or a 1:1:1 ratio (an entirely new allele appears).  Due to this large difference, Shoemaker explains that although his indexing-based sequencing technique provides only 33 sequencing reads per allele, aneuploidy can still be detected.  A1049 ¶ 140.  This is true even though this odd number of reads provides a starting error of 6%, as the allele ratio of detected reads from a typical fetal cell would at best be 17:16.  A2069:21-A2072:12.

Although massively parallel sequencing may be used in Shoemaker, the approach of Shoemaker is completely different from the '430 patent claims, which focus on chromosomes (not alleles) and need not analyze exclusively a fetal signal.  Further, as the Board noted, "Shoemaker does not disclose pooling the multiple

14

samples with each other, or pooling samples from other individuals. Nor does Shoemaker disclose analyzing a cell-free sample." A8.

### 3.    Binladen

Binladen is unrelated to prenatal diagnostics or testing for aneuploidy, and it provides no suggestion that it discloses a technique relevant to the patented inventions. At trial, Ariosa relied on Binladen as exemplifying the state of the art with regard to indexing. A170. Binladen discloses testing a single genetic marker in mitochondrial DNA ("mtDNA") from 13 individuals of 13 different species, including hippopotamus, impala, grey wolf, cheetah, lion, saiga antelope, Mueller's Bornean gibbon, narwhal, domestic mouse, musk ox, human, Burchell's zebra, and African buffalo. A1361.

In Binladen, "a unique tagged primer combination can be applied to each specific DNA template source." A1360. Equal amounts of sequences from the different DNA sources were then pooled for sequencing, and the tags were "observed in the generated sequence." A1360-61. Although equal amounts of sequences were pooled, the technique yielded uneven results that suffered from a high error rate, providing a range of 98 to 631 sequence reads per indexed sample. A1365.

Simply put, Binladen describes unsuccessful technology with discouraging results. As Binladen explained, that "so many sequences contained sequencing

errors in the primers (n=377) was surprising, and warranted further investigation."

A1364.    The errors were particularly pronounced in the human samples:

"Strikingly, more than half of the miss-assigned sequences (n=11) are of human

origin."  *Id.*  Further, the distribution of sequences was biased depending on the

nature of the tag, with a coverage variation that was "very large."  *See* A1359 ("We

observe a bias in the distribution of the differently tagged primers that is dependent

on the 5' nucleotide of the tag."); A1364 ("The coverage variation is very large.").

### B.    Ariosa's Obviousness Case

In its Petition, Ariosa alleged that the combination of Dhallan, Binladen, and

Shoemaker rendered the '430 patent obvious.  Ariosa described the combination of

Dhallan, Shoemaker, and Binladen as follows:

> [A] scientist in this field would have known that Dhallan could be
> enhanced through use of the PCR amplification techniques utilizing
> sample indices and massively parallel sequencing of pooled samples
> as discussed in Binladen. Professors Nussbaum and Morton explain
> in their declarations that a skilled artisan would also have readily
> understood that Shoemaker's methods for determining the presence
> of fetal abnormalities could be carried out with the use of cell-free
> DNA described in Dhallan and the multiplexed detection techniques
> taught in Binladen.

A208-09.  Thus, to achieve the claims, Ariosa relied upon different concepts from

the three unrelated and dissonant references.  Dhallan allegedly provided "the use

of cell-free DNA" along with a technique for detecting aneuploidy.  Shoemaker

provided a method for "determining the presence of fetal abnormalities."  And

Binladen supposedly provided "PCR amplification techniques utilizing sample indices and massively parallel sequencing of pooled samples" (*i.e.*, "multiplexed detection techniques").

Ariosa's Petition then provided an anticipation-style claim chart that purportedly identified where the individual references disclosed these concepts. *See* A209-23.   After that claim chart, Ariosa's analysis ends.   *See* A223-24. Ariosa's Petition provides no discussion of ***how*** or why the references would be combined.  Likewise, there was no explanation of why one of skill in the art would have been motivated to make the combination, whether the combination was possible, whether there was a reasonable expectation of success, or whether the combination was predictable.

### III.   THE BOARD'S FINAL WRITTEN DECISION

Based on findings consistent with the obviousness framework set forth in *Graham et al. v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966), the Board concluded that Ariosa had failed to meet its burden of proving that the '430 patent was obvious.  First, the Board laid out the legal standard it was applying, including the requirements laid out in *KSR*.  A7.  Then, the Board documented the scope and content of Ariosa's references, including a separate discussion for each of Shoemaker, Dhallan, and Binladen.  *See* A8-10.  In the process, the Board noted the substantial differences between the claimed invention and these references.

17

*See, e.g.*, A9 (noting that Shoemaker failed to disclose cell-free DNA, pooling samples, or pooling samples of other individuals); A10 (noting that Dhallan does not disclose indexing samples or pooling samples from multiple individuals).

Finally, the Board analyzed the references and explained the deficiencies in Ariosa's obviousness case. The Board searched the record for guidance from Ariosa regarding the differences between the claimed invention and the art, but found no such guidance. A11-12 ("However, there is no mention in the Petition or the Declarations of any differences between the claimed subject matter and the prior art, beyond a single statement that 'Dhallan does not teach indexing.'").

Likewise, the Board noted the numerous admissions from Ariosa's experts establishing that Ariosa could not possibly meet its burden, including at least the following:

- Dr. Morton's acknowledgment that "[d]etection of cell-free fetal nucleic acid sequences that are present in both the fetus and the pregnant mother presents different technical challenges, as does the detection of fetal aneuploidies" and "is currently possible only through the use of highly precise methods for quantification." A40.

- Dr. Morton's failure to recall "a synthesis of how to put [Shoemaker, Dhallan, and Binladen] together" in her declaration. A14.

- Dr. Morton's concession that Dhallan and Binladen would not be compatible and that "different methods" would be required to implement the claimed method. A15.

18

Importantly, the Board found that Ariosa had failed to provide any evidence or explanation for how the art could be combined to reach the claimed invention. A12; A16.

## SUMMARY OF THE ARGUMENT

Ariosa's obviousness references describe allele-based approaches that distinguish fetal DNA from maternal DNA. These references are disparate data points in a sea of art constituting chronic failed attempts to non-invasively diagnose aneuploidy in a practical and scalable way. They are nowhere close to the claimed invention of the '430 patent. Ariosa's expert acknowledged that Ariosa's references failed to disclose at least five of the six elements of the independent claims of the '430 patent.

Starting from this weak and disparate art, Ariosa was unable to present a legally sufficient obviousness case, and the Board correctly identified numerous defects in Ariosa's case. On appeal, Ariosa largely ignores these defects. At most, Ariosa contends that the Board should have accepted the holes in its case because obviousness is "flexible" and may involve "common sense." Yet, Ariosa's invocation of "flexibility" and "common sense" cannot substitute for evidence of obviousness that is so powerful that it would justify disturbing the Board's thoughtful analysis.

Ultimately, the essence of Ariosa's appeal is to quibble with the depth of the Board's analysis regarding the level of skill in the art and the Shoemaker reference. Yet, while Ariosa complains about the *scope* of the Board's analysis on these discrete issues, it makes no meaningful challenge to the *substance* of the Board's analysis or its conclusions.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews the Board's factual findings for substantial evidence and its legal conclusions de novo. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251-52 (Fed. Cir. 2013) (*citing In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *K/S Himpp v. Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014) (*citing Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This Court has noted that the "substantial evidence" standard of review for fact findings made by the Board makes the Appellant's burden on appeal "a challenging one." *Leo Pharm. Products, Ltd. v. Rea*, 726 F.3d 1346, 1348 (Fed. Cir. 2013).

At trial, the burden of proving unpatentability rested with Ariosa. *See* 35 U.S.C. § 316(e). On appeal, Ariosa bears an even more substantial burden. For Ariosa to prevail on appeal, it "must not only show the existence of error, but also

show that the error was in fact harmful because it affected the decision below." *In re Watts,* 354 F.3d 1362, 1369 (Fed. Cir. 2004). The "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination," which in this case is Ariosa. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Even if Ariosa identifies some error in the Board's decision, this Court may nonetheless affirm the Board's decision "on any ground that is supported by the record." *Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013)

## II.     THE '430 PATENT IS NOVEL AND NONOBVIOUS

Ariosa's brief ignores the gross defects in its obviousness case and does not fairly convey what was before the Board. Therefore, before addressing the discrete complaints in Ariosa's brief, the shortcomings of the case presented to the Board more broadly are reviewed. This confirms that the alleged errors in the Board's decision could not warrant reversal because the gaps in Ariosa's case were so substantial that Ariosa failed to carry its burden of proving obviousness.

### A.     Ariosa's References Are Distant From The '430 Patent

Ariosa contends that "the record here contains evidence of prior art that corresponds to each and every claim limitation." Ariosa.Br.33. In fact, undisputed record evidence shows that all three of Ariosa's references fail to disclose at least steps (b), (c), (d), (e), and (f) of the claim.

21

At trial, Ariosa's expert, Dr. Morton, admitted this. Starting with step (b) of the claim, Dr. Morton testified as follows:

> **Q.** But none of the references teach selectively enriching including an indexing nucleotide sequence which identifies a maternal blood sample of a plurality of maternal blood samples, right?
>
> **A.** That's correct.

A2147:12-16. Verinata's expert confirmed that step (b) was absent. A1393 ¶ 88-A1397 ¶ 100.

Moving to step (c), Dr. Morton agreed that it was also absent:

> **Q.** Sure. Okay. So none of the references teach Step C of Claim 1. We have discussed that, right?
>
> **A.** Yes.

A2160:13-15; *see also* A2158:14-25 (Dr. Morton agrees that none of the reference teaching pooling as specifically recited in step (c) and that none of the references teach massively parallel sequencing of the pool of sequences as in step (c)). Verinata's expert confirmed that step (c) was absent from Ariosa's art as well. A1397 ¶ 101-A1400 ¶ 113.

Next, Dr. Morton confirmed that step (d) was absent:

> **Q.** And that sequencing as recited in Step D is not taught by any of the references, right?
>
> **A.** Not explicitly, that's correct.

A2159:6-8. Verinata's expert agreed that step (d) was absent. A1400 ¶ 114-A1402 ¶ 120.

As to step (e), although Dr. Morton attempted to equivocate, her testimony ultimately leaves no doubt that it is not present either:

> **Q.** Okay. So turning back to Step E, none of the cited references teach enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences, right?
>
> **A.** It's correct that the sequences are not fetal and maternal non-random polynucleotide sequences.
>
> **Q.** And it's also correct that none of those references enumerate sequence reads based on the indexing nucleotide sequence as recited in Step B, right?
>
> **A.** Again, as the issue is that the difference is that the source of DNA is not a source from a single individual that's admixed with the host DNA, if you like, and the fetal DNA.

A2174:18-75:6. Verinata's expert explained in detail why this step was absent from all of Ariosa's references. A1402 ¶ 121-A1406 ¶ 130.

Finally, with regard to step (f), Dr. Morton confirmed point-blank that it also was not taught by any of the references:

> **Q.** But looking at Step F, do any of the references you cite teach those particular steps of that part of the claim?
>
> **A.** What I feel is the case is that knowing what's taught in the three things that are the Shoemaker, Dhallan and Binladen is, I can make the step to what's presented here.
>
> **Q.** Okay. But none of the references themselves teach that step?
>
> **A.** Individually, no, that's correct.

A2176:16-25. Verinata's expert confirmed this testimony. A1406 ¶ 131-A1411 ¶ 147.

Ignoring these important admissions of its own expert, Ariosa cites to page 16 of the Board's decision for the proposition that the Board supposedly

"recognized that the prior art references, in combination, satisfied all the claim limitations." Ariosa.Br.30. The Board made no such finding. Here is what the Board actually said on page 16 of its final written decision:

> Although the Petition and accompanying Declarations point to disparate elements of the three references, and ***attempt*** to map them to elements of the challenged claims, virtually no effort is made to explain how or where the references differ from the challenged claims, how one of ordinary skill in the art would go about combining their disparate elements, or what modifications one of ordinary skill in the art would necessarily have made in order to combine the disparate elements….***The inadequacy of the obviousness analysis in the Petition and accompanying Declarations is readily apparent when the disparate elements of the references are scrutinized closely***, as in Patent Owner's response, and we decline to search through the record and piece together those teachings that might support Petitioner's position.

A16. That is, the Board recognized that a close scrutiny of the "disparate elements" of the art cited by Ariosa revealed deficiencies—not strengths—in Ariosa's obviousness case. It then declined to "search through the record" on Ariosa's behalf to find elements that "might support" Ariosa. This is not, as Ariosa contends, a finding by the Board that Ariosa had identified all elements of the claims in its references.

### B.     Ariosa Could Not Present A Legally Cognizable Obviousness Case Based on Dhallan, Binladen, and Shoemaker

The number of claim elements absent from all three of Ariosa's references is symptomatic of the fact that they are nowhere close to the claimed invention. In

fact, for nearly every claim element, Ariosa relied on a combination of different references. This weighs heavily in favor of non-obviousness because it illustrates that each of the asserted references disclose a method fundamentally different from the claimed invention of the '430 patent. Consequently, no reasonable combination of Ariosa's art could be formulated so as to render the claims obvious.

Instead, as Verinata explained in its Patent Owner's response, one of skill in the art would need to distill basic "techniques" (*i.e.*, artificially disembodied concepts) from the references, create brand new and different methods from those techniques, and independently think to combine the techniques in the same way as the claims to arrive at the method of the claims as a whole. It was only from the perspective of a skilled artisan influenced by hindsight bias and applying incorrect standards for prior art comparison that Ariosa and its experts were able to suggest that such inventive activity would be obvious.

### 1.     Ariosa Failed To Analyze The Claims As A Whole

Ariosa's first error was that it failed to analyze the claims as a whole. Instead, Ariosa's obviousness analysis focused solely on whether the individual concepts and techniques that are used to carry out the claimed invention (e.g., collection of blood samples, DNA sequencing, etc.) could be extracted from the references. This erroneous approach to obviousness is exemplified by Ariosa's IPR Petition, which provided nothing but a 14-page claim chart that purports to

identify where the concepts set forth in the individual claim elements are present in Dhallan, Binladen, and Shoemaker. A209-23. This is inadequate to show obviousness. A "patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). Neither Ariosa's chart nor Ariosa's Petition provides argument or explanation regarding how or why the references should or could be combined to achieve the claimed invention. *Id.*

Although Ariosa's claim chart cites its experts' declarations, a review of these declarations shows that they too are nothing more than a claim chart for individual claim elements (albeit in text form). The declarations reflect only a baseline attempt to identify claim elements in a disparate combination of references. *See* A0349-81 (Morton declaration); A0910-933 (Nussbaum declaration).

On cross-examination, Ariosa's expert, Dr. Morton, confirmed that her approach to obviousness focused simply on "the concept of those references rather than whether the references and the methodology could actually be integrated" :

> **Q.**   Okay. We were talking about combining tags of Binladen with the methods of Dhallan, right?
> **A.**   That's correct.
> **Q.**   ***And you indicated you were really looking at the concept of those references rather than whether the references and the methodology could actually be integrated, right?***

**A.**    *That's correct.*

**Q.**    And is that also true about your approach to analyzing Shoemaker?

**A.**    In a different way, but there is an analogy in that in Shoemaker, the focus is on fetal cells isolated from maternal circulation, and tumor cells in those circulation. But --

**Q.**    But with regard to tagging or indexing, your comments about Dhallan and Binladen are equally applicable to Shoemaker; is that right?

**A.**    That's correct.

A2195:1-18.  Dr. Morton testified that she did not even understand the difference

between the individual components of the claim and the claim as a whole:

**Q.**    Okay. So the techniques you're referring to are DNA sequencing, for one, right?

**A.**    Massively parallel DNA sequencing.

**Q.**    Okay. So that your testimony is that the technique of massively parallel sequencing was obvious in view of those cited references, right?

**A.**    That's correct.

**Q.**    Okay. And you're testifying that the technique of indexing was obvious in view of those techniques–of those references, right?

**A.**    That's correct.

**Q.**    *Okay. So you're really referring to components of the claim as techniques rather than referring to the whole claim, right?*

**Q.**    *By "techniques," are you referring to the whole claim?*

**A.**    *I'm not exactly sure I understand the difference.*

A2119:4-23 (objections omitted).

For confirmation that Ariosa failed to consider how and why the loose

concepts in the art could be combined to achieve the claimed invention, one need

look no further than Dr. Morton's cross examination testimony.  She could not

even recall whether she provided any opinions or evidence on how the concepts

identified in Shoemaker, Dhallan, and Binladen could be combined:

> **Q.** Okay. Well, let's turn to the combination, then. So we'll turn back to Paragraph 98 of your 276 IPR declaration. Now, your declaration identifies the three references of Shoemaker, Dhallan and Binladen, but you never explain exactly how the references would be combined, do you?
> **A.** In 98 specifically, is that what you're asking?
> **Q.** Start with 98.
> **A.** No, it's not–it's not detailed here.
> **Q.** Do you think it's detailed elsewhere in the declaration?
> **A.** I don't know exactly at this moment. I would have to–
> **Q.** Sure. You wrote the declaration, though, so do you recall describing how those references would be combined?
> **A.** ***At this moment, I can't remember if there's a place that puts it together in one distinct paragraph or not.***

A2177:1-20; *see also* A2180:3-12 (Dr. Morton does not recall "a synopsis that puts

this path together").

Neither Dr. Morton nor Dr. Nussbaum included any meaningful description

of how or why one of skill in the art could or would combine the three references

to achieve the claim. As documented above, Ariosa's references fail to disclose

most of claim elements. Yet, even if this were not so, Ariosa's attempt to simply

identify individual claim concepts in the art is, at most, a partial obviousness

analysis.

### 2.    Ariosa's Art Could Not Be Combined To Achieve The Claimed Invention

Ariosa's second error was relying upon incompatible art that cannot be combined.  At trial, Ariosa argued that the indexing scheme of Binladen should be combined with Dhallan.  *See* A208-09.  On appeal, Ariosa urges instead that the indexing scheme of Shoemaker should actually be used with Dhallan.  Ariosa.Br.23-25.  Regardless, substantial evidence before the Board confirms that both of these combinations are not even possible and that a skilled artisan would need to combine ***different*** methods.

As to the combinability of Binladen with Dhallan, Dhallan relies on DNA primers that are digestible by a restriction enzyme.  Fig. 1G of Dhallan is shown below, and depicts the result of the enzymatic digestion process:



A1092.[2]  Specifically, the 5'-end of the DNA is cleaved away from the target

sequence to be analyzed, which is labeled as $N_{14}$ in the figure above.  A1382-83 ¶¶

54-56.  Yet, it is the 5'-end where the tags of Binladen are attached.  A1359 ("We

use conventional PCR with 5'-nucleotide tagged primers....").

As Verinata's expert explained at trial, one of ordinary skill "would

recognize that any tags hypothetically added to the Dhallan primers would be

cleaved off the exposed locus prior to sequencing and become useless."  A1431 ¶

224.   Confirming the testimony of Verinata's expert, Ariosa's expert testified

repeatedly that Dhallan could not be combined with Binladen, and that one of

ordinary skill in the art would not even try to do so:

> **Q.** Okay. That's fine. But I'm asking if you can start–if you can–
> you've got the process of Dhallan, right? Can you incorporate
> tags into that process, or do you have to fundamentally
> change that process to incorporate tags?
> **A.** I think you would do a different process to incorporate the
> tags.
> **Q.** Okay. So just to be clear, you would have to fundamentally
> alter the process of Dhallan in order to effectively incorporate
> the Binladen tags, right?
> **A.** *I wouldn't incorporate the Binladen tags as the method is*
> *given.*
> **Q.** *Okay. You wouldn't even try to do that?*
> **A.** *No. You use a different methods [sic].*

A2191:1-16; *see also* A2190:4-13 (Dr. Morton further confirms that it would not

be possible to add the tags of Binladen to Dhallan).

---

[2] Annotations supplied in red.

For the same reason that Binladen cannot be combined with Dhallan, the tags of Shoemaker also cannot be combined with Dhallan. Just like Binladen, Shoemaker incorporates the index on the PCR primer. A1047 ¶ 115. Accordingly, as Verinata's expert explained, the tags of Shoemaker, if used in connection with Dhallan, would be cleaved away from the target sequence and become unusable. *See* A1432 ¶ 226 ("As such, the methods of Dhallan would not be amenable for use with any primer-based index to tag, as such a tag would simply be removed during enzymatic cleavage"). On cross examination, Dr. Morton confirmed that her testimony about Dhallan being uncombinable with Binladen was equally applicable to Shoemaker and Dhallan:

> **Q.** But with regard to tagging or indexing, your comments about Dhallan and Binladen are equally applicable to Shoemaker; is that right?
> **A.** That's correct.

A2195:15-18.

Thus, the Board was presented with substantial evidence—from experts on both sides of the table—that Ariosa's art could not be combined in the way Ariosa suggested. This is substantial evidence confirming the Board's decision. *See, e.g.*, *Power-One, Inc. v. Artesyn Technologies, Inc.*, 599 F.3d 1343, 1351-52 (Fed. Cir. 2010) ("As the district court pointed out, Stewart's testimony did not provide a plausible rational as to why the prior art references would have worked together to render the claims of the '125 patent obvious."). Ariosa's reliance upon

31

incompatible references further underscores that Ariosa's obviousness analysis was directed solely to identifying technical concepts in disparate art, without regard to whether the art actually provided one of skill in the art a reasonable path to the claimed invention.

### 3.    One Of Skill In The Art Would Not Be Motivated To Combine Ariosa's References

Even if one *could* combine Binladen or Shoemaker with Dhallan, a skilled artisan *would not* make such a combination, as the Board correctly found based on Dr. Morton's admissions. A15-16. At trial, Ariosa expressly relied on Binladen as reflecting the state of the art in indexing technology at the relevant time frame. *See* A170 ("Dhallan, Quake and Shoemaker render the claimed subject matter obvious when considered in light of then-conventional techniques for indexing sequence reads when using massively parallel sequencing, *as exemplified by Binladen*, et al., …."). The picture of the state of the art as revealed by Binladen confirms that Binladen would be not be appropriate for the fetal aneuploidy detection application claimed in the '430 patent, let alone for combination with Dhallan or Shoemaker.

As explained above, the claimed invention of the '430 patent counts selected DNA fragments and seeks to identify a tiny differential in the representation of the chromosome that is being tested for aneuploidy. *See supra* pp. 5-10. The presence of substantial errors in determining sequencing counts would prevent one from detecting this difference and derail the test completely. Verinata's expert

documented this at trial. A1424 ¶ 199. Ariosa's expert likewise confirmed that sequencing errors would be intolerable for this application:

> **Q.** So is getting a double error a problem when you're looking at chromosome counts?
> **A.** Getting any error is a problem.

A2198:14-16; *see also* A2199:5-11 ("I can tell you that we would want–a goal would be to have the minimum number of errors.").

Yet, substantial and unpredictable error is precisely what Binladen discloses. Specifically, Binladen discloses a roughly 17% error rate, far outweighing the tiny change in the amount to be detected from a chromosome that is being tested for aneuploidy. *See* A1364; *see also* A1385[Butte Decl.] ¶ 63; *supra* pp. 5-10. Notably, Binladen observed a "strikingly" high error rate in human samples: "Strikingly, more than half of the miss-assigned sequences (n=11) are of human origin." A1364. That is Binladen observed an unusually high error rate in the very species for which the '430 application is intended. *See* A164 at 65:14-15. Across other species, Binladen observed unpredictable variation in the number of sequence tags identified:

> Despite pooling the PCR products together in equal concentrations, we find significant variation in the coverage level of the different amplicons, at the extremes varying from a single read to more than 200 reads. This variation is greater than would be expected due to random processes and although there is weak evidence that in some cases the 59 nucleotide of the tag may play a role, it is more likely an artefact of natural errors.

A1365; *see also* A1364 ("The coverage variation is very large.").  As another example, instead of observing consistency across the different sequence tags, Binladen observed a "bias in the distribution of the differently tagged primers that is dependent on the 5' nucleotide of the tag."  A1359.

As Verinata's expert explained, these sorts of errors make Binladen unsuitable not only for the technique claimed in the '430 patent, but also unsuitable for combination with Dhallan and Shoemaker.  For instance, Dhallan relies on the identification of SNPs as "beacons" for fetal DNA.  A1198:1-12.  "Since a SNP is a single nucleotide base, even small error rates could result in a complete inability to properly determine the SNP allele. For example, it was known at the time that SNP's were found in the human genome only at a rate of about 1 per 1,300 bases (i.e., less than 0.001)....A method having an error rate above 10% would simply be unsuitable for SNP detection occurring as such a low rate."  A1425 ¶ 201.

With regard to the technique claimed in the '430 patent, Binladen is even more unsuitable.  Binladen describes an extremely simple assay that analyzes the presence or absence of a single marker on one set of chromosomes for samples each from different species.  A1426[Butte Decl.] ¶ 204.  The '430 patent, on the other hand, is directed to a more complex analysis involving quantification of slight differences in genomic DNA from both sets of chromosomes of multiple sets of two closely related individuals from the same species (mother and fetus) to

determine a copy number variation.  *Id*.  As the Board noted, *see* A15-16, Arisoa's own expert confirmed the complexity of such analyses, opining that "[d]etection of cell-free fetal nucleic acid sequences that are present in both the fetus and the pregnant mother presents ***different technical challenges***, as does the detection of fetal aneuploidies or other copy number variants."  A297[Morton Decl.] ¶ 23.

Verinata's expert explained why this is so. The sequences from different species analyzed in Binladen are more dissimilar than the sequences from the same species analyzed in the claims of the '430 patent.  A1426 ¶ 205.  Although the error prone techniques disclosed in Binladen may be suitable for distinguishing the presence or absence of a marker in samples from divergent species, they are unusable for quantitation of fine differences in the fetal aneuploidy detection technique of the '430 patent that requires stringent distinction among sequences from the same species that have great homology.  *Id.*

"Under the proper legal standard, a reference will teach away when it suggests that the developments flowing from its disclosures are unlikely to produce the objective of the applicant's invention."  *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).  Further, although "predictability is a touchstone of obviousness, the 'predictable result' discussed in *KSR* refers not only to the expectation that prior art elements are capable of being physically combined, but also that the combination would have worked for its intended purpose."  *DePuy*

*Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009). Here, there is not only no possibility of physical combination, *see supra* pp. 29-32, but substantial evidence establishing that Binladen cannot be used to achieve the purpose of the claimed invention. A1395-96; A1423-34. As such, the Board correctly found that Ariosa's combination of references does not render the '430 patent obvious.

### 4.    Ariosa's Obviousness Analysis Was Infected With Improper Hindsight

The anatomy of Ariosa's case reveals that it was the product of improper hindsight. As documented above, Ariosa starts by attempting to identify disembodied concepts used in the claimed invention in three disparate references. After putting the results in an anticipation-style claim chart, Ariosa's analysis ends. Ariosa never analyzes the claims as a whole, and there is no treatment of how or why one of skill in the art could or would modify or combine the references to yield the claimed invention. The only thing that can possibly fill the gap is hindsight. *See, e.g.*, *ActiveVideo Networks v. Verizon Communications*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) ("conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions…is not sufficient and is fraught with hindsight bias").

Ariosa's impermissible reliance on hindsight is express in the testimony of both of its experts. For instance, the full scope of Dr. Nussbaum's testimony regarding the combinability of Dhallan, Binladen, and Shoemaker is below. Starting with art for which it is undisputed that combination is impossible, Dr. Nussbaum purports to reconstruct the claimed invention based solely on the fact that it offers cost and efficiency benefits:

> I have reviewed Shoemaker, et al., US Pub. No. 2008/0090239 ("Shoemaker") and Dhallan in combination with Binladen. It is my view that this combination discloses each element of Claims 1-18 of the '430 patent and believe that one skilled in the art would have been motivated to combine these techniques, as the combination would clearly result in an enhanced productivity and increased throughput of sample analysis. The sequencing and multiplexing technology of Binladen would have made the procedures of Shoemaker and Dhallan less expensive, faster and more efficient because one could sequence indexed samples from many different patients in a single sequencing run instead of laboriously performing a single sequencing run for the DNA samples from each patient.

A910 ¶ 109. This approach—which would render any invention that offers a benefit invalid as obvious—is classic hindsight. Dr. Nussbaum omits any discussion of the predictability of the combination, the feasibility of the combination, and/or whether one of skill in the art would have had a reasonable expectation of success in making the combination. *See ActiveVideo*, 694 F.3d at 1327 (rejecting the notion that generic testimony regarding cost and efficiency establishes rationale to combine references).

37

Ariosa and its experts never bothered to conduct their obviousness analysis from the proper perspective of a skilled artisan at the time of filing. Rather, in an approach that can only lead to hindsight bias, Ariosa's experts conducted their obviousness analysis from their own personal perspective based on present-day knowledge.

For instance, Dr. Morton opines that a "person of skill in the art of prenatal diagnostics would be familiar with the information provided in ¶¶ 7-24" of her declaration. A0297 ¶ 25. These paragraphs are loaded with post-filing information and technology. For instance, Dr. Morton cites "four different, commercially-available non-invasive tests that detect fetal aneuploidies." *Id.* ¶ 24. These tests, however, constitute the new class of aneuploidy diagnostic of the type developed at Verinata; they were not available until late-2011 and early-2012, more than a year after the filing date of the '430 patent. Dr. Morton's reliance on the modern prenatal diagnostic techniques that ***resulted*** from the type of inventive activity that led to the '430 patent is the definition of hindsight.

As another example, Dr. Morton relies upon sequencing platforms, such as the PacBio RS and Ion Torrent system, which were unavailable until well after the effective filing date of the '430 patent. *See* A292-3 ¶ 16; *see also id.* (Dr. Morton cites the Kircher and Kelso publication, first published several months after the earliest priority date of the '430 patent). Dr. Nussbaum commits the same errors in

his testimony.  *See, e.g.*, A874-75 ¶ 19 (citing PacBio single molecule sequencing, IonTorrent ion detection sequencing, and Oxford Nanopore sequencing); A877 ¶ 25 (citing "four different, commercially-available noninvasive prenatal diagnostic tests").  Relying upon technology, techniques, and knowledge that post-dates the filing of the '430 patent, Ariosa's experts necessarily approached the obviousness analysis with a diminished view of what it would take to achieve the claimed invention of the '430 at the relevant time frame.

There is no indication in either Dr. Morton's or Dr. Nussbaum's declaration that obviousness was ever evaluated from the proper perspective of ordinary skill at the time of filing.  In fact, Dr. Morton's own cross-examination testimony directly confirms that her obviousness analysis was conducted from an inappropriate perspective that can only result in hindsight bias:

| | |
|---|---|
| **Q.** | But you never define the term "obvious" in your declaration, do you? |
| **A.** | There is no definition given of what "obvious" means. |
| **Q.** | Okay. What is your understanding of the term? |
| **A.** | My understanding of the context of that term here is that it's reasonable for a person who has comparable knowledge to have found that the publications or patents of Shoemaker, Dhallan and Binladen would have allowed that individual to come to a conclusion that the–what's disclosed in the–in Claims 1 to 18 of the 430 patent were able to be easily be put together. |
| **Q.** | And by "a person," you're referring to a skilled artisan; is that right? |
| **A.** | I'm referring to a person of comparable knowledge, yes. |
| **Q.** | Of comparable knowledge to yourself? |
| **A.** | That's correct. |

**Q.**    Right? And you testified earlier that that's yourself at the time
         you wrote the declaration, right?

**A.**    That's correct.

A2124:5-25:1; *see also* A2123:17-24 ("**Q.** Okay. So just to be clear, a skilled

artisan would have comparable skill and knowledge as you; is that right? **A.** That's

what I said. Yeah. **Q.** Okay. And that's the knowledge you had at the time that you

wrote this declaration; is that right? **A.** That's correct.").

A centerpiece of Ariosa's appeal is that the Board's decision must be

reversed because the Board failed to adequately consider the level of ordinary skill

in the art. Ariosa.Br.22-29. However, the very pieces of evidence Ariosa cites as

providing this level of skill are interspersed with the above, post-filing knowledge

*See, e.g.*, Ariosa.Br.16 (paragraphs 19-23 of Dr. Nussbaum's declaration cited by

Ariosa are part and parcel of the very sections of his declaration that rely upon

post-filing developments for the level of skill in the art); A877[Nussbuam Decl.] ¶

26. Ariosa's treatment of the level of ordinary skill in the art at trial, however, was

thus legally improper and could not have been adopted by the Board. Ariosa's

contention that reversal is warranted based on the faulty record of the level of skill

in the art that it built at trial demonstrates the weakness of Ariosa's appeal.

## III.    ARIOSA'S ARGUMENTS ON APPEAL DO NOT WARRANT REVERSAL OR REMAND

As shown above, Ariosa's obviousness case was based on weak art and was plagued by hindsight.  The Board's final written decision documented these and other deficiencies in detail and ruled against Ariosa.  This was not erroneous.

In an effort to sidestep the gross deficiencies in its obviousness case, Ariosa targets peripheral aspects of its case and complains that the Board gave them short shrift.  For instance, Ariosa demands reversal based on the Board's alleged failure to consider an Illumina product brochure that was *never* mentioned once in Ariosa's Petition.    A0027-28;  37 CFR § 42.22(a) ("Each petition…must include…(2) A full statement of the reasons for relief requested, including a detailed explanation of the significance of the evidence…."); *id.* § 42.6(a)(3)("Arguments must not be incorporated by reference from one document into another document.").  Ariosa's contention that such "errors" require reversal reflect yet another attempt to rewrite its case into a form that was simply never presented to the Board, and Ariosa fails to identify anything that justifies altering the Board's decision.

### A.    The Board Did Not Err By Failing To Adopt Ariosa's Treatment Of The Level Of Ordinary Skill

Ariosa's lead argument is that the Board failed to adequately take into account the level of ordinary skill in the art.  Ariosa.Br.22-29.  Briefly, Ariosa

contends that certain techniques and concepts were so well known that Ariosa was exempt from having to articulate an evidentiary basis for why they could be used to render the claimed invention obvious. Ariosa's arguments are not just legally erroneous, but irreconcilable with the record.

### 1. The Board Considered And Rejected The Indexing Approach Of Shoemaker.

Ariosa's first argument as to the level of skill in the art is that the Board erred because it "made no reference to **any** of Shoemaker's teachings with respect to tagging or indexing DNA sequence as it had in the Institution Decision." Ariosa.Br.25 (emphasis in original). Ariosa even contends that the Board's "analysis relied solely on Dhallan and Binladen and ignored Shoemaker, the primary reference cited in the petition and Institution Decision." Ariosa.Br.17. In fact, the Board addressed Shoemaker directly, and Ariosa's attempt to fault the Board for not saying more about Shoemaker is misguided.

As an initial matter, Ariosa's contention that Shoemaker was somehow its "primary" reference is without basis. The claim chart in Ariosa's Petition actually cites Dhallan more than it does Shoemaker. *See* A209-23 (39 citations for Dhallan as compared to 37 for Shoemaker). A review of Ariosa's claim chart reveals that it attempts to indiscriminately identify where the three references supposedly disclose the claim elements, never calling out Shoemaker (or any other reference) as being the foundational art in the obviousness analysis. Likewise, the text of

Ariosa's Petition never documents what might be unique about Shoemaker to make it a "primary" reference. Ariosa's own expert even suggested the opposite. A2195:15-18. Even on appeal, Ariosa fails to explain how or why Shoemaker is "primary" relative to Ariosa's other references. In fact, as Ariosa acknowledges, the Board found the Dhallan/Binladen combination redundant to the Dhallan/Binladen/Shoemaker combination, thus indicating that Shoemaker adds little. Ariosa.Br.3. Ariosa never challenged the Board's determination to this effect, and has not questioned it on appeal.

Given that Shoemaker's cited disclosure does not even utilize cell-free DNA but is instead based on the analysis of isolated fetal cells, it is a different approach than the claims of the '430 patent. *See supra* pp. 12-15; A1399[Butte Decl.] ¶ 108. It is thus difficult to see how it could serve as a "primary" reference in an obviousness analysis of the '430 patent claims. In fact, fetal cell-based approaches reflect a prior art method that had been explored for "decades" without any meaningful success. *See* A855[Chiu et al., Trends in Genetics 2009] ("Decades of research then followed in which intact fetal cells, present in the maternal circulation, were studied for use in NIPD [2]. However, the rarity of circulating fetal cells, typically several cells per milliliter of maternal whole blood, has prevented their robust detection [2]."). Certainly, if fetal cell-based approaches truly guided skilled artisans to the '430 patent, then there would not have been

"decades" of research into such approaches before the '430 patent ultimately appeared.

In any event, the Board did not "ignore" Shoemaker. The Board explicitly considered Shoemaker, including its teaching of indexing. Ultimately, the Board concluded that this approach lacked critical elements—a conclusion that is entitled to substantial deference.

The Board's analysis began with a discussion of each of Ariosa's three references. As to Shoemaker, the Board noted that it included a feature that could be used for indexing that used "locator elements of the tags" "to sort the sequence reads into 'bins.'" A9. However, the Board then found that "Shoemaker does not disclose pooling the multiple samples with each other, or pooling samples from other individuals." A8. That is, the Board concluded that although Shoemaker teaches some approaches for indexing and pooling tags, it does not teach the approach that would be needed to perform the methods of the '430 patent. The Board further reviewed reply material submitted by Ariosa's expert regarding embodiments of Dhallan that could allegedly be combined with Shoemaker and concluded that Dr. Morton "still does not explain how these other methods would be combined with Binladen or Shoemaker." A0017. These findings regarding Shoemaker are entitled to substantial deference.

Ariosa cannot legitimately criticize this treatment of Shoemaker. Ariosa's IPR Petition directed the Board to Binladen for indexing. As the Board noted, Ariosa stated in its Petition that "a scientist in this field would have known that Dhallan could be enhanced through use of the PCR amplification techniques utilizing ***sample indices and massively parallel sequencing of pooled samples as discussed in Binladen***." A208. Shoemaker's contribution to the obviousness combination, in contrast, was that "Shoemaker's methods for determining the presence of fetal abnormalities could be carried out with the use of cell-free DNA described in Dhallan ***and the multiplexed detection techniques taught in Binladen***." A208-9. Thus, even when Shoemaker is used, "multiplexed detection techniques" (*i.e.*, indexing) came from Binladen. Having directed the Board to Binladen in this manner, Ariosa should not be heard to complain that the Board erred by not providing a thorough enough analysis of the indexing in Shoemaker.

During cross-examination of Ariosa's witnesses, Verinata even sought to confirm the nature of Ariosa's use of the references. Ariosa's expert, Dr. Morton, made clear that Ariosa was relying upon Binladen for indexing:

> **Q**. Okay. Sure. But earlier, you indicated that Dhallan doesn't teach indexing, right?
> **A**. Dhallan doesn't teach indexing the—so that you could combine many samples from different pregnant women.
> **Q**. Okay. So to get that teaching, you have to go to Binladen and use the Binladen tags, right?
> **A**. That's correct.

A2187:11-18; *see also* A2172:21-25.

Only after realizing that the combination it was advancing suffered from fatal flaws did Ariosa attempt to pivot—during reply—and focus on an alleged teaching of indexing in Shoemaker.  This pivot, however, does not help Ariosa.  Ariosa's expert agreed that the indexing in Shoemaker is different from indexing in the claimed invention.  For example, Dr. Morton explained that the Shoemaker tags relate to separating indexed fetal cells so that they may be separated from maternal cells, as opposed to indexing all cell-free DNA regardless of fetal or maternal origin as required by the '430 Patent.    A2148:19-24 ("**Q**. Are the Shoemaker tags the same as the indexing tags of Claim 1 of the 430 patent? **A**. The Shoemaker tags are related to cells, fetal cells, indexing fetal cells, as opposed to indexing a sample from a mixed fetal and maternal sample. Shoemaker is separating cells.").

Likewise, Dr. Morton agreed that the pooling used in Shoemaker is different from the pooling used in the '430 patent.  As the Board noted, and as Dr. Morton testified, Shoemaker teaches pooling of different cells from the same individual, it "doesn't teach pooling samples from different individuals…."  A2156:5-9; *see also* A2156:17-20 ("**Q**. So just to be clear, then, you're saying Shoemaker teaches pooling; it's just not pooling as recited in Claim 1, right? **A**. That's correct.").  Ultimately, as explained above, Dr. Morton agreed that the tags of Shoemaker

could **not** be combined with the method of Dhallan.  A2195:15-18; *supra* pp. 31-31.

In addition, Verinata explained how the pooling and indexing of Shoemaker was

unsuitable for use in Ariosa's proposed combination.  A1432 ¶ 226-A1434 ¶ 235;

A2060:7-A2063:4; A2069:21-A2072:12.

Neither in its Petition nor in its experts' declarations does Ariosa explain

how there is anything special or different about the tags of Shoemaker relative to

the tags of Binladen.  Ariosa does not even attempt such an explanation on appeal.

In this light, Ariosa's contention that reversal is required because the Board did not

say enough about Shoemaker's treatment of indexing becomes just another

indicator of the weakness of Ariosa's appeal.

## 2.     The Board Considered The State Of The Art Of DNA Indexing

Ariosa's second argument regarding the level of skill in the art is that the

Board failed to adequately take into account "background knowledge" regarding

indexing.  Ariosa.Br.25-28.  In particular, Ariosa contends that the Board ignored

background knowledge regarding the Illumina Genome Analyzer with respect to

indexing.  Ariosa.Br.25.  Ariosa again seeks to rewrite the record.

a. **Ariosa Did Not Meet Its Burden Of Establishing That The Illumina Genome Analyzer Renders The Claimed Invention Obvious**

At trial, Ariosa expressly relied upon Binladen—not the Illumina Genome Analyzer—for the state of the art of conventional indexing technology at the relevant time frame:

> Dhallan, Quake and Shoemaker render the claimed subject matter obvious when considered in light of then-conventional techniques for indexing sequence reads when using massively parallel sequencing, *as exemplified by Binladen*, et al., PLoS One. 2(2):e197 (2007) and Craig et al. Nat Methods 5(10): 887–893 (2008).

A0170.[3]  The state of the art of indexing technology as revealed by Binladen suggested that indexing, though perhaps useful in certain circumstances, was fraught with error, particularly in human samples. *See supra* pp 32-36.  As such, Binladen teaches that the indexing technique was *unsuitable* for the prenatal diagnostic application of the '430 patent, and thus would not render the claimed invention obvious.  The Board's factual findings to this effect—based on a thorough review of the record—are entitled to substantial deference. *See* A13-16.

Pivoting away from Binladen, Ariosa now argues that the Board ignored testimony related to "background knowledge" regarding the Illumina Genome Analyzer system.  Ariosa.Br.25.  Ariosa confusingly argues that because this

---

[3] Notably, this is another example of Ariosa directing the Board to Binladen—not Shoemaker—for indexing.  It further undercuts Ariosa's argument that the Board erred by not discussing in greater detail any disclosure of indexing in Shoemaker.

system was known, sample tagging and indexing were commonplace and routine. This argument—in addition to having never been presented to the Board—is factually wrong. There is no dispute that the Illumina Genome Analyzer was preexisting technology. But it is a massively parallel sequencing instrument. The Illumina Genome Analyzer does not itself perform indexing and pooling, and there is no evidence in the record to suggest that it does.

Rather, to perform indexing and pooling, a sample must be prepared in a particular way *prior* to being sequenced on the Illumina Genome Analyzer. To the extent indexing kits might have been available from Illumina for use with the Illumina Genome analyzer, the only evidence on this point was an unauthenticated product brochure regarding an Illumina kit. It was not mentioned once in Ariosa's Petition. The document bears the label "FOR RESEARCH USE ONLY," A992, and was referred to only briefly in passing by just one of Ariosa's two experts. A876. As the Board noted, it was not until reply that Ariosa attempted to present any meaningful argument or evidence regarding this brochure. *Id*. It was thus not properly before the Board, and the Board rightly declined to consider it. *See infra* pp. 52-54.

Regardless, although the generic treatment of indexing in Ariosa's brief obscures this point, there is no reason to believe that the indexing method in the Illumina brochure is appropriate for combination with Dhallan or Shoemaker. The

Illumina brochure method first uses an enzyme to "repair" (make "blunt") the ends of the double-stranded DNA in the sample.  A990 at Fig. 2.  A second enzyme adds an adenine (A) base to one strand on each end of these double-stranded DNA, allowing a third enzyme (ligase) to ligate double-stranded adapters with universal priming sequences to the modified double-stranded DNA, the adapter sequences being used to universally add indexes.  *Id.*  Using this universal, ligation-based technique of the Illumina brochure, all of the DNA sequences in the sample gained indexes.

Both Binladen and Shoemaker teach adding an index using a primer that targets a specific sequence on single-stranded of DNA, such that only the primer-targeted DNA sequences gain the index.  A1429-32.  Ariosa provided no explanation or evidence—either before the Board or on appeal—regarding how the universal, ligation-based method used on double-stranded DNA in the Illumina brochure would provide insight to skilled artisans implementing the targeted, polymerase-based method used on single-stranded targets of Binladen or Shoemaker—the references upon which review was initiated.  A19.  Had Verinata been given the opportunity to address the Illumina kit (no such opportunity was available because Ariosa first advanced the argument in reply) it could have explained that the Illumina kit and Shoemaker/Binladen were different indexing methods that operated on different principles and that the Illumina kit does not

50

provide guidance for implementing the Shoemaker or Binladen indexing methods. A2010.

Ariosa's reliance upon *Randall Mfg. v. Rea* for the proposition that the Board needed to consider the Illumina brochure under the umbrella of "background knowledge," even though it was never mentioned in Ariosa's Petition, is misplaced. 733 F.3d 1355 (Fed. Cir. 2013). *Randall* was a case about an *inter partes* reexamination where the Board improperly refused to consider four references that the petitioner had submitted in its case-in-chief, not in reply. *Id.* The four references established that a feature was known in the art for well over hundred years. *Id.* at 1361. In *Randall* it was undisputed that there were no functional concerns that would have undermined the art's 100-year old modification, and it was undisputed that the modification could be made. *Id.* at 1363.

Here, other than the single mention of the Illumina brochure buried within one of Ariosa's expert declarations, all of Ariosa's evidence was submitted on reply. Unlike *Randall*, the evidence Ariosa identified regarding the state of the art of indexing (Binladen) did not establish 100 years of conventionality, but that the nascent technique has been available for at most a few years and that it was unsuitable for the claimed invention of the '430 patent due to high error rate and uneven sequence distribution. No meaningful evidence was submitted regarding expectation of success or functional concerns. Whatever *Randall* stands for, it is

not the proposition that a petitioner is excused from developing evidence on these issues in its case-in-chief.

### b.    The Board Properly Declined To Rely Upon Ariosa's Tardy Evidence

Not only was Ariosa's evidence regarding the Illumina product brochure deficient, but it was also properly rejected by the Board as untimely under multiple Board rules.

If Ariosa wished to rely upon the Illumina product brochure, Board regulations required Ariosa to do so in its Petition. *See* 37 CFR § 42.104(b)(5) (the statement of relief requested for each claim challenged must include "the relevance of the evidence to the challenge raised, including identifying specific portions of the evidence that support the challenge"). Board regulations make clear that the "Board may exclude or give no weight to the evidence where a party has failed to state its relevance or to identify specific portions of the evidence that support the challenge." But Ariosa never mentioned this reference in its Petition.

Ariosa's late introduction of this art on reply further violated the Board's rule that "Reply evidence…must be responsive and not merely new evidence that could have been presented earlier to support the movant's motion." Rules of Practice for Trials Before the Patent Trial and Appeal Board, 77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2012); *see also* 37 CFR § 42.23(b) (noting that a "reply may only

respond to arguments raised in the corresponding opposition or patent owner response.").

As the Board explained, Ariosa was attempting to use its Reply to replace "the tagging and sequencing techniques of Dhallan and Binladen with the Illumina indexing kit" in its obviousness combination—which would, in effect, be an entirely new obviousness combination. A19. As the Board further noted, Ariosa failed to provide any explanation for its failure to present this information in its opening Petition as it certainly could. A19. Accordingly, because Ariosa could not demonstrate good cause, the Board properly rejected Ariosa's attempt to introduce new obviousness combinations under the guise of background knowledge on reply. *Id.*

The Board has ample discretion in determining that Ariosa's newly presented evidence should be rejected. "The Supreme Court has long recognized that an agency's construction of its own regulations is entitled to substantial deference." *In re Lovin*, 652 F.3d 1349, 1353 (Fed. Cir. 2011). For example, in *In re Lovin*, the PTO determined that the appellant had waived arguments for review of dependent claims, under 37 CFR § 41.37, by failing to adequately present the arguments in their opening Petition. *Id.* The Board explained that 37 CFR § 41.37 required substantive explanation for why the examiner erred as to each ground for rejection and appellant's cursory reference was insufficient. The Federal Circuit

agreed and held the Board's interpretation of the rule was not plainly erroneous or inconsistent with the regulation and was thus entitled to substantial deference. *Id*.

The same is true here. The Board's rules plainly require that "Reply evidence…must be responsive and not merely new evidence that could have been presented." 37 CFR § 42.104(b)(5). Applying this rule, the Board rejected Ariosa's belated efforts to add new evidence and arguments that were not presented in its initial Petition. Far from erroneous, the Board's rule is consistent with longstanding judicial practice. "Generally speaking, a court should not consider new evidence presented in a reply without giving the other party an opportunity to respond." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1332 (Fed. Cir. 2008).

## B.    The Board Did Not Apply An Erroneous Obviousness Standard

Ariosa next alleges that the Board erred by failing to properly apply *KSR*. Ariosa.Br.29-35. Ariosa first complains that the Board erroneously required it to provide a "step-by-step" explanation of how to "combine the specific constructs found in the art." Ariosa.Br.31. According to Ariosa, while "an obviousness rejection requires record evidence for prior art disclosures of particular claim limitations, no such evidence is required to show that such references would be combined." Ariosa.Br.33. Ariosa's contention that it can show obviousness

without evidence to back up its combination of disparate references is contrary to law, and is emblematic of the defects in Ariosa's case.

Ariosa begins with the mistaken assertion that the "Board recognized that the prior art references, in combination, satisfied all of the claim limitations." Ariosa.Br.30.  As shown above, the Board made no such acknowledgment, and the evidence before the Board confirmed that the art did not contain "all of the claim limitations."  *See supra* pp. 21-24.  But even if Ariosa had identified all of the claim elements in the art, a "patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, 550 U.S. at 418.  This is particularly true, where, as here, the proposed elements cannot be combined "according to their established function" and must instead be modified in some manner.  *Id*.

Ariosa makes the conclusory assertion that "Shoemaker's methods for determining the presence of fetal abnormalities ***could*** be carried out with the use of cell-free DNA described in Dhallan and the multiplexed detection techniques taught in Binladen." Ariosa.Br.31.  For obviousness, however, what matters is not what a skilled artisan "could" have done, but what the skilled artisan "would" have done at the time of the invention and without the benefit of hindsight.  *See InTouch Techs., Inc. v. VGo Comms.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) ("VGo's expert also succumbed to hindsight bias in her obviousness analysis. Dr. Yanco's

testimony primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so.") (emphasis in original).

Ariosa next alleges that the Board "ignored the common sense and common knowledge of a person of ordinary skill in combining the elements of the prior art." Ariosa.Br.32.    The Federal Circuit has made clear, however, that the "mere recitation of the words 'common sense' without any support adds nothing to the obviousness equation." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012).    Obviousness findings "grounded in 'common sense' must contain explicit and clear reasoning providing some rational underpinning why common sense compels a finding of obviousness." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (quoting *In re Nouvel*, 493 F. App'x 85, 92 (Fed. Cir. 2012)).

Here, Ariosa's Petition never argued that a person of ordinary skill in the art could or would use "common sense" to combine the proposed elements in its Petition.    Nor did Ariosa's Petition explain how different elements of the art could be combined and where a person of ordinary skill in the art would supply "common sense."    Even on appeal, Ariosa offers no explanation for why this is a case where "common sense" could or should be applied to render the claimed invention obvious.    The evidence here confirms that "common sense" compels the

opposite conclusion. Each of the three references fails to disclose almost all of the claim elements, it is undisputed that the references cannot be combined, and severe performance issues in the art would teach away from making Ariosa's proposed combination. *See supra* pp. 21-24, 29-32, 32-36.

Ariosa's approach of simply identifying disparate elements in references, or alternatively, stating in conclusory fashion that a missing element would be in the possession of a person of ordinary skill in the art, is insufficient. There "must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006); *see also K/S Himpp v. Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014) (The "Board cannot accept general conclusions about what is 'basic knowledge' or 'common sense' as a replacement for documentary evidence for core factual findings in a determination of patentability."). It was not error for the Board to hold Ariosa to this standard.

Relying on *Kahn*, Ariosa suggests that the Board's reasoning was flawed because the Board pointed to the unsuitability of using the tags in Binladen in the claimed invention. Ariosa.Br.34-35. As an initial matter, nothing in *Kahn* or any other authority cited by Ariosa suggests that it is improper to point to the inability to use an element of one reference with another. Here, the Board expressly found that "Binladen's indexing scheme could not be used with Dhallan's restriction-

digestible amplification primers." A17; *See also supra* pp. 29-32. That is, contrary to Ariosa's claim, the Board expressly found that the two were entirely incompatible—not just that Binladen would be less effective. This approach is proper.

Moreover, to the extent the Board discussed the high error rate of Binladen's primer designs, its discussion was entirely proper. As explained above, *see supra* pp. 32-36, the presence of substantial errors in determining sequencing counts would prevent one from "determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of different pregnant women"—the very purpose of the claimed invention. A163; A132:33-37. As the Board noted, *see* A16, Ariosa's own expert made clear that "[d]etection of fetal sequences that are present in both the fetus and the pregnant mother is currently possible only through the use of ***highly precise methods for quantification*** …." A297 ¶ 23. As such, efficacy of indexing is central to the objective scope of the claimed invention because the claimed invention would not otherwise be able to achieve one of its stated purposes.

### C.    The Board Adequately Articulated Its Reasoning

Relying on *Kahn* and *Lee*, Ariosa criticizes the Board for failing to adequately articulate its reasoning, arguing that this constitutes "agency error." Ariosa.Br.36. In both *Kahn* and *Lee*, the Federal Circuit was reviewing an examiner's decision rejecting a patent as obvious. Those cases did not address the

situation where a patent had already been granted, and was presumed obvious, and was challenged in an adversarial proceeding where the adverse party bore the burden of proof.  Accordingly, any suggestion that *Kahn* or *Lee* shifts the burden of proof to the Board in an IPR to demonstrate non-obviousness must be rejected.

To the extent Ariosa contends that the Board must explain the reasoning underpinning its decision, the Board did precisely that while rejecting the same conclusory statements presented by Ariosa that the Federal Circuit held insufficient to sustain an obviousness finding in *Lee*.  *Id.*

First, the Board identified key differences between the art and the claimed invention.  For example, the Board noted that "Shoemaker does not disclose pooling the multiple samples with each other, or pooling samples from other individuals. Nor does Shoemaker disclose analyzing a cell-free sample." A8.  Similarly, the Board noted that Dhallan does not disclose indexing the samples, or pooling samples from multiple individuals." A9.  Thus, the Board recognized that any combination would need to overcome these differences.

Second, the Board explained that it was unclear how the various elements in the references could be combined to reach the claimed invention.  For example, the Board noted that "on cross-examination, Dr. Morton was unable to recall describing 'a synthesis of how to put [Shoemaker, Dhallan, and Binladen] together' anywhere in her declaration."  A14.  And, the Board noted that "Dr. Morton

conceded that certain aspects of Dhallan and Binladen would not be compatible, and 'different methods' would have been required to implement the claimed method." A15. Although Ariosa attempted to cure these defects by pointing to other methods in Dhallan, the Board noted that "Dr. Morton still does not explain how these other methods would be combined with Binladen or Shoemaker." A17.

Third, contrary to Ariosa's assertion, the Board considered arguments regarding a person of ordinary skill in the art. For example, the Board considered Dr. Morton's conclusory statements that a person of ordinary skill in the art would "understand that the disclosed methods for determining the presence of fetal abnormalities could be carried out with the Dhallan/Binladen techniques." A11. Moreover, the Board considered Dr. Nussbaum's purported motivation for a person of ordinary skill in the art to combine the techniques of Binladen with Shoemaker and Dhallan. *Id.* Yet, the Board rejected these opinions because they provided insufficient explanation. As the Board stated, "nowhere is it explained how one of ordinary skill in the art would go about combining the disparate elements of the references, nor is it explained what modifications one of ordinary skill in the art would necessarily have made in order to combine them." A36.

Ariosa's only complaint is that the Board failed to make particular findings regarding the person of ordinary skill in the art with respect to labeling DNA and to provide an explanation for rejecting the combination of Shoemaker, Dhallan,

and Binladen.  As noted above, the Board made explicit findings on both of these points.  Even assuming there was some yet unmentioned finding that Ariosa claims the Board failed to make, any shortcoming is the result of Ariosa's failure to adequately present the evidence—not error on the part of the Board.  As the Board explained, in Arisoa's Petition, "***virtually no effort is made to explain*** how or where the references differ from the challenged claims, ***how one of ordinary skill in the art would go about combining their disparate elements***, or what modifications one of ordinary skill in the art would necessarily have made in order to combine the disparate elements."  A16.

### D.    Substantial Evidence Supports The Board's Conclusion That Dhallan And Binladen Cannot Be Combined

Finally, Ariosa argues that there was not substantial evidence supporting the Board's determination that the tags of Binladen are incompatible with Dhallan.  In fact, there was extensive evidence on this issue, including detailed testimony from Verinata's expert that was confirmed by admissions from Ariosa's experts.  *See supra* pp. 29-32.

Faced with this substantial evidence, Ariosa makes a backup argument that its Petition actually relied upon embodiments of Dhallan that did not require restriction enzyme digestible primers and were hence compatible with Binladen.  This contention is wrong too.  As Verinata explained during oral argument, Ariosa relied solely upon the incompatible embodiments of Dhallan that use restriction

enzyme digestion.  A2035:8-36:2.  In response to Board questioning on this issue, Ariosa confirmed that it did not rely upon any other embodiments of Dhallan in its Petition because it did not think it was necessary:

> **JUDGE ELLURU**: Counsel, when you get to the question about the identification of the petition of where the reason to combine is located, could you also point me to where you talk about, if you do and where it is, where you talk about the Dhallan embodiments that do not require the use of a restriction enzyme?
>
> **MR. GARDELLA**: You know, as to that, Your Honor, again, this was a head scratcher. This is not something we expected. ***And so this is something we addressed in the second round in the reply***.
> ***So our experts thought with respect that it is not something they needed to explain***, that one wouldn't use the restriction enzyme embodiment, but rather you would use a different embodiment.

A2028:12-25; A2033:15-19 ("Judge Elluru, I believe you also asked a question about–yeah, where we discussed restriction enzymes and I responded that we didn't cover that until the reply period because it is–again, our experts didn't believe that anybody would have considered doing such a thing.").  Certainly, if Ariosa had truly relied on embodiments of Dhallan that do not require restriction enzymes, it would have informed the Board of this.  Its new contention on appeal that it had relied on such embodiments is not credible.

Consistent with this, Ariosa presents no bona fide evidence of embodiments in Dhallan that do not use restriction enzymes.  While Ariosa points out that Dhallan discloses the use of numerous techniques, *see* Ariosa.Br.39, no evidence

establishes that the methods that use these techniques do not also utilize restriction enzymes or other cleavage of the targets. Again, Ariosa's contention that reversal is warranted because the Board allegedly gave inadequate consideration to arguments that were never presented in its Petition demonstrates the weakness of Ariosa's appeal.

## CONCLUSION

The Board's decision should be affirmed.

Dated: April 23, 2015                    Respectfully submitted,


By:  /s/ *Edward R. Reines*
_____

          Edward R. Reines
          WEIL, GOTSHAL & MANGES LLP
          201 Redwood Shores Parkway
          Redwood Shores, CA  94065
          (650) 802-3000

          *Attorneys for  Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  This brief contains 13,999 words as calculated by the "Word Count" feature of Microsoft Word 2007, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.

Dated:  April 23, 2015            */s/ Edward R. Reines*
                                   Edward R. Reines

                                   *Counsel for Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2015, I filed or caused to be filed copies of the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served or caused to be served a copy on all counsel of record by the CM/ECF system.


Dated:  April 23, 2015                    */s/ Edward R. Reines*
                                          Edward R. Reines

                                          *Counsel for Appellee*