## 2015-1215, -1226

# United States Court of Appeals
# for the Federal Circuit

ARIOSA DIAGNOSTICS,

*Appellant,*

*v.*

VERINATA HEALTH, INC.,

*Appellee.*

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2013-00276 and IPR2013-00277.*

## BRIEF FOR APPELLANT, ARIOSA DIAGNOSTICS

GREG GARDELLA
OBLON, SPIVAK, MCCLELLAND,
MAIER & NEUSTADT, LLP
1940 Duke Street, Suite 3100
Alexandria, VA 22314
(703) 413-3000
ggardella@oblon.com

DARALYN J. DURIE
MARK A. LEMLEY
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
ddurie@durietangri.com
mlemley@durietangri.com

*Counsel for Appellant, Ariosa Diagnostics*

March 9, 2015

## CERTIFICATE OF INTEREST

Counsel for Appellant Ariosa Diagnostics, Inc. certifies the following:

1.  The full name of every party or amicus represented by me is:

    Ariosa Diagnostics, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Ariosa Diagnostics, Inc.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Ariosa Diagnostics, Inc. is a wholly-owned subsidiary of Roche Molecular Systems, Inc., which is a wholly-owned subsidiary of Roche Holdings, Inc. and an indirect subsidiary of Roche Holding Ltd.  Novartis AG, a publicly held company, owns more than 10% of the voting shares of Roche Holding Ltd.  Novartis AG has no representation on Roche Holding Ltd.'s board of directors and does not in any way control Roche Holding Ltd. or any of its subsidiaries.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Greg H. Gardella
    OBLON, MCCLELLAND, MAIER & NEUSTADT, LLP
    Daralyn J. Durie and Mark A. Lemley
    DURIE TANGRI LLP


March 9, 2015                         /s/ Mark A. Lemley
                                      Mark A. Lemley

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES..............................................................2

INTRODUCTION ...................................................................................3

STATEMENT OF THE CASE.................................................................4

    A.    Technical Background and the State of the Art at the
Time of Filing.................................................................................4

        1.    Cell-Free Fetal and Maternal DNA Samples..............................5

        2.    DNA Amplification ..................................................................5

        3.    DNA Sequencing .....................................................................6

        4.    Multiplexed DNA Samples........................................................6

    B.    The '430 Patent .............................................................................7

    C.    The Inter Partes Review Petition......................................................12

        1.    Shoemaker..............................................................................12

        2.    Dhallan ..................................................................................13

        3.    Binladen .................................................................................14

        4.    The Level of Skill in the Art....................................................16

    D.    Institution Decision .......................................................................17

    E.    Board Decision ..............................................................................17

SUMMARY OF THE ARGUMENT .......................................................19

ARGUMENT ........................................................................................21

I.    Standard of Review........................................................................21

II.   The Board's Determination of Non-Obviousness Is Legally Erroneous
      Under Federal Circuit and Supreme Court Precedent ...................21

      A.    The Board Erred in Failing to Consider the Knowledge of
            a Person of Ordinary Skill in the Art at the Time of the
            '430 Patent's Priority Date ...................................................22

            1.    The Board Erred in Ignoring Evidence that Shoemaker Taught
                  Indexing of DNA Samples........................................................23

            2.    The Board Erred in Ignoring Evidence of the Background
                  Knowledge Regarding the Illumina Genome Analyzer a Person
                  of Ordinary Skill Would Have With Respect to DNA Indexing
                  ................................................................................................25

            3.    The Board's Failure to Consider Evidence of the Knowledge of
                  One of Ordinary Skill in the Art Warrants Vacatur..................28

      B.    The Board Failed to Apply *KSR* When Assessing the
            Combinability of Prior Art References and the Scope of
            the Prior Art ..........................................................................29

III.  The Board's Failure To Articulate Its Reasoning Constitutes Agency Error
      Under the Administrative Procedure Act § 706 ............................36

IV.   The Board's Decision As To The Impossibility of Combining Dhallan And
      Binladen Lacks Substantial Evidentiary Support ..........................38

CONCLUSION ....................................................................................41

CERTIFICATE OF SERVICE ..............................................................43

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B) ............44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
    701 F.3d 1367 (Fed. Cir. 2012) ....................................................................38

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
    464 F.3d 1356 (Fed. Cir.2006) .....................................................................23

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)..........................................................................................21

*In re Baxter Int'l, Inc.*,
    678 F.3d 1357 (Fed. Cir. 2012) .....................................................................21

*In re Cuozzo Speed Techs., LLC*,
    No. 2014-1301, 2015 WL 448667 (Fed. Cir. Feb. 4, 2015)................... 21, 35

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ......................................................... 34, 36, 37

*In re Sang-Su Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) ............................................................ passim

*In re Taylor Made Golf Co.*,
    589 F. App'x 967 (Fed. Cir. 2014)................................................................29

*In re Thrift*,
    298 F.3d 1357 (Fed. Cir. 2002) .....................................................................38

*K/S Himpp v. Hear-Wear Techs., LLC*,
    751 F.3d 1362 (Fed. Cir. 2014) .....................................................................33

*KSR International Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007).............................................................................. passim

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007) .....................................................................32

*PerfectWeb Techs., Inc. v. InfoUSA, Inc.*,
    587 F.3d 1324 (Fed. Cir. 2009) .....................................................................33

*Randall Manufacturing v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ............................................................ passim

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
    Case No. 3:12-cv-05501-SI (N.D. Cal.) ..........................................................1

iv

**Statutes**

35 U.S.C. § 141(c) ................................................................................1

35 U.S.C. § 315(e) ...............................................................................38

5 U.S.C. § 706(2) .................................................................................36

Administrative Procedure Act § 706................................................ 20, 36

Leahy-Smith America Invents Act § 7(c)(2), Pub. L. 112-29, 125 Stat. 314............1

## STATEMENT OF RELATED CASES

This is a consolidated appeal of 2015-1215 and 2015-1226, each of which is from a final written decision of the Patent Trial and Appeal Board ("Board") concerning certain claims of U.S. Patent No. 8,318,430 ("the '430 patent"). The underlying *inter partes* review case numbers are IPR2013-00276 and IPR2013-00277. Given that the consolidated IPR proceedings are substantially identical, for the sake of simplicity, references herein are to IPR2013-00276 (challenging claims 1–18), but apply equally to IPR2013-00277 (challenging claims 19–30) as well. The '430 patent is the also subject of the district court litigation captioned *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, Case No. 3:12-cv-05501-SI (N.D. Cal.).

## STATEMENT OF JURISDICTION

The statutory basis for jurisdiction of this Court to hear this appeal is 35 U.S.C. § 141(c) (as amended by the Leahy-Smith America Invents Act § 7(c)(2), Pub. L. 112-29, 125 Stat. 314 (effective Sept. 16, 2011)). This is an appeal of final orders from the Patent Trial and Appeal Board dated October 23, 2014, dismissing the Inter Partes Review proceedings in cases IPR20013-00276 and IPR2013-00277.

# STATEMENT OF THE ISSUES

1.     Whether the Board's ultimate determination of non-obviousness should be reversed for legal error because the Board failed to consider the knowledge of a person of ordinary skill in the art, as required under *Randall Manufacturing v. Rea*, 733 F.3d 1355 (Fed. Cir. 2013);

2.     Whether the Board's ultimate determination of non-obviousness should be reversed for legal error because the Board failed to consider the common knowledge and common sense of a person of ordinary skill in the art or the objective reach of the claims, as required under *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007);

3.     Whether the Board's omission of relevant factors from its obviousness analysis and Final Decision violates the Administrative Procedure Act under *In re Sang-Su Lee*, 277 F.3d 1338 (Fed. Cir. 2002), such that its decision should be vacated and remanded; and

4.     Whether the Board's determination with respect to the combination of Dhallan and Binladen lacks substantial support given record evidence contradicting that finding and establishing that Dhallan and Binladen would be combinable.

## INTRODUCTION

The Board granted the IPR petition in this case to determine whether the '430 patent was obvious over the Shoemaker reference in view of the Dhallan and Binladen references.  At the same time, the Board denied the petition as to the asserted ground of obviousness over Dhallan and Binladen, finding that the combination of those references alone was redundant.  Yet remarkably, the Board's ultimate determination takes the completely opposite approach—it ignored the primary Shoemaker reference in its entirety, and instead focused its analysis solely on whether the '430 patent is obvious over Dhallan and Binladen.  That contradictory approach was not only improper, but was marred by several legal and factual errors.

First, the Board erred as a matter of law when it ignored the evidence submitted in the initial petition demonstrating that one of skill in the art was aware of multiple standard methods of indexing and tagging that would be compatible with the listed references.  Instead, it focused only on the specific teachings of the references themselves, not the knowledge of one of skill in the art or their ability to use off-the-shelf tools to implement the ideas in the prior art.  It further erred by ignoring the Shoemaker reference despite granting the petition on that basis and despite its obligation under the Administrative Procedure Act to make findings on the instituted grounds of the petition.  Finally, even when it did analyze two of the

references cited in the petition, its analysis of Dhallan and Binladen was flawed. Specifically, the Board chose one embodiment of Dhallan and ignored express teachings in Dhallan that would motivate one of skill in the art to use any of a variety of standard tagging and indexing methods.

The Board's approach here should be rejected, and its ruling reversed. That approach, reading individual references narrowly for an indication that their specific implementations should be combined with another reference, ignores the teachings of ten years of case law, including *KSR*, and many of this Court's post-*KSR* decisions such as *Randall*, none of which the Board cited. The Board's approach and its conclusions were inconsistent with the law and the facts, and must be reversed.

## STATEMENT OF THE CASE

### A.    Technical Background and the State of the Art at the Time of Filing

The '430 patent is directed to methods for prenatal testing to determine whether a fetus has certain chromosomal conditions, such as Down Syndrome. A138 at 13:9–29.  The presence of an abnormal number of chromosomes (either an extra copy of a chromosome or a missing chromosome) is called "aneuploidy." A877 ¶ 24.  In the case of Down Syndrome, the fetus has three copies of chromosome 21 instead of the usual pair.  A138 at 13:20–21.  The method of the '430 patent involves sequencing DNA samples that have been amplified (*i.e.*,

copied) and indexed (*i.e.*, labelled), counting the resulting sequence reads, and

determining whether aneuploidy is present in a sample.  A132 at 1:41–47.

### 1.     Cell-Free Fetal and Maternal DNA Samples

The '430 patent involves testing cell-free samples containing both fetal and

maternal DNA.  A132 at 1:23–25.  Well before the '430 patent's January 23, 2010

priority date, practitioners in the field knew how to take blood samples containing

both fetal and maternal DNA.  A302–03 ¶ 36 (quoting Dhallan, A1122 at 5:39–41;

A1229 at 219:57–63).  They also knew how to produce cell-free samples by

removing the cells from the surrounding plasma in the blood sample.  A1135 at

31:44–51.  This technology for isolating fetal and maternal DNA was

commercially available and already "standard" by 2002.  *Id.*

### 2.     DNA Amplification

The claimed method also involves selectively enriching DNA sequences

taken from the blood samples before sequencing them.  The specification explains

that the step of selectively enriching sequences can be done using polymerase

chain reaction (PCR).  A132 at 1:48–49; A873–74 ¶¶ 16–17.  PCR is an

amplification technique that facilitates the reproduction of numerous copies of a

particular DNA sequence.  A132 at 1:50; A288–91 ¶¶ 9–12; A873–74 ¶¶ 16–18.

PCR was well established by 1991.  A289 ¶ 10.

### 3.    DNA Sequencing

Next the samples must be analyzed to determine if chromosomal abnormalities such as aneuploidy are present.  This analysis is done by counting the number of times a certain DNA sequence occurs in a particular sample using sequencing techniques that were developed well before January 23, 2010.  A1137 at 36:4-23; A292–93 ¶ 16; A874 ¶ 18.  The '430 patent describes DNA sequencing techniques, including massively parallel sequencing, and identifies those techniques as commercially available, *see* A132 at 1:23–37 (Background of the Invention), and specifically useful for practicing the claimed invention, *see* A136–37 at 10:6–12:39.  The '430 patent also repeatedly references products embodying those techniques, including Illumina's Genome Analyzer sequencer.  *See* A133 at 3:24; A134 at 5:8 (describing Fig. 10); A136 at 10:29; A137 at 12:62; A138 at 14:14; A140 at 18:52–53; A142 at 22:25; and A100 at [56] (References Cited).

### 4.    Multiplexed DNA Samples

Multiplexing technology allows samples from multiple patients to be processed at once.  A292–94 ¶¶ 16–17; A874–76 ¶¶ 18–21.  A unique "tag" or "index" (typically, a non-naturally occurring DNA sequence) is added to each individual DNA sequence so that the source of the DNA sample can be identified.  A293–94 ¶ 17; A875–76 ¶ 20; *see also* A142 at 22:9–19 ("The enriched fragments from each sample . . . can have sequence incorporated that identifies the fragment

as originating from that sample.").  After sequencing, the tags can be used to identify the sequencing counts tied to a particular individual.  A293–94 ¶ 17; A875–76 ¶ 20; A142 at 22:9–19.  Multiplexing was in widespread use before the '430 patent's priority date.  A292–94 ¶¶ 16–17; A874–76 ¶¶ 18–21.

Products embodying multiplexing technology included the Illumina Genome Analyzer, a multiplexed sequencing platform which facilitated multiplexed sequencing in combination with the Illumina Multiplexing Sample Preparation Oligonucleotide Kit and the Multiplexing Sequencing Primers and PhiX Control Kit.  A876 ¶ 21.

## B.    The '430 Patent

The methods of the '430 patent are directed to testing for fetal aneuploidy by selectively enriching non-random DNA sequences taken from cell-free samples containing both maternal and fetal DNA to create a library containing indexed samples from multiple sources, sequencing the library, counting the resulting sequence reads, and determining whether fetal aneuploidy is present in particular samples.  A132 at 1:41–48.  Claim 1, which is illustrative, *see* A4, is reproduced below:

> 1. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:

7

(a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;

(b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples, wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome, wherein the first chromosome tested for being aneuploid and the reference chromosome are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length,

(c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

(d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the reference chromosome;

8

(e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal nonrandom polynucleotide sequences selected from the reference chromosome; and

(f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the first chromosome and a number of enumerated sequence reads corresponding to the reference chromosome of (e).

A163 at 63:9–67. Claims 2–18 depend from claim 1, and recite additional limitations, including, *inter alia*, particular sequence lengths, groups of particular chromosomes to test, and methods of enriching or amplifying sequences. *See* A163–64 at 64:1–65:11.

Claim 19,[1] from which claims 20–30 depend, is the only other independent claim in the '430 patent. Like claim 1, claim 19 is illustrative of its dependent

---

[1] In full, claim 19 reads:

19. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:

(a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;

(b) selectively enriching a plurality of non-random poly-nucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples, wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region, wherein the at least one chromosome region tested for being aneuploid and the at least one chromo-some control region are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length;

(c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

(d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome control region;

claims.  *See* A28.  The primary difference between the two sets of claims is that

claims 1–18 require the tested chromosome to be compared against sequences

selected from a "reference chromosome" while claims 19–30 instead require that

such sequences be selected from "at least one chromosome control region."  A232;

*compare* A164 at 65:35–36 *with* A163 at 63:33.  This difference in claim language

appears specifically in steps (b) and (d)–(f) of independent claims 1 and 19, and

dependent claims 2, 3, 4, 10, and 18, which depend from claim 1, and dependent

claims 20, 21, 23, 26, and 30, which depend from claim 19.

　　Importantly, the '430 patent cites a number of publications that reference the

Illumina system.  A publication titled "Multiplexed Sequencing with the Illumina

---

> (e) based on the indexing nucleotide sequence, for each of the
>     plurality of maternal blood samples, enumerating sequence
>     reads corresponding to enriched and indexed fetal and
>     maternal non-random polynucleotide sequences selected
>     from the at least one chromosome region tested for being
>     aneuploid and sequence reads corresponding to enriched and
>     indexed fetal and maternal non-random polynucleotide
>     sequences selected from the at least one chromosome
>     control region; and
> (f) for each of the plurality of maternal blood samples,
>     determining the presence or absence of a fetal aneuploidy
>     comprising using a number of enumerated sequence reads
>     corresponding to the at least one chromosome region tested
>     for being aneuploid and a number of enumerated sequence
>     reads corresponding to the at least one chromosome control
>     region of (e).

A164 at 65:12–65.

Genome Analyzer System," dated December 2, 2008, is cited on the face of the '430 patent. A100 at [56]. The patent also cites four other publications whose titles name the Illumina system. A101–02 at [56]. The specification also describes the Illumina system, including its use in embodiments of the invention. *See* A133 at 3:24; A134 at 5:8; A136 at 10:29–30; A137 at 12:62; A138 at 14:14; A140 at 18:47, 18:52; A142 at 21:12, 22:25.

## C.    The Inter Partes Review Petition

Ariosa filed two petitions for IPR on May 10, 2013. A225; A284. One petition sought IPR of claims 1–18, the other sought IPR of claims 19–30 of the '430 patent, but both proposed the same three grounds of invalidity based on the same combinations of prior art references. A173–74; A234–35. For purposes of this appeal, the relevant ground of invalidity is obviousness in view of Shoemaker, *et al.*, U.S. Pat. Pub. US 2008/0090239 (published April 17, 2008) ("Shoemaker") (A996–1078); Dhallan, U.S. Patent No. 7,332,277 (issued February 19, 2008) ("Dhallan") (A1079–1358); and Binladen, *et al.*, PLoS One, 2(2):e197 (published in February, 2007) (A1359–67). A173–74.

## 1.    Shoemaker

Shoemaker, titled "Rare Cell Analysis Using Sample Splitting and DNA Tags," has a filing date of June 13, 2007, and publication date of April 17, 2008. A996 at [22], [43], [54]. The invention is directed to detecting fetal abnormalities

in a sample containing fetal and maternal cells by labeling regions of genomic DNA in each cell.  A1037 ¶ 7.  Shoemaker specifically teaches DNA sequencing to detect trisomy (*i.e.*, Down Syndrome) in fetal cells.  A1058 ¶ 225.

In connection with fetal trisomy analysis, Shoemaker teaches that "[t]he primers for each [Short Tandem Repeat ("STR") sequence] can be designed with two important features.  First, each primer can contain a common . . . sequence on the 5' end which can be used for the subsequent DNA cloning and sequencing procedures.  Second, each well in the microtiter plate can be assigned a unique . . . DNA tag sequence which can be incorporated into the middle part of the upstream primer for each of the different STRs . . . to pool all of the STR amplicons following the multiplex PCR, which makes possible to analyze the amplicons in parallel during the ultra-deep sequencing procedure."  A1058 ¶ 228.  Shoemaker thus teaches the addition of nucleotide sequences to the sequences from the cells being tested prior to sequencing and the additional step of using those sequences to physically separate the samples for additional analysis.  Claim 23 of Shoemaker specifically recites a method "wherein said amplifying comprises tagging said one or more genomic sequences to generate tagged genomic amplicons."  A1077.

### 2.    Dhallan

Dhallan, titled "Methods for Detection of Genetic Disorders," was filed on September 11, 2003, and issued on February 19, 2008.  A1079 at [22], [45], [54].

13

The invention provides a method for detecting genetic disorders, including chromosomal abnormalities, in a fetus. A1120 at 1:31–35. The specification expressly contemplates application of the claimed invention to identifying additional copies of chromosome 21, which results in Down Syndrome. A1120 at 2:17–21; *see also id.* at 2:25–40. Dhallan teaches that DNA sequencing of maternal blood samples is a better neonatal diagnostic method than earlier methods of neonatal testing (such as ultrasonography), and identifies the need for such a method as the object of the claimed invention. A1122 at 5:8–59. Dhallan's method provides for detecting chromosomal abnormalities in a fetus by (a) determining the sequence of an allele on a chromosome, (b) determining the ratio for the identified alleles relative to the sample, and (c) using the ratio to determine whether a chromosomal abnormality exists. *See* A1132 at 26:9–15.

### 3. Binladen

Binladen is a printed publication titled, "The Use of Coded PCR Primers Enables High-Throughput Sequencing of Multiple Homolog Amplification Products by 454 Parallel Sequencing." A1359. It was published in February, 2007, and teaches indexing DNA samples from multiple different sources and sequencing those multiplexed samples in a high-throughput manner. *Id.* In the study Binladen describes, mitochondrial DNA samples from thirteen species were extracted and pooled, and sequencing was performed to identify matches. A1360–

61, 1363–64. That study specifically used "conventional PCR with 5'-nucleotide tagged primers to generate homologous DNA amplification products from multiple specimens, followed by sequencing through the high-throughput Genome Sequence 20™ DNA Sequencing System (GS20, Roche/454 Life Sciences)." A1359; *compare* A137 at 11:10–29 (discussing Roche/454 sequencing). After sequencing, "[e]ach DNA sequence is subsequently traced back to its individual source through 5' tag-analysis." A1359.

In analyzing the sequencing results, Binladen explains that "[d]ue to the stringent screening criteria applied in this study, 458 (6.8%) of the 6765 initial sequences generated from a 1/8[th] of a plate run on the GS20 were identified as Primer Mismatch Sequences." A1364. The resulting 6307 matched sequences were identified by comparison to the reference sequences from the thirteen different species. *Id.* Of those, 5642 (89%) diverged by no more than 1bp (one pair of corresponding nucleotides) from one of the reference sequences. *Id.* A total of twenty sequences (0.4%) of the 6307 in the pool were misassigned; eleven of those twenty were of human origin. *Id.* Binladen ultimately concluded that "despite the possibility of sequencing (and other) errors, the assignment based on 5' tagging is remarkably reliable." *Id.*

#### 4.    The Level of Skill in the Art

In a section entitled State of the Art, the petition explained that "[m]ultiplexed massively parallel sequencing of a pooled sample (e.g., efficiently sequencing a mixed or pooled sample containing the DNA fragments from several different individuals after indexing the DNA fragments from each individual with a tag or barcode unique to a sample) were also well known and in widespread use as of 2010."  A179 (citing Morton Decl. ¶¶ 17–19 (A293–95); Nussbaum Decl. ¶¶ 19–23 (A874–76)).  This statement directly cited, *inter alia*, the declaration of Professor Nussbaum for his discussion of commercially available means of producing and analyzing indexed DNA samples from different sources.  A179 (citing A876 ¶¶ 21–23).

Professor Nussbaum specifically referenced the Illumina multiplexed sequencing platform, including the Illumina Genome Analyzer.  A876 ¶ 21.  In view of this well-known and widely-used technology, Professor Nussbaum explained that "as a molecular geneticist in 2008, I would have had the ability to order a commercially available kit for production of enriched and indexed libraries, which I could have analyzed on a commercially-available massively parallel sequencing platform sold by the same vendor.  Moreover, the software for sample identification and de-convolution of the multiplexed sequencing data would have been provided with the multiplexing kit and sequencing platform."  A876 ¶ 23.  In

16

other words, Professor Nussbaum referenced the same product documentation regarding the Illumina Genome Analyzer that is cited on the front page of the '430 patent.  A100 at [56].

### D.    Institution Decision

The Board made the determination, in view of the evidence cited above, "that there is a reasonable likelihood that Ariosa would prevail on the ground that" the challenged claims "are unpatentable as obvious over Shoemaker, Dhallan, and Binladen," and instituted review of claims 1–30 on that basis.  A73.  The Board specifically discussed Shoemaker's teachings with respect to tagging and sequencing pooled DNA samples.  A69–72.  It stated that "Shoemaker teaches labeling one or more regions of genomic DNA from the samples, amplifying highly polymorphic DNA region(s) (*e.g.*, SNPs) and quantifying the labeled region. . . . The method may include labeling each DNA region with a unique tag sequence which can be used to identify the presence or absence of a DNA polymorphism."  A69.

### E.    Board Decision

However, in its Final Decision, the Board took a different approach. Although it identified all three of these references, its analysis relied solely on Dhallan and Binladen and ignored Shoemaker, the primary reference cited in the petition and Institution Decision.

In truth, the Board based its decision on a single embodiment of the Dhallan reference, and concluded that the Dhallan embodiment could not be combined with the specific indexing methodology set forth in Binladen.  In so concluding, the Board specifically ignored the additional embodiments of Dhallan compatible with the indexing taught in Binladen and Shoemaker.  Specifically, the Board found that Dhallan's fetal diagnostic method would not be combinable with Binladen's indexing because the particular primers used in Dhallan and tags used in Binladen could not be used together.  A17.  The Board did not consider whether the tagging disclosed in Shoemaker would be combinable with the testing method taught in Dhallan.  *See* A10–19.  The Board also rejected evidence that use of massively parallel sequencing systems in combination with sample multiplexing was well known and even commercially available to persons of ordinary skill in the art before the priority date of the '430 patent.  The Board reasoned that such testimony would improperly replace the prior art references forming the basis for the asserted ground of unpatentability, and in doing so gave "no weight" to published evidence of the level of ordinary skill in the art.  A18–19.

In its Final Decision, the Board refused to consider the Multiplexed Sequencing Kit and the level of skill in the art with respect to indexing or tagging.  A19.  The Board refused to consider the Multiplexed Sequencing Kit because it was in the first instance presented as part of the level of skill in the art rather than

18

as an express part of the proposed ground of unpatentability.  The Board did not

consider any references to commercially-available massively parallel sequencing

products (*e.g.*, the Illumina Genome Analyzer, discussed above) disclosed in the

text of the '430 patent itself.  *See id.*

## SUMMARY OF THE ARGUMENT

The Board's finding of non-obviousness contravenes governing precedent in

several respects.

First, the Board committed legal error when it ignored this Court's precedent

and failed to consider the knowledge of one of skill in the art at the time of the

invention.  In *Randall*, this Court forbade such a blinkered approach, concluding

that the Board erred by ignoring record evidence demonstrating the knowledge and

perspective of a person of ordinary skill in the relevant art.  As in *Randall*, "[t]he

Board's failure to consider that evidence—its failure to consider the knowledge of

one of skill in the art appropriately—was plainly prejudicial."  *Id.* at 1363.

Second, the Board compounded that legal error by failing to apply the

Supreme Court's holding in *KSR*.  Contrary to *KSR*, the Board focused narrowly on

the explicit teachings of the prior art references, requiring an explicit motivation to

combine those specific references and ignoring the common sense a person of

ordinary skill would employ when combining known technologies.  In doing so,

the Board also failed to compare the prior art against what the claims actually require. This too constitutes legal error and warrants reversal.

Third, the Board erred in failing to articulate its factual findings and rationale with respect to obviousness as required by the Administrative Procedure Act § 706. *Lee*, 277 F.3d at 1343–44. The Board arbitrarily picked one particular combination of references—Dhallan and Binladen—and analyzed that combination to the exclusion of the Shoemaker reference that was the basis for the petition and the Institution Decision. The procedural context of IPR—specifically, the fact that the Board's decision to institute review gives rise to estoppel against the petitioner—means that the Board's failure to address each of the challenges before it deprives the petitioner of any opportunity to have those claims meaningfully and explicitly adjudicated. That preclusive effect requires the Board to comply with the requirements of the APA.

Finally, the Board also erred in its finding that Dhallan could not be combined with the tagging taught in Binladen or modified to accommodate other known methods of tagging DNA samples. The evidence of record contradicts the Board's finding and demonstrates that it lacks substantial support from the record.

# ARGUMENT

## I.   STANDARD OF REVIEW

On appeal, this Court reviews the Board's ultimate determination of

obviousness under § 103 *de novo* as a question of law and its underlying factual

determinations for substantial evidence.  *In re Cuozzo Speed Techs., LLC*, No.

2014-1301, 2015 WL 448667, at *9 (Fed. Cir. Feb. 4, 2015) (citing *In re Baxter

Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012); *Graham v. John Deere Co.*, 383

U.S. 1, 17–18 (1966)).  Factual findings underlying an obviousness determination

include: (1) the scope and content of the prior art; (2) the differences between the

claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4)

any objective indicia of non-obviousness.  *Graham*, 383 U.S. at 17–18.

While obviousness is often dependent on subsidiary facts, in this case the

Board did not make required factual determinations on the issue that is the subject

of this appeal.

## II.   THE BOARD'S DETERMINATION OF NON-OBVIOUSNESS IS LEGALLY ERRONEOUS UNDER FEDERAL CIRCUIT AND SUPREME COURT PRECEDENT

The Board's obviousness decision should be reversed for legal error because

it failed to apply the legal framework required by governing Federal Circuit and

Supreme Court law.

## A.    The Board Erred in Failing to Consider the Knowledge of a Person of Ordinary Skill in the Art at the Time of the '430 Patent's Priority Date

The Federal Circuit has held that the "failure to consider the knowledge of one of skill in the art appropriately" in making a determination of non-obviousness is "plainly prejudicial." *Randall*, 733 F.3d at 1363.  In *Randall*, the Board refused to consider background references that a reexamination requestor submitted in responsive briefing because the references were not part of the proposed obviousness combination.  *Id.* at 1361.  The Federal Circuit vacated the decision on the ground that the Board's refusal to consider those references was legal error.  *Id.* at 1364.  Although the overlooked references were not part of the proposed obviousness combination, they demonstrated knowledge that persons of ordinary skill in the art would have possessed.  Therefore, the Board erred by refusing to give any weight to that evidence.

*Randall* makes explicit that governing precedent "require[s] an analysis that reads the prior art in context, taking account of 'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ,'" and that this approach "'not only permits, but *requires*, consideration of common knowledge and common sense.'"  *Randall*, 733 F.3d at 1362 (quoting *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick*

*Co.*, 464 F.3d 1356, 1367 (Fed. Cir.2006)) (emphasis in original).  By failing to consider evidence of an ordinarily skilled artisan's knowledge in *Randall*, the Board "ran afoul of that basic mandate." *Id.* at 1362.

Here, the Board made the same type of error that required vacatur of its decision in *Randall*: it turned a blind eye to record evidence showing what a person of ordinary skill would have known years before the '430 patent's priority date. By ignoring references indicative of the level of ordinary skill in the art, the Board ignored "documentary evidence consisting of prior art in the area" that is "perhaps the most reliable [evidence] because [it is] not litigation-generated." *Id.* at 1362–63.  In particular, the Board failed to consider the teachings of the Shoemaker and Illumina Genome Analyzer references, discussed below, in their treatment of indexing or tagging DNA samples.

### 1. The Board Erred in Ignoring Evidence that Shoemaker Taught Indexing of DNA Samples

The Board's error is even more manifestly apparent here than in *Randall* because it ignored relevant teachings in one of the cited obviousness references— Shoemaker—on which its own Institution Decision had relied.  At the time of its Institution Decision, the Board acknowledged that Shoemaker taught tagging or labeling DNA samples prior to sequencing, and found the challenged claims likely unpatentable partly on that basis.  A69–70.  As the Board explained, "Shoemaker teaches labeling one or more regions of genomic DNA from the samples,

23

amplifying highly polymorphic DNA region(s) (*e.g.*, SNPs), and quantifying the labeled DNA region. . . . The method may include labeling each DNA region with a unique tag sequence, which can be sued to identify the presence or absence of a DNA polymorphism."  A69 (citing A1038 ¶ 13, A1047 ¶ 119, A1050 ¶ 147); *see also* A1039 ¶ 27 ("The amplifying can comprise tagging the one or more genomic sequences to generate tagged genomic amplicons."); A353–54 ¶ 70 ("Shoemaker generates enriched and indexed libraries.").[2]

However, in its Final Decision, the Board completely ignored the Shoemaker reference for the purpose of providing evidence that methods of tagging DNA samples were known before the purported invention of the '430 patent.  For example, the Board stated "[s]pecifically, Patent Owner argues that Binladen's tagging method would not have been combinable with Dhallan's use of

---

[2] Dr. Morton specifically explained that the tagging disclosed in Shoemaker was applicable to a range of amplification methods "including, but not limited to, quantitative PCR, quantitative fluorescent PCR (QF-PCR), multiplex fluorescent PCR (MF-PCR), real time PCR (RT-PCR), single cell PCR, restriction fragment length polymorphism PCR (PCR-RFLP), PCR-RFLP/RT-PCR-RFLP, hot start PCR, nested PCR, in situ polony PCR, in situ rolling circle amplification (RCA), bridge PCR, picotiter PCR and emulsion PCR.  Other suitable amplification methods include the ligase chain reaction (LCR), transcription amplification, self-sustained sequence replication, selective amplification of target polynucleotide sequences, consensus sequence primed polymerase chain reaction (CP-PCR), arbitrarily primed polymerase chain reaction (AP-PCR), degenerate oligonucleotide-primed PCR (DOP-PCR) and nucleic acid sequence based amplification (NASBA)."  A354 (quoting Shoemaker ¶ 119 (A1047)).  In comparison, Example 4 of the '430 patent also discusses indexing sequences through "nested PCR."  A142 at 22:9–19.

restriction digestible primers." A12. The Board made no reference to *any* of Shoemaker's teachings with respect to tagging or indexing DNA sequences as it had in the Institution Decision. A8–19; A67–74. While it concluded that Dhallan could not be combined with the tagging taught in Binladen, the Board did not even consider the question of whether those references could be combined with the tagging techniques disclosed in Shoemaker, thereby rendering the indexed sequences of the '430 patent obvious. A10–16. Critically, that conclusion rests on no factual findings with respect to Shoemaker's disclosure of tagging, but rather on the Board's failure to even consider Shoemaker for that purpose. That failure constitutes legal error.

> ### 2. The Board Erred in Ignoring Evidence of the Background Knowledge Regarding the Illumina Genome Analyzer a Person of Ordinary Skill Would Have With Respect to DNA Indexing

The Board further erred in ignoring record evidence showing the background knowledge of an ordinarily skilled practitioner just as it erroneously did in *Randall*. Every piece of evidence before the Board provided specific insight into the knowledge of one of skill in the art—the challenged patent, all three references in the proposed obviousness combination, and the accompanying expert declarations and exhibits. The Board erroneously narrowed the scope of its review to exclude *any* consideration of background knowledge in the art.

To find evidence showing that persons or ordinary skill knew how to tag or index genomic DNA, one need look no further than the '430 patent itself. As explained in the Background of the Invention, DNA sequencing and identification technology already existed: "Massively parallel sequencing techniques are used for detection of fetal aneuploidy from samples that comprise fetal and maternal nucleic acids." A132 at 1:23–25. The '430 patent cites a 2008 publication, "Multiplexed Sequencing with the Illumina Genome Analyzer System," A100 at [56], which discusses then-existing technology for indexing and sequencing multiple DNA samples at once. *See also* A989. It also cites four other printed publications whose very titles reference the Illumina system. A101–02. Other cited publications also describe commercially available systems for identifying numerous DNA sequences at once. *See, e.g.*, A102.

Although the Board, in its Final Decision, refused to consider expert testimony related to common knowledge of the Illumina Genome Analyzer system on the ground that such evidence was introduced in Petitioner's reply declaration, *see* A17–19, the fact remains that the Illumina system is part of the intrinsic record, and thus was properly before the Board. The '430 patent cites the above publication discussing Illumina, and repeatedly references the Illumina system as preexisting technology that enabled the claimed invention to be practiced. *See, e.g.*, A136 at 10:27–29 ("sequencing technology that can be used in the methods of

the provided invention is SOLEXA sequencing (Illumina)"); A133 at 3:22–24

(sequencing can be performed "using an Illumina Genome Analyzer sequencer,");

and A138 at 14:17–19 (extending the length of sequences "can facilitate SOLEXA

sequencing").

Moreover, evidence attesting to the commercial uses of the Illumina system

was submitted with the petition, and not only with the Reply, as the Board's Final

Decision suggests, *see* A17.  Indeed, the Board expressly acknowledged the

Illumina Genome Analyzer in the Institution Decision and ascribed it to the prior

art.  A71 ("Shoemaker teaches amplifying DNA regions and analyzing them by

sequencing methods, including by the Illumina Genome Analyzer.").  Submitted

with the petition was a declaration from Ariosa's expert (Dr. Nussbaum), which

spent nine paragraphs discussing prior art sequencing and indexing techniques, and

two focusing specifically on the Illumina system.  A874–76 ¶¶ 17–23.  The

petition cited those same portions of the declaration to support its assertion that

"[m]ultiplexed massively parallel sequencing of a pooled sample (*e.g.*, efficiently

sequencing a mixed or pooled sample containing the DNA fragments from several

different individuals after indexing the DNA fragments from each individual with a

tag or barcode unique to a sample) were also well known and in widespread use as

of 2010."  A179; A876 ¶¶ 21–23.  Evidence attesting to the Illumina system was

thus before the Board from the filing of the petition.

27

The Board alternatively indicated that its reason for ignoring *all* evidence of the Illumina system was to avoid substituting that system for the cited Dhallan and Binladen references (the Board said nothing about Shoemaker).  *See* A19 ("This testimony, in effect, replaces the tagging and sequencing techniques of Dhallan and Binladen with the Illumina indexing kit and sequencing platform . . . .").  However, this Court rejected that very argument in *Randall*, explaining that "[t]he significance of those and other references did not depend on any attempt to change the combination . . . rather, the references constitute important evidence of the state of the art and the context in which the Examiner-cited combination should be evaluated."  *Id.* at 1363.  The references properly before the Board, including the '430 patent and the overlooked Shoemaker reference, as well as the petition and accompanying submissions, similarly constitute important evidence showing the context and state of the art.  Just as in *Randall*, a cursory look at that evidence demonstrates that there is no question that techniques for tagging DNA samples prior to sequencing were known and used by those of ordinary skill before 2010.

### 3. The Board's Failure to Consider Evidence of the Knowledge of One of Ordinary Skill in the Art Warrants Vacatur

The Board's failure to consider *any* of the above evidence—Shoemaker, the other embodiments described in Dhallan, or the Illumina system cited and described in the '430 patent—constitutes legal error.  This error is the same as in

*Randall*: the Board narrowly focused on a subset of the evidence before it (here, not even the full array of cited prior art references) and ignored evidence concerning the knowledge of a person of ordinary skill in the art at the time of the claimed invention.  The Board was obligated to consider record evidence demonstrating that other tagging methods were known before 2010.  The Board ignored "record evidence [Petitioner] cited to demonstrate the knowledge and perspective of one of ordinary skill in the art," and thus erred in failing to consult evidence that "must be consulted when considering whether a claimed invention would have been obvious."  *Randall*, 733 F.3d at 1362; *see also In re Taylor Made Golf Co.*, 589 F. App'x 967, 971 (Fed. Cir. 2014) (vacating and remanding because "neither the Examiner nor the Board considered the record evidence" as to what was "common knowledge at the time of the invention and was disclosed even in the specific prior art references considered by the Board").

**B.     The Board Failed to Apply *KSR* When Assessing the Combinability of Prior Art References and the Scope of the Prior Art**

The Board also committed legal error in applying an obviousness standard that on its face contravenes the framework set out by the Supreme Court in *KSR*. In *KSR*, the Supreme Court emphasized that "our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its [teaching, suggestion, or motivation] test here."  *Id.* at 415.  Consistent with such

an approach, a teaching, suggestion, or motivation may come from "design incentives and other market forces . . . either in the same field or a different one." *Id.* at 417.  As the Court explained, the touchstone of obviousness is whether "a person of ordinary skill can implement a predictable variation."  *Id.*  When determining whether an invention that combines previously known elements is patentable, "a court ***must*** ask whether the improvement is more than the predictable use of prior art elements according to their established functions."  *Id.* (emphasis added).

Here, the Board violated that mandate by failing to "take account of the inferences and creative steps that a person of ordinary skill in the art would employ" to modify the prior art to meet the claim limitations of the '430 patent. *Id.* at 418.  The Board recognized that the prior art references, in combination, satisfied all of the claim limitations, but concluded that the claims were not obvious because there was no express formulation for "how one of ordinary skill in the art would go about combining their disparate elements, or what modifications of ordinary skill in the art would necessarily have made in order to combine the disparate elements" of the prior art references.  A16.  In particular, the Board took the position that Binladen's particular tagging method was not compatible with the method of testing cell-free fetal DNA taught in Dhallan, and therefore determined that the combination would not have been obvious.  A16–18.

The Board's analysis of Binladen is strikingly similar to the analysis the Court rejected in *KSR*. There, the Federal Circuit had reversed the district court's finding of obviousness on the ground that a person of ordinary skill would not have physically combined a bulky, expensive (non-electronic) prior art pedal with a modular sensor designed for smaller, cheaper (electronic) pedals. *KSR*, 550 U.S. at 424. The Supreme Court rejected the notion that a person of skill in the art was narrowly limited to the four corners of the prior art, and held that, instead, the "proper question to have asked was whether a pedal designer of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to upgrading" the prior art to include the features claimed in the challenged patent. *Id.*

Here, the Board did not ask—let alone answer—the question whether testing for fetal aneuploidy using massively parallel sequencing and multiplex techniques would be a predictable combination of prior art elements. Instead, it rejected the Petitioner's evidence for failing to provide a step-by-step explanation of how to combine the specific constructs found in the prior art. *See* A16. In so doing, the Board ignored Petitioner's argument that "a skilled artisan would also have readily understood that Shoemaker's methods for determining the presence of fetal abnormalities could be carried out with the use of cell-free DNA described in Dhallan and the multiplexed detection techniques taught in Binladen." A209

31

(citing Nussbaum Declaration ¶¶ 109–165 (A910–32); First Morton Declaration ¶¶ 98–129 (A349–81)).

The Board also ignored the common sense and common knowledge of a person of ordinary skill in combining the elements of the prior art, in direct contravention of *KSR*, which emphasizes "the need for caution in granting a patent based on the combination of elements found in the prior art."  *KSR*, 550 U.S. at 415–16.  The Board's approach is similarly inconsistent with this Court's precedent.  For example, in *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007), this Court upheld an obviousness determination even though the prior art references did not, alone or together, disclose a particular claim limitation (generating a sound for a single letter), but rather a variation (generating a sound for an entire word).  *Id.* at 1162.  This Court in *Leapfrog* invoked "the common sense of those skilled in the art [which] demonstrates why some combinations would have been obvious where others would not."  *Id.* at 1161–62.  It also followed *KSR* in looking for motivations beyond any single prior art reference, including those found generally in the art, such as "providing an added benefit and simplified use . . . to increase its marketability."  *Id.* at 1162.  Here, the Board failed to consider the common sense of those skilled in the art in combining prior art elements or motivations to combine that would arise generally in the field.  Having identified variations between the prior art references, the Board did not

then consider whether those variations would be obvious and easily overcome by a person of ordinary skill in the art. *See* A14–16.

There is no requirement that evidence of a motivation to combine be provided in synthesized or documentary form. *PerfectWeb Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) ("an analysis of obviousness . . . may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion"). While an obviousness rejection requires record evidence for prior art disclosures of particular claim limitations, no such evidence is required to show that such references would be combined. *Id.*; *see also K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014). The Federal Circuit articulated this distinction in *K/S Himpp*, where it affirmed a non-obviousness finding because of the lack of record evidence for a particular claim limitation. At the same time, this Court distinguished the situation in that case from *KSR*, explaining that "[i]n contradistinction to *KSR*, this case involves the lack of evidence of a specific claim limitation, whereas *KSR* related to the combinability of references where the claim limitations were in evidence." *K/S Himpp*, 751 F.3d at 1366. Unlike in *K/S Himpp*, the record here contains evidence of prior art that corresponds to each and every claim limitation. As in *Perfect Web*, common sense may therefore be invoked because the only question is whether a person of ordinary skill in the art

would have a reasonable expectation of success in combining references that are in evidence. The Board's failure to apply this approach is reversible legal error.

Notably, the Board's analysis here relied on a pre-*KSR* case, *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006), and did not cite a single post-*KSR* case from this Court in support of its approach. *See* A1–20. And even in *Kahn*, this Court rejected arguments that echo the Board's reasoning here. Specifically, *Kahn* recognized that "even if applying [the prior art references in combination] resulted in a device that would be less effective for the purpose intended by [one of the references], the teaching of [the latter] reference is not limited to the specific invention disclosed." *Id.* at 990. But here the Board explicitly relied on arguments about the efficacy (rather than operability) of Binladen's tags for neonatal testing. As the Board explained, based on "Patent Owner's contentions regarding the unsuitability of Binladen's tags due to a high rate of sequencing errors and variation in sequence distribution," it rejected Dr. Morton's testimony that "one of ordinary skill . . . would be able to easily apply the teachings of Binladen to optimize the tags to decrease the error rate and increase the accuracy of putative sample tags." A15 (quoting Second Morton Declaration ¶¶ 27, 29 (A1473–75)). Yet *Kahn* and *KSR* both establish that the efficacy of a feature disclosed in a reference is not a reason to disregard the substance of its teachings with respect to that feature.

Even if the efficacy of Binladen's testing could in some circumstances be relevant to an obviousness analysis, it is not relevant here. The obviousness analysis turns on the "objective reach" of the claims, which say nothing about the efficacy of the DNA indexing process. *KSR*, 550 U.S. at 419. The claims of the '430 patent recite no particular efficacy range, level, or limitation with respect to tagging or labelling: they require only "indexed" or "indexing" sequences. *See, e.g.*, A163 at 63:22, 63:25 (claim 1). Unrecited, unclaimed features, such as efficacy, are not relevant to the obviousness of the invention the '430 patent actually claims. *KSR*, 550 U.S. at 419 ("What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103."); *see also In re Cuozzo*, 2015 WL 448667, at *9 ("It is a 'long-established rule that claims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter.'") (internal quotation marks omitted).

The Board's decision should be overturned because it is the result of the Board ignoring *KSR* and taking precisely the kind of rigid approach it rejected as inconsistent with and impermissible under the requisite obviousness analysis.

### III.  THE BOARD'S FAILURE TO ARTICULATE ITS REASONING CONSTITUTES AGENCY ERROR UNDER THE ADMINISTRATIVE PROCEDURE ACT § 706

This Court has held that the Board's findings and conclusions are reviewed in accordance with 5 U.S.C. § 706(2).  *Lee*, 277 F.3d at 1342.  "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements, instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness. . . . This requirement is as much rooted in the Administrative Procedure Act, which ensures due process and non-arbitrary decision-making, as it is in § 103."  *Kahn*, 441 F.3d at 988 (internal citations omitted).  The APA exists to ensure meaningful judicial review of agency decision-making.  This Court has held that in order to facilitate that review, "[t]he agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts."  *Lee*, 277 F.3d at 1342.

In *Lee*, the Board's finding of obviousness was overturned because the Board failed to meet that standard.  The Court explained that the "[o]mission of a relevant factor required by precedent is both legal error and arbitrary agency action," and that the "[B]oard cannot rely on conclusory statements when dealing with particular combinations of prior art and specific claims, but must set forth the rationale on which it relies."  *Id.* at 1344, 1345; *see also Kahn*, 441 F.3d at 987–88

(A "teaching, suggestion, or motivation to combine the relevant prior art teachings does not have to be found explicitly in the prior art," but "rejections on obviousness grounds cannot be sustained by mere conclusory statements.").

Here, the Board misunderstood this requirement when it cited *Kahn* for the proposition that "[w]hat is lacking in the Petition and accompanying Declarations is an 'articulated reason[] with some rational underpinning to support the legal conclusion of obviousness.'"  A16 (quoting *Kahn*, 441 F.3d at 988).  That requirement does not refer to a ***challenger's*** burden of proving obviousness, but rather to the ***Board's*** obligation to articulate its findings and reasons pursuant to the Administrative Procedure Act.  *Kahn*, 441 F.3d at 988.  To be sure, a petitioner in an IPR proceeding must support its proposed grounds for invalidity by a preponderance of the evidence, but in evaluating that evidence, the Board must provide a record that can facilitate meaningful judicial review and ensure due process of law.  Here, the Board violated the APA requirement established in *Lee* and confirmed in *Kahn* by failing to articulate any factual findings as to the knowledge of a person of ordinary skill in the art with respect to labelling DNA samples, and by failing to articulate any reason for rejecting the obviousness combination of Shoemaker, Dhallan, and Binladen, on the basis of which it had previously instituted review.

37

The Board's silence raises due process concerns that are particularly compelling because the Board's decision to institute review based on the proposed combination of Shoemaker, Dhallan, and Binladen estops Ariosa from raising that invalidity argument in any subsequent district court proceeding. *See* 35 U.S.C. § 315(e). At the very least, the Board was obligated to address the combination of references for which it instituted review, including Shoemaker, and to explain why it found those combinations to be deficient. The Board's failure to make its findings and analysis explicit violates the requirements of the APA and governing precedent and requires this Court to remand to the Board for further findings. *Lee*, 277 F.3d at 1344; *In re Thrift*, 298 F.3d 1357, 1366 (Fed. Cir. 2002) (vacating and remanding where "the *Chenery* rule is implicated because the Board failed to provide an adequate ground" for its decision); *see also Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012) (citing *Lee*, 277 F.3d at 1345–46, and remanding for Commerce to reconsider and explain calculation of anti-dumping duty).

## IV.   THE BOARD'S DECISION AS TO THE IMPOSSIBILITY OF COMBINING DHALLAN AND BINLADEN LACKS SUBSTANTIAL EVIDENTIARY SUPPORT

In addition to the numerous legal errors described above—each of which standing alone warrants reversal of the Board's Final Decision—that Decision is also factually flawed. Specifically, the Board's determination that Binladen's

method of tagging DNA sequences would not be compatible with Dhallan's
neonatal testing methods lacks substantial support.  In its Decision, the Board
explicitly refused to consider prior art teachings on the procedural premise that
Petitioner did not present those embodiments at the appropriate time.  Specifically,
the Board did not consider multiple embodiments of Dhallan that were compatible
with Binladen (and Shoemaker) on the basis that "those portions of Dhallan were
not identified or discussed in the Petition or the accompanying declarations."  A17.

That determination is wrong.  The petition explicitly cited and relied on
embodiments of Dhallan that incorporate various techniques for determining the
nucleotides in a particular DNA sequence.  *See* A189, 215 (citing Dhallan at 36:6–
14 (A1137)); *see also* A359–61 ¶ 110 (describing types of sequencing and
selective amplification taught in Dhallan); A888 ¶ 52 & A918–19 ¶¶ 131–32
(describing various sequencing methods taught in Dhallan).  As one cited portion
of Dhallan teaches, "[a]ny method that provides information on the sequence of a
nucleic acid can be used including but not limited to allele specific PCR, PCR, gel
electrophoresis, ELISA, mass spectrometry, MALDI-TOF mass spectrometry
hybridization, primer extension, fluorescence detection, fluorescence resonance
energy transfer (FRET), fluorescence polarization, DNA sequencing, Sanger
dideoxy sequencing, DNA sequencing gels, capillary electrophoresis on an
automated DNA sequencing machine, microchannel electrophoresis, microarray,

southern blot, slot blot, dot blot, single primer linear nucleic acid amplification . . . ." A1137 at 36:6–15. This description demonstrates that Dhallan's method is compatible with numerous detection techniques—including sequencing techniques that do not incorporate the feature that purportedly renders Dhallan incompatible with Binladen—restriction digestible primers (i.e., primers designed to include a recognition site for a restriction enzyme). *See* A1479 ¶ 34.

Although the patent owner's expert, Dr. Butte, characterized restriction digestible primers as "critical" to Dhallan's method, *see* A1429–30 ¶¶ 215, 217, Dr. Butte's statements do not support that conclusion. According to Dr. Butte, restriction digestible primers are not technically necessary to detect matching DNA fragments, only to do so in a particular way. As he explains, "this particular primer design approach is necessary for Dhallan's goal of limiting sequence identification to one or a few nucleotides." A1430 ¶ 217; *see also id.* ¶ 218 (such primers allow for "limited sequencing"). Dr. Butte does not even suggest that restriction digestible primers are necessary for identifying sequences, only for doing so without identifying a large number of nucleotides in the process. Moreover, Dr. Butte does not provide evidence that a restriction *digestible* primer must necessarily be *digested* regardless of the purpose for which it is used. Dr. Butte does not opine that one ordinarily skilled in the art would necessarily use an enzyme to digest a primer to which a tag or index had previously been added.

There is no evidence that Dhallan requires such a feature and Dhallan itself says it does not.

Dr. Butte's declaration simply does not address, let alone disparage, the other teachings in Dhallan with respect to identifying sequences using allele specific PCR, primer extension, DNA sequencing, or single primer linear nucleic acid amplification. *See* A1137 at 36:6–15 (cited in Petition at 21, 47 (A189, 215)). Given the embodiments and teachings showing that Dhallan's method could be combined with techniques including those taught in Binladen, the Board's conclusion lacks substantial evidentiary support.

## CONCLUSION

The Board here adopted a rigid and formulaic approach that resulted in a failure to consider relevant evidence: precisely the opposite of the "flexible and expansive" approach required by *KSR* and this Court's precedent. This legal error was compounded by the Board's failure to articulate its factual findings and finding in contravention of the APA. The finding the Board did make as to Dhallan and Binladen lacks substantial support because of evidence showing that Dhallan did not even require the feature that purportedly made it incompatible with Binladen. By ignoring the requisite legal factors, cited prior art references, and evidence of background knowledge in the art, the Board fundamentally erred in finding the '430 patent claims not obvious. That decision requires reversal.

DATED:  March 9, 2015                Respectfully submitted,

        /s/ Mark A. Lemley

        MARK A. LEMLEY
        mlemley@durietangri.com
        DURIE TANGRI LLP
        217 Leidesdorff Street
        San Francisco, CA 94111
        Telephone:  415-362-6666
        Facsimile:   415-236-6300
        *Attorneys for Appellant*
        *Ariosa Diagnostics, Inc.*

# ADDENDUM

Trials@uspto.gov                                          Paper No. 43
571-272-7822                                    Entered: October 23, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

ARIOSA DIAGNOSTICS,
Petitioner,

v.

VERINATA HEALTH, INC.,
Patent Owner.

————————

Case IPR2013-00276
Patent 8,318,430 B2

————————

Before TONI R. SCHEINER, LORA M. GREEN, and RAMA G. ELLURU,
*Administrative Patent Judges*.

SCHEINER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

I. INTRODUCTION

*A. Background*

Ariosa Diagnostics, Inc. ("Petitioner") filed a Petition requesting *inter
partes* review of claims 1–18 of U.S. Patent No. 8,318,430 B2 (Ex. 1001,
"the '430 patent") pursuant to 35 U.S.C. §§ 311–319.  Paper 1 ("Pet.").
Verinata Health, Inc., ("Patent Owner") filed a Preliminary Response.  Paper

IPR2013-00276
Patent 8,318,430 B2

10.  On the basis of the Petition and the Preliminary Response, the panel
determined that Petitioner had demonstrated a reasonable likelihood of
prevailing with respect to at least one of the challenged claims, and on
October 25, 2013, an *inter partes* review of claims 1–18 was instituted on
the asserted ground that the claims would have been unpatentable over the
combined teachings of Shoemaker, Dhallan, and Binladen.  Paper 11
("Dec.").[1]

　　　After institution of trial, Patent Owner filed a Patent Owner Response
(Paper 20, "PO Resp."), to which Petitioner filed a Reply (Paper 26).  Oral
argument was requested by both parties, and was held on July 16, 2014.  A
transcript of the oral hearing is included in the record.  Paper 42, "Tr."

　　　Both parties presented witness testimony via declaration during the
course of the proceeding.  Petitioner presented the Declarations of Dr.
Cynthia Casson Morton (Ex. 1002, "Morton Decl.") and Dr. Robert
Nussbaum (Ex. 1003, "Nussbaum Decl.") with the Petition.[2]  Patent Owner
presented the Declaration of Dr. Atul J. Butte (Ex. 2003, "Butte Decl.") with
its Patent Owner's Response.  Finally, with its Reply, Petitioner presented
the Second Declaration of Dr. Morton.  Ex. 1042 ("Second Morton Decl.").

　　　The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written
Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73,
addresses issues and arguments raised during trial.  For the reasons
discussed below, we determine that Petitioner has not met its burden to

---

[1]  Patent Owner did not address this asserted ground in its Preliminary
Response.
[2]  All references to Exhibits 1002 and 1003 are to the replacement
Declarations filed on March 31, 2014, unless otherwise indicated.

2

prove, by a preponderance of the evidence, that claims 1–18 of the '430 patent are unpatentable.

### B. Related Matters

The '430 patent is the subject of a civil action, *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, Case No. 3:12-cv-05501-S1 (N.D. Cal.), filed October 25, 2012.  Paper 39.  Furthermore, concurrent with the instant Petition, Petitioner filed another petition challenging claims 19–30 of the '430 patent, IPR2013-00277.

### C. The '430 Patent

The '430 patent discloses a method for determining the presence or absence of fetal aneuploidy—a condition in which a fetus carries an abnormal number of chromosomes—by determining the relative amounts of non-random polynucleotide sequences from a chromosome suspected of being aneuploid, and from a reference chromosome or a chromosome control region, in a cell-free sample from a pregnant woman.  Ex. 1001, 1:23–27, 2:10–11, 13:9–12, 19:18–19.  The '430 patent further discloses determining simultaneously the presence or absence of fetal aneuploidy in pooled, indexed cell-free samples from a plurality of pregnant women, using massively parallel sequencing.  *Id.* at 1:23–25, 1:66–67.

Briefly, cell-free samples (e.g., maternal serum or plasma) containing both maternal and fetal nucleic acid fragments are obtained from a plurality of pregnant women.  *Id.* at 1:41–44.  In each sample, non-random polynucleotide sequences from a chromosome suspected of being aneuploid, and non-random sequences from a reference chromosome or chromosome control region, are enriched selectively and indexed (i.e., tagged for later

IPR2013-00276
Patent 8,318,430 B2

identification as originating from a particular sample). *Id.* at 22:9–15. The enriched, indexed samples are pooled, and the enriched, indexed nucleic acids are sequenced by massively parallel sequencing to produce sequence reads. *Id.* The number of sequence reads from the chromosome suspected of being aneuploid, and the number of sequence reads from the reference chromosome or a chromosome control region, are counted, and the two numbers are compared to determine whether there is an abnormal level of DNA associated with the chromosome suspected of being aneuploid. *Id.* at 1:45–48, 17:53–59. As discussed above, indexing allows results from different samples to be distinguished. Ex. 1001, 22:10–15.

### D. Illustrative Claim

Of challenged claims 1–18, claim 1 is the only independent claim. Claim 1, reproduced below, is illustrative.

> 1. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:
>
> (a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;
>
> (b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples, wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-

4

random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome, wherein the first chromosome tested for being aneuploid and the reference chromosome are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length,

(c)  pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

(d)  performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the reference chromosome;

(e)  based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the reference chromosome; and

(f)  for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the first chromosome and a number of enumerated sequence reads corresponding to the reference chromosome of (e).

IPR2013-00276
Patent 8,318,430 B2

*E.  The Prior Art*

Petitioner relies on the following prior art:

Shoemaker   US 2008/0090239 A1     Apr. 17, 2008     (Ex. 1008)

Dhallan        US 7,332,277 B2         Feb. 19, 2008     (Ex. 1004)

Jonas Binladen et al., *The Use of Coded PCR Primers Enables High-Throughput Sequencing of Multiple Homolog Amplification Products by 454 Parallel Sequencing,* 2 PLoS ONE 1–9 (2007) (Ex. 1005) ("Binladen").

*F. Grounds of Unpatentability Instituted for Trial*

The Board instituted *inter partes* review based on the following ground of unpatentability:

Claims 1–18 under 35 U.S.C. §103(a) as unpatentable over the combination of Shoemaker, Dhallan, and Binladen.

## II. ANALYSIS

*A. Claim Construction*

In the Decision on Institution, the panel construed several claim terms (Dec. 7–11), all of which appear in claim 1: (1) "selectively enriching a plurality of non-random polynucleotide sequences;" (2) "at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome;" (3) "sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences;" (4) and "reference chromosome."  We determine it is not necessary to depart from those claim constructions for purposes of this decision.

IPR2013-00276
Patent 8,318,430 B2

*B. Principles of Law*

To prevail in its challenge to the patentability of the claims, Petitioner must prove unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 18 (1966). An invention "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Moreover, a rejection on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418.

We analyze the instituted grounds of unpatentability in accordance with those principles.

IPR2013-00276
Patent 8,318,430 B2

### C. Alleged Obviousness over Shoemaker, Dhallan, and Binladen

Petitioner asserts that claims 1–18 of the '430 patent are unpatentable under 35 U.S.C. § 103(a) as having been obvious over the combination of Shoemaker, Dhallan, and Binladen. Petitioner asserts that the combination of Shoemaker, Dhallan, and Binladen teaches all the limitations of the claimed subject matter (Pet. 40–55), and relies, initially, on the Declaration of Dr. Morton (Ex. 1002), as well as the Declaration of Dr. Nussbaum (Ex. 1003), for a rationale to combine those elements. Patent Owner disagrees with Petitioner's assertions (PO Resp. 4–55) and relies on the Declaration of Dr. Butte (Ex. 2003) as evidence that it would not have been obvious for one of ordinary skill in the art to combine the teachings of the references relied on.

### 1. Shoemaker (Exhibit 1008)

Shoemaker discloses detection and genetic analysis of fetal cells in a blood sample from a pregnant woman—a maternal blood sample—which contains both fetal and maternal cells. Ex. 1008 ¶¶ 13, 71. Genetic analysis of the fetal cells may include determination of the presence or absence of fetal aneuploidy, such as trisomy of chromosome 21, 18, or 13. Ex. 1001 ¶¶ 71, 107, 108. Multiple samples may be obtained from the same individual at different times during the course of the pregnancy (*id.* ¶ 108), but Shoemaker does not disclose pooling the multiple samples with each other, or pooling samples from other individuals. Nor does Shoemaker disclose analyzing a cell-free sample.

Specifically, Shoemaker's method involves enriching fetal cells in the maternal blood sample and distributing them among an array of discrete, addressable locations, e.g., the wells of a microtiter plate, such that each well

8

IPR2013-00276
Patent 8,318,430 B2

contains either one fetal cell, or none at all.  *Id.* ¶¶ 107–110.  Genomic
regions, i.e., loci, of interest are chosen "on a chromosome suspected of
trisomy and on a control chromosome," and the loci are amplified and
tagged with locator elements (short nucleic acid sequences incorporated into
amplification primers).  *Id.*¶¶ 114–118.  The locator elements "make[] it
possible to pool the amplicons from all the discrete locations following the
amplification step and analyze the amplicons in parallel."  *Id.* ¶¶ 118, 119.
After the amplicons are analyzed—i.e., sequenced—the locator elements of
the tags are used to sort the sequence reads into "bins" which correspond to
the individual wells of the microtiter plate (and thus, the cell(s) in that well),
and the sequence reads from the bins are used to determine allele abundance,
which in turn, is used to determine aneuploidy.  *Id.* ¶¶ 138, 140.

### 2. Dhallan (Exhibit 1004)

Dhallan discloses non-invasive detection of chromosomal
abnormalities, including fetal aneuploidy, in cell-free maternal blood
samples.  Ex. 1004, 5:63–6:14.  Dhallan does not disclose indexing the
samples, or pooling samples from multiple individuals.

Briefly, Dhallan's method involves amplifying loci of interest with
multiple primer sets.  Ex. 1004, 47:63-65, 48:64.  Loci of interest may be
single nucleotide polymorphisms (SNPs).  *Id.* at 25:1-10.  The primers may
be "designed such that one or both primers of the primer pair contain a
sequence in the 5' region for one or more restriction endonucleases
(restriction enzyme)."  *Id.* at 37: 51-54.  Following amplification, restriction
digestion of the primer(s) allows creation of a 5' overhang proximal to a
locus of interest, and the sequence of the locus of interest is analyzed by
incorporating fluorescently-labeled nucleotides to fill in the 5' overhang.  Ex.

9

IPR2013-00276
Patent 8,318,430 B2

1004, 7:61–8:8, 19:7–11, 45:43–46, 53:29–31.  Hundreds or thousands of loci of interest on multiple chromosomes are sequenced simultaneously, their relative amounts are quantitated, and expressed as a ratio.  *Id.* at 7:9–16.

### 3. Binladen (Exhibit 1005)

Binladen discloses simultaneous sequencing of homolog amplification products from the mitochondrial DNA of thirteen mammalian species, including humans.  Ex. 1005, 1, 3.

Binladen's method involves generating homologous DNA amplification products with 5'-nucleotide tagged primers from multiple specimens using conventional PCR, followed by high-throughput sequencing on a parallel sequencing platform.  Each DNA sequence is subsequently traced back to its individual source through 5'-tag-analysis.  *Id.* at 1, 3, 5.

### 4. Analysis

Petitioner's position, supported by the Morton and Nussbaum Declarations, is that the method of claim 1 would have been obvious because "a scientist in this field would have known that Dhallan could be enhanced through the use of the PCR amplification techniques utilizing sample indices and massively parallel sequencing of pooled samples as discussed in Binladen" and because "a skilled artisan would also have readily understood that Shoemaker's methods for determining the presence of fetal abnormalities could be carried out with the use of cell-free DNA described in Dhallan and the multiplexed detection techniques taught in Binladen" (Pet. 40–41 (citing Ex. 1002 ¶ 98, Ex. 1003 ¶ 109)).

10

IPR2013-00276
Patent 8,318,430 B2

Specifically, Dr. Morton explains that:

[A] skilled artisan would read Dhallan in the context of the state of the art in indexed PCR amplification techniques as discussed in Binladen. A skilled artisan reading Shoemaker would understand that the disclosed methods for determining the presence of fetal abnormalities could be carried out with the Dhallan/Binladen techniques. It is my view that the state of the art as reflected by Shoemaker, Dhallan and Binladen makes obvious the techniques described in claims 1–18 of the '430 patent.

Ex. 1002 ¶ 98.

Similarly, Dr. Nussbaum explains that:

[T]his combination discloses each element of Claims 1–18 of the '430 patent and [I] believe that one skilled in the art would have been motivated to combine these techniques, as the combination would clearly result in an enhanced productivity and increased throughput of sample analysis. The sequencing and multiplexing technology of Binladen would have made the procedures of Shoemaker and Dhallan less expensive, faster and more efficient because one could sequence indexed samples from many different patients in a single sequencing run instead of laboriously performing a single sequencing run for the DNA samples from each patient.

Ex. 1003 ¶ 109.

In addition, Petitioner provides a claim chart detailing where various elements of the challenged claims can be found in Shoemaker, Dhallan, and Binladen. Pet. 41–55. For each element or clause of the claims, the claim chart purportedly identifies where some aspect of that element or clause is disclosed by one or more of the references. The Morton Declaration and the Nussbaum Declaration closely correspond to Petitioner's claim chart in this respect. Ex. 1002 ¶¶ 99–112, Ex. 1003 ¶¶ 110–165. However, there is no mention in the Petition or the Declarations of any differences between the

11

claimed subject matter and the prior art, beyond a single statement that "Dhallan does not teach indexing" (Ex. 1002 ¶ 104).  Moreover, nowhere is it explained how one of ordinary skill in the art would go about combining the disparate elements of the references, nor is it explained what modifications one of ordinary skill in the art would necessarily have made in order to combine them.

Patent Owner argues that "[Petitioner] and its experts fail to address the claims as a whole and instead dissect the claims into artificially disembodied 'techniques,' which they interpret in a vacuum and attempt to map into the disclosures of Shoemaker, Dhallan and Binladen."  PO Resp. 8. Patent Owner contends "[t]his piecemeal approach is presented in the Petition in the form of a claim chart listing quotes from Shoemaker, Dhallan and Binladen" and "[a] similar piecemeal approach is performed by Drs. Morton and Nussbaum in their declarations."  PO Resp. 8 (citing Pet. 41–55, Ex. ¶¶ 98–129, Ex. 1003 ¶¶ 109–165).

Moreover, Patent Owner argues that Petitioner's failure to explain how one of ordinary skill in the art would "combine the disparate parts of these unrelated references in a functional manner" is particularly relevant to this *inter partes* review because "a person of ordinary skill in the art could not actually combine the methods disclosed in the cited references and . . . would not even attempt the proposed combination."  PO Resp. 2.

Specifically, Patent Owner argues that Binladen's tagging method would not have been combinable with Dhallan's use of restriction digestible primers.  Patent Owner contends "the methods disclosed in Dhallan critically rely on restriction digestible primers [for amplification] followed by cleaving the primer sequence by enzyme digestion" (PO Resp. 50).  As

12

IPR2013-00276
Patent 8,318,430 B2

explained by Dr. Butte, Dhallan's "'primers are designed such that one or both primers of the primer pair contain [a]sequence in the 5' region for one or more restriction endonucleases (restriction enzyme)'" (Ex. 2003 ¶ 215 (quoting Ex. 1004, 37:50–53)), and the primers are "designed so that digestion occurs proximal to the SNP site" (Ex. 2003 ¶ 217 (citing Ex. 1004, 38:8–5, 38:24–26, Fig. 1A)).  Following amplification, restriction digestion allows creation of a 5' overhang, and the SNP sequence is analyzed by incorporating fluorescently-labeled nucleotides to fill in the 5' overhang.  Ex. 2003 ¶¶ 218, 219 (citing Ex. 1004, 7:61–8:8, 19:7–11, 45:43–46, 53:29–31). Dr. Butte explains that Dhallan's "particular primer design approach is necessary for Dhallan's goal of limiting sequence identification to one or a few nucleotides." *Id.* ¶ 217 (citing Ex. 1004, 38:8–5, 38:24–26, Fig. 1A). Binladen, however, teaches the use of tags that are vulnerable to restriction enzymes because they have restriction enzyme sites. *Id.* ¶ 222.  Thus, contends Patent Owner, "Binladen['s] tags could not be incorporated in the methods described in Dhallan because they would be incompatible with the restriction digestible primers critical to the process of Dhallan" and "would simply be cleaved off by the restriction enzyme" (*id.* at 52 (citing Ex. 2003 ¶¶ 222–224)).   In support, Dr. Butte testifies that "[o]ne of ordinary skill in the art would recognize that the Binladen tags could not be incorporated in the methods described in Dhallan because they would be incompatible with the restriction digestible primers critical to the process of Dhallan."  Ex. 2003 ¶ 222.

In addition, Patent Owner argues that a skilled artisan would not have combined the references because Binladen's high error rate is unsuitable for detecting fetal aneuploidy.  Patent Owner argues that "determination of fetal

13

IPR2013-00276
Patent 8,318,430 B2

aneuploidy requires not only accurate sequence determination but also highly precise quantification methods" because "a mistake leading to either false negative . . . or false positive    . . . can be devastating." PO Resp. 45–46. Patent owner contends "Binladen discloses generating a limited amount of sequences with a large and unpredictable number of sequencing errors" (*id.* at 46 (emphasis omitted)), as well as "unpredictable variation in sequence distribution . . . specifically attribute[d] to tag composition" (*id.* at 47). Thus, Patent Owner contends, one of ordinary skill in the art would recognize that "the tags and corresponding methods of Binladen would simply be unsuitable for use in methods for determining fetal aneuploidy." *Id.* at 49 (citing Ex. 2003 ¶ 207). In Dr. Butte's opinion, "one of ordinary skill . . . would not have considered utilizing the Binladen tags in a fetal aneuploidy determination method" because of the large number of sequencing errors, an observed bias in sequence read distribution, and unpredictable variation in sequence distribution, attributed by Binladen to the composition of the tags. Ex. 2003 ¶¶ 200–203. Dr. Butte asserts that "high sequencing error rates and inaccuracies in sequence abundance (which may correlate to chromosome numbers) would be unacceptable" in determining fetal aneuploidy, which "requires not only accurate sequence determination but also highly precise quantification methods." *Id.* ¶ 199.

On cross-examination, Dr. Morton was unable to recall describing "a synthesis of how to put [Shoemaker, Dhallan, and Binladen] together" anywhere in her Declaration (Ex. 2005, 85:12–16), but expressed the opinion that the three references, taken together, provide "the path to do what is presented here" (*id.* at 84:17–19). Dr. Morton testified:

14

IPR2013-00276
Patent 8,318,430 B2

> [W]hen you combine . . . what's presented in the three references . . . you recognize from Dhallan that you have the presence of fetal DNA in the maternal circulation, and that in Binladen, you can index samples from different individuals and combine them for sequence analysis, and then you can figure out the sequence for that particular individual based on the indexing.
>
> And that in Shoemaker, you can do a similar analysis, except that you're using individual cells instead of -- as the source of DNA, instead of the source being a particular individual, a pregnant woman that has a mixture of fetal and maternal sequences in the same sample. Instead, in Shoemaker, you're combining single fetal cells and indexing those, and then you can actually deconvolute the sequence in each one of those. So in I feel that taken together, the three of them actually show me the path to do what is presented here.

*Id.* at 84:1–19.

Nevertheless, Dr. Morton conceded that certain aspects of Dhallan and Binladen would not be compatible, and "different methods" would have been required to implement the claimed method. Ex. 2005, 97:16. For example, Dr. Morton conceded that one "would do a different process to incorporate the tags" (*id.* at 97:6–7), and Binladen's "tagging would not be the way that that was done, because the method of inserting the tag, the way it's done now was not known at that time" (*id.* at 100:10–13).

In response to Patent Owner's contentions regarding the unsuitability of Binladen's tags due to a high rate of sequencing errors and variation in sequence distribution, Dr. Morton asserts that "Binladen proposes 'primer design guidelines'" and "one of ordinary skill . . . would be able to easily apply the teachings of Binladen to optimize the tags to decrease the error rate and increase the accuracy of putative sample tags." Ex. 1042 ¶¶ 27, 29. We are not persuaded. We note Dr. Morton's earlier testimony, in which

15

**A0015**

she asserted that, unlike detection of fetal nucleic acids "known *a priori* to be physically absent in the mother" (e.g., Y chromosome sequences), "[d]etection of cell-free fetal nucleic acid sequences that are present in both the fetus and the pregnant mother presents different technical challenges, as does the detection of fetal aneuploidies" and "is currently possible only through the use of highly precise methods for quantification by, e.g., amplification of the fetal and maternal nucleic acids in the sample followed by single molecule sequencing." Ex. 1002 ¶¶ 22, 23.

Having considered the Petition, and the Declarations of Drs. Morton and Nussbaum that accompanied it, we conclude that Petitioner has failed to prove by a preponderance of the evidence that claims 1–18 would have been unpatentable over Shoemaker, Dhallan, and Binladen. Although the Petition and accompanying Declarations point to disparate elements of the three references, and attempt to map them to elements of the challenged claims, virtually no effort is made to explain how or where the references differ from the challenged claims, how one of ordinary skill in the art would go about combining their disparate elements, or what modifications one of ordinary skill in the art would necessarily have made in order to combine the disparate elements. What is lacking in the Petition and accompanying Declarations is an "articulated reason[] with some rational underpinning to support the legal conclusion of obviousness." *Kahn*, 441 F.3d at 988. The inadequacy of the obviousness analysis in the Petition and accompanying Declarations is readily apparent when the disparate elements of the references are scrutinized closely, as in Patent Owner's response, and we decline to search through the record and piece together those teachings that might support Petitioner's position. *Cf. DeSilva v. DiLeonardi*, 181 F.3d

IPR2013-00276
Patent 8,318,430 B2

865, 866-67 (Fed. Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record.").

To the extent Petitioner's Reply and Dr. Morton's Second Declaration are responsive to specific points raised by Dr. Butte in his Declaration concerning the combinability of Binladen or Shoemaker with Dhallan, we are not persuaded. As discussed above, Dr. Morton acknowledged on cross-examination that Binladen's indexing (i.e., tagging) scheme could not be used with Dhallan's restriction-digestible amplification primers. Dr. Morton, in her Second Declaration, contends that Dhallan also teaches a number of amplification and/or detection methods which do not require the use of restriction digestible primers" (Ex. 1042 ¶¶ 17, 18), but those portions of Dhallan were not identified or discussed in the Petition or the accompanying Declarations. Moreover, although Dr. Morton asserts that "one of ordinary skill in the art would use basic common sense and not utilize the embodiments of Dhallan where restriction sites are added to the primers" (*id.* ¶ 32 (emphasis omitted)), Dr. Morton still does not explain how these other methods would be combined with Binladen or Shoemaker.

Nor are we persuaded by the belated attempt in the Reply and Dr. Morton's Second Declaration to bolster Petitioner's initial obviousness challenge by reference to technical advances, e.g., massively parallel sequencing (MPS), that one of ordinary skill in the art would have been aware of "in the years between the filing of *Dhallan* and the earliest claimed priority date" (Reply 8, 9). For example, Exhibit 1010 was introduced briefly in Dr. Nussbaum's Declaration as disclosing "a commercially available kit for production and analysis of indexed libraries from different samples of origin" "designed to be used with Illumina's multiplexed

17

IPR2013-00276
Patent 8,318,430 B2

sequencing platform, the Illumina Genome Analyzer$^{TM}$," (Ex. 1003 ¶ 21).  In

her Second Declaration, Dr. Morton asserts:

> It is my opinion that one of ordinary skill in January 2010
> would not only be aware of the use of next generation,
> massively parallel sequencing [*e.g.*, Ex. 1033; Ex. 1036; Ex.
> 1011; Ex. 1045], but would have been aware of the
> commercially-available indexing kit available through Illumina,
> Inc. in 2008 [Ex. 1010] that allowed for sequencing of 96
> different samples on a single flow cell.  Thus, not only was
> barcoding or sample indexing known in the art as evidenced by
> both Binladen and Shoemaker, but as early as 2008 Illumina,
> Inc. offered a sample indexing kit that was compatible with the
> Genome Analyzer, the same sequencing system used in
> generating the data reported in the '430 patent. [Ex. 1001 at col.
> 18:52-540].

> It is my opinion that one of ordinary skill in January 2010
> would be motivated to index individual samples and pool them
> for sequencing to maximize sequencing capacity and to
> minimize sequencing cost.  For example, the Illumina, Inc.
> product flyer from 2008 [Ex. 1010] states, "[h]arnessing this
> sequencing power in a multiplexed fashion increases
> experimental throughput while reducing time and cost."

Ex. 1042 ¶¶ 42–43 (brackets in original).[3]

_____

[3]  Exhibit 1010, submitted with the Nussbaum Declaration, Exhibits 1033
and 1036, submitted with the Morton Declaration, and Exhibits 1011 and
1045, submitted with Dr. Morton's Second Declaration, are as follows:

> *Multiplexed Sequencing with the Illumina Genome Analyzer
> System*, Illumina Inc. (2008) (Ex. 1010).

> Rossa W.K. Chiu et al., *Noninvasive Prenatal Diagnosis of
> Fetal Chromosomal Aneuploidy by Massively Parallel Genomic
> Sequencing of DNA in Maternal Plasma*, 105 PNAS 20458–
> 20462 (2008) (Ex. 1033).

> Rossa W.K. Chiu et al., *Noninvasive Pre-natal Diagnosis by
> Single Molecule Counting Technologies*, 25 Trends in Genetics
> 324–331 (2009) (Ex. 1036).

18

IPR2013-00276
Patent 8,318,430 B2

This testimony, in effect, replaces the tagging and sequencing techniques of Dhallan and Binladen with the Illumina indexing kit and sequencing platform, but neither Petitioner nor Dr. Morton explains why Exhibit 1010 could not have been presented as part of the asserted ground of unpatentability in the first instance with the Petition.[4]  Therefore we accord this aspect of Dr. Morton's testimony no weight.

*5. Conclusion*

Having considered Petitioner's and Patent Owner's positions, as well as their supporting evidence, we determine that Petitioner has not met its burden of showing, by a preponderance of the evidence, that claims 1–18 of the '430 patent are unpatentable as having been obvious over Shoemaker, Dhallan, and Binladen.

*D. Patent Owner's Motion to Exclude*

Patent Owner, by its Motion to Exclude, seeks to exclude Petitioner's Replacement Exhibit 1002, Replacement Exhibit 1003, Exhibits 1014–1040, portions of Exhibit 1041, Paragraphs 3–46 of Exhibit 1042, Exhibit 1011, Exhibit 1045, and Exhibit 1046.  Paper 30 ("Mot.").

---

H. Christina Fan et al., *Noninvasive Diagnosis of Fetal Aneuploidy by Shotgun Sequencing DNA from Maternal Blood*, 105 PNAS 16266–16271 (2008) (Ex. 1011).

Lo et al.     US 2009/0029377 A1     Jan. 29, 2009     (Ex. 1045)

[4] "A reply may only respond to arguments raised in the corresponding . . . patent owner response." 37 C.F.R. § 42.23(b).  That is, "[r]eply evidence . . . must be responsive and not merely new evidence that could have been presented earlier to support the movant's motion."  Rules of Practice for Trials before the Patent Trial and Appeal Board, 77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2014).

IPR2013-00276
Patent 8,318,430 B2

As the movant, Patent Owner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R § 42.20(c). For the reasons discussed below, Patent Owner's Motion to Exclude is *denied*.

### 1. Replacement Exs. 1002, 1003, and Substitute Exs. 1014–1040

Patent Owner seeks to exclude the replacement Declarations of Drs. Morton and Nussbaum (Exs. 1002 and 1003), and substitute Exhibits 1014–1040, filed on March 31, 2014. Mot. 2–3.

Patent Owner contends that it "may incur some prejudice" because substitute Exhibits 1014–1040 were originally "buried in the record as attachments to Petitioner's expert declarations" (*id.* at 3), and are now "present[ed] in a new light as separate documents" (*id.*). Substitute exhibits 1014–1040 were included as attachments to original Exhibits 1002 and 1003 (filed on May 10, 2013), but were not in compliance with 37 C.F.R § 42.63(c). Petitioner was authorized to refile the exhibits that were already included and listed in the Declarations of Drs. Morton and Nussbaum (Exs. 1002 and 1003, originally filed on May 10, 2013), to bring the exhibits into compliance with 37 C.F.R § 42.63(c). *See* Paper 22. The substitute exhibits were merely renumbered, and the replacement Declarations amended to reflect the new numbering scheme. We regard the risk of prejudice to Patent Owner as minimal in this instance.

Accordingly, the Motion is denied with respect to the replacement Declarations of Drs. Morton and Nussbaum (Exs. 1002 and 1003), and substitute Exhibits 1014–1040.

IPR2013-00276
Patent 8,318,430 B2

*2. Deposition Transcript of Dr. Butte (Ex. 1041); Dr. Morton's Second Declaration (Ex. 1042); Fan (Ex. 1011); (Lo Ex. 1045); (Daines Ex. 1046)*

Patent Owner argues that portions of Exhibit 1041 relied on by Petitioner on pages 1, 2, 4, 5, and 14 of its Reply (Paper 26) should be excluded under Federal Rule of Evidence 403[5] because "Petitioner's citations to portions of Ex. 1041 omit portions 'that in fairness ought to be considered at the same time,' and inaccurately characterized the testimony so as to be misleading and unfairly prejudicial to [Patent Owner]." Mot. 4, 6.

Patent Owner also seeks to exclude paragraphs 3–46 of Dr. Morton's Second Declaration. Essentially, Patent Owner contends

> Dr. Morton's second declaration is replete with attempted remedial testimony related to a *prima facie* case of obviousness that should have been submitted with the Petition. It is packed with terms such as "person of ordinary skill," "motivation to combine references," "references considered as a whole," "reasonable expectation of success," and the "relevant field." None of these phrases or subjects appear in her first declaration or in the Petition.

*Id.* at 7.

Patent Owner further seeks to exclude Exhibits 1011 and 1045 as "new evidence used to belatedly address knowledge of the person of ordinary skill in the art during the relevant time period" and "outside the scope of the Petition." *Id.* at 4, 13. Patent Owner seeks to exclude Exhibit 1046 as "a belated identification of challenge." *Id.* at 13.

---

[5] As stated in 37 C.F.R. § 42.62, the Federal Rules of Evidence generally apply in an *inter partes* review.

IPR2013-00276
Patent 8,318,430 B2

Nevertheless, the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to evidence presented. *Gnosis S.P.A. v. S. Alabama Medical Science Foundation*, Case IPR2013-00118, slip op. at 43 (PTAB June 20, 2014) (Paper 64). *See also Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received."). In an *inter partes* review, we regard it as the better course to have a complete record of the evidence to facilitate public access, as well as appellate review. *See id.* ("If the record on review contains not only all evidence which was clearly admissible, but also all evidence of doubtful admissibility, the court which is called upon to review the case can usually make an end of it, whereas if evidence was excluded which that court regards as having been admissible, a new trial or rehearing cannot be avoided.").

To the extent the arguments made in Petitioner's Reply and Dr. Morton's Second Declaration are responsive to arguments made in Patent Owner's Response and Dr. Butte's Declaration, we have considered the arguments and found them unpersuasive. To the extent the arguments and evidence presented in Petitioner's Reply and Dr. Morton's Second Declaration are not responsive and could have been presented earlier to support Petitioner's challenge, we accord them no weight. Patent Owner's Motion to Exclude is denied.

IPR2013-00276
Patent 8,318,430 B2

## III. CONCLUSION

We conclude that Petitioner has failed to meet its burden of proof, by a preponderance of the evidence, that claims 1–18 of the '430 patent are unpatentable under 35 U.S.C. § 103 as having been obvious over the combination of Shoemaker, Dhallan, and Binladen.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has failed to prove by a preponderance of the evidence that claims 1–18 of U.S. Patent No. 8,318,430 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00276
Patent 8,318,430 B2

For PETITIONER:

Greg Gardella
cpdocketgardella@oblon.com

Scott McKeown
cpdocketmckeown@oblon.com

Kevin Laurence
cpdocketlaurence@oblon.com

Dianna DeVore
ddevore@ariosadx.com


For PATENT OWNER:

Michael T. Rosato
mrosato@wsgr.com

Maya Skubatch
mskubatch@wsgr.com

Steven W. Pamlee
sparmelee@wsgr.com

Trials@uspto.gov                                    Paper No. 42
571-272-7822                              Entered: October 23, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

ARIOSA DIAGNOSTICS,
Petitioner,

v.

VERINATA HEALTH, INC.,
Patent Owner.

_____

Case IPR2013-00277
Patent 8,318,430 B2

_____

Before TONI R. SCHEINER, LORA M. GREEN, and RAMA G. ELLURU,
*Administrative Patent Judges*.

SCHEINER, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*


# I. INTRODUCTION

## A. Background

Ariosa Diagnostics, Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 19–30 of U.S. Patent No. 8,318,430 B2 (Ex. 1001, "the '430 patent") pursuant to 35 U.S.C. §§ 311–319. Paper 1 ("Pet."). Verinata Health, Inc., ("Patent Owner") filed a Preliminary Response. Paper

IPR2013-00277
Patent 8,318,430 B2

9.  On the basis of the Petition and the Preliminary Response, the panel determined that Petitioner had demonstrated a reasonable likelihood of prevailing with respect to at least one of the challenged claims, and on October 25, 2013, an *inter partes* review of claims 19–30 was instituted on the asserted ground that the claims would have been unpatentable over the combined teachings of Shoemaker, Dhallan, and Binladen.  Paper 10 ("Dec.").[1]

   After institution of trial, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), to which Petitioner filed a Reply (Paper 25).  Oral argument was requested by both parties, and was held on July 16, 2014.  A transcript of the oral hearing is included in the record.  Paper 41, "Tr."

   Both parties presented witness testimony via declaration during the course of the proceeding.  Petitioner presented the Declarations of Dr. Cynthia Casson Morton (Ex. 1002, "Morton Decl.") and Dr. Robert Nussbaum (Ex. 1003, "Nussbaum Decl.") with the Petition.[2]  Patent Owner presented the Declaration of Dr. Atul J. Butte (Ex. 2003, "Butte Decl.") with its Patent Owner's Response.  Finally, with its Reply, Petitioner presented the Second Declaration of Dr. Morton.  Ex. 1042 ("Second Morton Decl.").

   The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during trial.  For the reasons discussed below, we determine that Petitioner has not met its burden to

---

[1]  Patent Owner did not address this asserted ground in its Preliminary Response.
[2]  All references to Exhibits 1002 and 1003 are to the replacement Declarations filed on March 31, 2014, unless otherwise indicated.

IPR2013-00277
Patent 8,318,430 B2

prove, by a preponderance of the evidence, that claims 19–30 of the '430 patent are unpatentable.

### B. Related Matters

The '430 patent is the subject of a civil action, *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, Case No. 3:12-cv-05501-S1 (N.D. Cal.), filed October 25, 2012. Paper 38. Furthermore, concurrent with the instant Petition, Petitioner filed another petition challenging claims 1–18 of the '430 patent, IPR2013-00276.

### C. The '430 Patent

The '430 patent discloses a method for determining the presence or absence of fetal aneuploidy—a condition in which a fetus carries an abnormal number of chromosomes—by determining the relative amounts of non-random polynucleotide sequences from a chromosome suspected of being aneuploid, and from a reference chromosome or a chromosome control region, in a cell-free sample from a pregnant woman. Ex. 1001, 1:23–27, 2:10–11, 13:9–12. The '430 patent further discloses determining simultaneously the presence or absence of fetal aneuploidy in pooled, indexed cell-free samples from a plurality of pregnant women, using massively parallel sequencing. *Id.* at 1:23–25, 1:66-67.

Briefly, cell-free samples (e.g., maternal serum or plasma) containing both maternal and fetal nucleic acid fragments are obtained from a plurality of pregnant women. *Id.* at 1:41–44, 1:66-67. In each sample, non-random polynucleotide sequences from a chromosome suspected of being aneuploid, and non-random sequences from a reference chromosome or chromosome control region, are enriched selectively and indexed (i.e., tagged for later identification as originating from a particular sample). *Id.* at 22:9–15. The

3

IPR2013-00277
Patent 8,318,430 B2

enriched, indexed samples are pooled, and the enriched, indexed nucleic acids are sequenced by massively parallel sequencing to produce sequence reads. *Id.* The number of sequence reads from the chromosome suspected of being aneuploid, and the number of sequence reads from the reference chromosome or chromosome control region, are counted, i.e, enumerated, and the two numbers are compared to determine whether there is an abnormal level of DNA associated with the chromosome suspected of being aneuploid. *Id.* at 1:45–48, 17:53–59. As discussed above, indexing allows results from different samples to be distinguished. Ex. 1001, 22:10–15.

### *D. Illustrative Claim*

Of challenged claims 19–30, claim 19 is the only independent claim. Claim 19, reproduced below, is illustrative.

19. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:

(a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;

(b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples, wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100

4

different non-random polynucleotide sequences selected from at least one chromosome control region, wherein the at least one chromosome region tested for being aneuploid and the at least one chromosome control region are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length,

(c)  pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

(d)  performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome control region;

(e)  based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome control region; and

(f)  for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the at least one chromosome region tested for being aneuploid and a number of enumerated sequence reads corresponding to the at least one chromosome control region of (e).

IPR2013-00277
Patent 8,318,430 B2

*E. The Prior Art*

Petitioner relies on the following prior art:

Shoemaker   US 2008/0090239 A1    Apr. 17, 2008     (Ex. 1008)

Dhallan     US 7,332,277 B2       Feb. 19, 2008     (Ex. 1004)

Jonas Binladen et al., *The Use of Coded PCR Primers Enables High-Throughput Sequencing of Multiple Homolog Amplification Products by 454 Parallel Sequencing,* 2 PLoS ONE 1–9 (2007) (Ex. 1005).

*F. Grounds of Unpatentability Instituted for Trial*

The Board instituted *inter partes* review based on the following ground of unpatentability:

Claims 19–30 under 35 U.S.C. §103(a) as unpatentable over the combination of Shoemaker, Dhallan, and Binladen.

II. ANALYSIS

*A. Claim Construction*

In the Decision on Institution, the panel construed several claim terms (Dec. 7–12), all of which appear in claim 19: (1) "selectively enriching a plurality of non-random polynucleotide sequences;" (2) "at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region;" (3) "sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences;" (4) and "chromosome control region." We determine it is not necessary to depart from those claim constructions for purposes of this decision.

6

IPR2013-00277
Patent 8,318,430 B2

*B. Principles of Law*

To prevail in its challenge to the patentability of the claims, Petitioner must prove unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 18 (1966). An invention "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Moreover, a rejection on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418.

We analyze the instituted grounds of unpatentability in accordance with those principles.

IPR2013-00277
Patent 8,318,430 B2

*C. Alleged Obviousness over Shoemaker, Dhallan, and Binladen*

Petitioner asserts that claims 19–30 of the '430 patent are
unpatentable under 35 U.S.C. § 103(a) as having been obvious over the
combination of Shoemaker, Dhallan, and Binladen.    Petitioner asserts that
the combination of Shoemaker, Dhallan, and Binladen teaches all the
limitations of the claimed subject matter (Pet. 38–53), and relies, initially, on
the Declaration of Dr. Morton (Ex. 1002), as well as the Declaration of Dr.
Nussbaum (Ex. 1003), for a rationale to combine those elements.  Patent
Owner disagrees with Petitioner's assertions (PO Resp. 4–53) and relies on
the Declaration of Dr. Butte (Ex. 2003) as evidence that it would not have
been obvious for one of ordinary skill in the art to combine the teachings of
the references relied on.

*1. Shoemaker (Exhibit 1008)*

Shoemaker discloses detection and genetic analysis of fetal cells in a
blood sample from a pregnant woman—a maternal blood sample—which
contains both fetal and maternal cells.  Ex. 1008 ¶¶ 13, 71.  Genetic analysis
of the fetal cells may include determination of the presence or absence of
fetal aneuploidy, such as trisomy of chromosome 21, 18, or 13.  Ex. 1001
¶¶ 71, 107, 108.  Multiple samples may be obtained from the same
individual at different times during the course of the pregnancy (*id.* ¶ 108),
but Shoemaker does not disclose pooling the multiple samples with each
other, or pooling samples from other individuals.  Nor does Shoemaker
disclose analyzing a cell-free sample.

Specifically, Shoemaker's method involves enriching fetal cells in the
maternal blood sample and distributing them among an array of discrete,
addressable locations, e.g., the wells of a microtiter plate, such that each well

8

IPR2013-00277
Patent 8,318,430 B2

contains either one fetal cell, or none at all. *Id.* ¶¶ 107–110. Genomic regions, i.e., loci, of interest are chosen "on a chromosome suspected of trisomy and on a control chromosome," and the loci are amplified and tagged with locator elements (short nucleic acid sequences incorporated into amplification primers). *Id.* ¶¶ 114–118. The locator elements "make[] it possible to pool the amplicons from all the discrete locations following the amplification step and analyze the amplicons in parallel." *Id.* ¶¶ 118, 119. After the amplicons are analyzed—i.e., sequenced—the locator elements of the tags are used to sort the sequence reads into "bins" which correspond to the individual wells of the microtiter plate (and thus, the cell(s) in that well), and the sequence reads from the bins are used to determine allele abundance, which in turn, is used to determine aneuploidy. *Id.* ¶¶ 138, 140.

### 2. Dhallan (Exhibit 1004)

Dhallan discloses non-invasive detection of chromosomal abnormalities, including fetal aneuploidy, in cell-free maternal blood samples. Ex. 1004, 5:63–6:14. Dhallan does not disclose indexing the samples, or pooling samples from multiple individuals.

Briefly, Dhallan's method involves amplifying loci of interest with multiple primer sets. Ex. 1004, 47:63-65, 48:64. Loci of interest may be single nucleotide polymorphisms (SNPs). *Id.* at 25:1-10. The primers may be "designed such that one or both primers of the primer pair contain a sequence in the 5' region for one or more restriction endonucleases (restriction enzyme)." *Id.* at 37: 51-54. Following amplification, restriction digestion of the primer(s) allows creation of a 5' overhang proximal to a locus of interest, and the sequence of the locus of interest is analyzed by incorporating fluorescently-labeled nucleotides to fill in the 5' overhang. Ex.

9

IPR2013-00277
Patent 8,318,430 B2

1004, 7:61–8:8, 19:7–11, 45:43–46, 53:29–31.  Hundreds or thousands of loci of interest on multiple chromosomes are sequenced simultaneously, their relative amounts are quantitated, and expressed as a ratio.  *Id.* at 7:9–16.

### 3. Binladen (Exhibit 1005)

Binladen discloses simultaneous sequencing of homolog amplification products from the mitochondrial DNA of thirteen mammalian species, including humans.  Ex. 1005, 1, 3.

Binladen's method involves generating homologous DNA amplification products with 5'-nucleotide tagged primers from multiple specimens using conventional PCR, followed by high-throughput sequencing on a parallel sequencing platform.  Each DNA sequence is subsequently traced back to its individual source through 5'-tag-analysis.  *Id.* at 1, 3, 5.

### 4. Analysis

Petitioner's position, supported by the Morton and Nussbaum Declarations, is that the method of claim 19 would have been obvious because "a scientist in this field would have known that Dhallan could be enhanced through the use of PCR amplification techniques utilizing sample indices and massively parallel sequencing of pooled samples as discussed in Binladen" and because "a skilled artisan would also have readily understood that Shoemaker's methods for determining the presence of fetal abnormalities could be carried out with the use of cell-free DNA described in Dhallan and the multiplexed detection techniques taught in Binladen" (Pet. 38 (citing Ex. 1002 ¶ 85, Ex. 1003 ¶ 95)).

IPR2013-00277
Patent 8,318,430 B2

Specifically, Dr. Morton explains that:

[A] skilled artisan would read Dhallan in the context of the state of the art in indexed PCR amplification techniques as discussed in Binladen. A skilled artisan reading Shoemaker would understand that the disclosed methods for determining the presence of fetal abnormalities could be carried out with the Dhallan/Binladen techniques. It is my view that the state of the art as reflected by Shoemaker, Dhallan and Binladen makes obvious the techniques described in claims 19–30 of the '430 patent.

Ex. 1002 ¶ 85.

Similarly, Dr. Nussbaum explains that:

[T]his combination discloses each element of Claims 19–30 of the '430 patent and [I] believe that one skilled in the art would have been motivated to combine these techniques, as the combination would clearly result in an enhanced productivity and increased throughput of sample analysis. The sequencing and multiplexing technology of Binladen would have made the procedures of Shoemaker and Dhallan less expensive, faster and more efficient because one could sequence indexed samples from many different patients in a single sequencing run instead of laboriously performing a single sequencing run for the DNA samples from each patient.

Ex. 1003 ¶ 95.

In addition, Petitioner provides a claim chart detailing where various elements of the challenged claims can be found in Shoemaker, Dhallan, and Binladen. Pet. 39–53. For each element or clause of the claims, the claim chart purportedly identifies where some aspect of that element or clause is disclosed by one or more of the references. The Morton Declaration and the Nussbaum Declaration closely correspond to Petitioner's claim chart in this respect. Ex. 1002 ¶¶ 86–111, Ex. 1003 ¶¶ 96–142. However, there is no mention in the Petition or the Declarations of any differences between the

11

IPR2013-00277
Patent 8,318,430 B2

claimed subject matter and the prior art, beyond a single statement that "Dhallan does not teach indexing" (Ex. 1002 ¶ 91).  Moreover, nowhere is it explained how one of ordinary skill in the art would go about combining the disparate elements of the references, nor is it explained what modifications one of ordinary skill in the art would necessarily have made in order to combine them.

Patent Owner argues that "[Petitioner] and its experts fail to address the claims as a whole and instead dissect the claims into artificially disembodied 'techniques,' which they interpret in a vacuum and attempt to map into the disclosures of Shoemaker, Dhallan and Binladen."  PO Resp. 8. Patent Owner contends "[t]his piecemeal approach is presented in the Petition in the form of a claim chart listing quotes from Shoemaker, Dhallan and Binladen" and "[a] similar piecemeal approach is performed by Drs. Morton and Nussbaum in their declarations."  PO Resp. 8 (citing Pet. 41–55, Ex. ¶¶ 98–129, Ex. 1003 ¶¶ 109–165).

Moreover, Patent Owner argues that Petitioner's failure to explain how one of ordinary skill in the art would "combine the disparate parts of these unrelated references in a functional manner" is particularly relevant to this *inter partes* review because "a person of ordinary skill in the art could not actually combine the methods disclosed in the cited references and . . . would not even attempt the proposed combination."  PO Resp. 2.

Specifically, Patent Owner argues that Binladen's tagging method would not have been combinable with Dhallan's use of restriction digestible primers.  Patent Owner contends "the methods disclosed in Dhallan critically rely on restriction digestible primers [for amplification] followed by cleaving the primer sequence by enzyme digestion" (PO Resp. 48).  As

12

IPR2013-00277
Patent 8,318,430 B2

explained by Dr. Butte, Dhallan's "'primers are designed such that one or both primers of the primer pair contain [a] sequence in the 5' region for one or more restriction endonucleases (restriction enzyme)'" (Ex. 2003 ¶ 204 (quoting Ex. 1004, 37:50–53)), and the primers are "designed so that digestion occurs proximal to the SNP site" (Ex. 2003 ¶ 206 (citing Ex. 1004, 38:8–5, 38:24–26, Fig. 1A)).  Following amplification, restriction digestion allows creation of a 5' overhang, and the SNP sequence is analyzed by incorporating fluorescently-labeled nucleotides to fill in the 5' overhang.  Ex. 2003 ¶¶ 207, 208 (citing Ex. 1004, 7:61–8:8, 19:7–11, 45–43–46, 53:29–31). Dr. Butte explains that Dhallan's "particular primer design approach is necessary for Dhallan's goal of limiting sequence identification to one or a few nucleotides." *Id.* ¶ 206 (citing Ex. 1004, 38:8–5, 38:24–26, Fig. 1A). Binladen, however, teaches the use of tags that are vulnerable to restriction enzymes because they have restriction enzyme sites. *Id.* ¶ 211.  Thus, contends Patent Owner, "Binladen['s] tags could not be incorporated in the methods described in Dhallan because they would be incompatible with the restriction digestible primers critical to the process of Dhallan" and "would simply be cleaved off by the restriction enzyme" (*id.* at 50 (citing Ex. 2003 ¶¶ 211–213)).  In support, Dr. Butte testifies that "[o]ne of ordinary skill in the art would recognize that the Binladen tags could not be incorporated in the methods described in Dhallan because they would be incompatible with the restriction digestible primers critical to the process of Dhallan."  Ex. 2003 ¶ 211.

In addition, Patent Owner argues that a skilled artisan would not have combined the references because Binladen's high error rate is unsuitable for detecting fetal aneuploidy.  Patent Owner argues that "determination of fetal

aneuploidy requires not only accurate sequence determination but also highly precise quantification methods" because "a mistake leading to either false negative . . . or false positive    . . . can be devastating."  PO Resp. 44. Patent owner contends "Binladen discloses generating a limited amount of sequences with a large and unpredictable number of sequencing errors" (*id.* (emphasis omitted)), as well as "unpredictable variation in sequence distribution . . . specifically attribute[d] to tag composition" (*id.* at 47). Thus, Patent Owner contends, one of ordinary skill in the art would recognize that "the tags and corresponding methods of Binladen would simply be unsuitable for use in methods for determining fetal aneuploidy." *Id.* at 45 (citing Ex. 2003 ¶ 192).  In Dr. Butte's opinion, "one of ordinary skill . . . would not have considered utilizing the Binladen tags in a fetal aneuploidy determination method" because of the large number of sequencing errors, an observed bias in sequence read distribution, and unpredictable variation in sequence distribution, attributed by Binladen to the composition of the tags. Ex. 2003 ¶¶ 187–192.  Dr. Butte asserts that "high sequencing error rates and inaccuracies in sequence abundance (which may correlate to chromosome numbers) would be unacceptable" in determining fetal aneuploidy, which "requires not only accurate sequence determination but also highly precise quantification methods." *Id.* ¶ 188.

On cross-examination, Dr. Morton was unable to recall describing "a synthesis of how to put [Shoemaker, Dhallan, and Binladen] together" anywhere in her Declaration (Ex. 2005, 85:12–16), but expressed the opinion that the three references, taken together, provide "the path to do what is presented here" (*id.* at 84:17–19).  Dr. Morton testified:

IPR2013-00277
Patent 8,318,430 B2

> [W]hen you combine . . . what's presented in the three references . . . you recognize from Dhallan that you have the presence of fetal DNA in the maternal circulation, and that in Binladen, you can index samples from different individuals and combine them for sequence analysis, and then you can figure out the sequence for that particular individual based on the indexing.
>
> And that in Shoemaker, you can do a similar analysis, except that you're using individual cells instead of -- as the source of DNA, instead of the source being a particular individual, a pregnant woman that has a mixture of fetal and maternal sequences in the same sample. Instead, in Shoemaker, you're combining single fetal cells and indexing those, and then you can actually deconvolute the sequence in each one of those. So in I feel that taken together, the three of them actually show me the path to do what is presented here.

*Id.* at 84:1–19.

Nevertheless, Dr. Morton conceded that certain aspects of Dhallan and Binladen would not be compatible, and "different methods" would have been required to implement the claimed method. Ex. 2005, 97:16. For example, Dr. Morton conceded that one "would do a different process to incorporate the tags" (*id.* at 97:6–7), and Binladen's "tagging would not be the way that that was done, because the method of inserting the tag, the way it's done now was not known at that time" (*id.* at 100:10–13).

In response to Patent Owner's contentions regarding the unsuitability of Binladen's tags due to a high rate of sequencing errors and variation in sequence distribution, Dr. Morton asserts that "Binladen proposes 'primer design guidelines'" and "one of ordinary skill . . . would be able to easily apply the teachings of Binladen to optimize the tags to decrease the error rate and increase the accuracy of putative sample tags." Ex. 1042 ¶¶ 27, 29. We are not persuaded. We note Dr. Morton's earlier testimony, in which

15

IPR2013-00277
Patent 8,318,430 B2

she asserted that, unlike detection of fetal nucleic acids "known *a priori* to be physically absent in the mother" (e.g., Y chromosome sequences), "[d]etection of cell-free fetal nucleic acid sequences that are present in both the fetus and the pregnant mother presents different technical challenges, as does the detection of fetal aneuploidies" and "is currently possible only through the use of highly precise methods for quantification by, e.g., amplification of the fetal and maternal nucleic acids in the sample followed by single molecule sequencing." Ex. 1002 ¶¶ 22, 23.

Having considered the Petition, and the Declarations of Drs. Morton and Nussbaum that accompanied it, we conclude that Petitioner has failed to prove by a preponderance of the evidence that claims 19–30 would have been unpatentable over Shoemaker, Dhallan, and Binladen. Although the Petition and accompanying Declarations point to disparate elements of the three references, and attempt to map them to elements of the challenged claims, virtually no effort is made to explain how or where the references differ from the challenged claims, how one of ordinary skill in the art would go about combining their disparate elements, or what modifications one of ordinary skill in the art would necessarily have made in order to combine the disparate elements. What is lacking in the Petition and accompanying Declarations is an "articulated reason[] with some rational underpinning to support the legal conclusion of obviousness." *Kahn*, 441 F.3d at 988. The inadequacy of the obviousness analysis in the Petition and accompanying Declarations is readily apparent when the disparate elements of the references are scrutinized closely, as in Patent Owner's response, and we decline to search through the record and piece together those teachings that might support Petitioner's position. *Cf. DeSilva v. DiLeonardi*, 181 F.3d

16

IPR2013-00277
Patent 8,318,430 B2

865, 866-67 (Fed. Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record.").

To the extent Petitioner's Reply and Dr. Morton's Second Declaration are responsive to specific points raised by Dr. Butte in his Declaration concerning the combinability of Binladen or Shoemaker with Dhallan, we are not persuaded. As discussed above, Dr. Morton acknowledged on cross-examination that Binladen's indexing (i.e., tagging) scheme could not be used with Dhallan's restriction-digestible amplification primers. Dr. Morton, in her Second Declaration, contends that Dhallan also teaches a number of amplification and/or detection methods which do not require the use of restriction digestible primers" (Ex. 1042 ¶¶ 17, 18), but those portions of Dhallan were not identified or discussed in the Petition or the accompanying Declarations. Moreover, although Dr. Morton asserts that "one of ordinary skill in the art would use basic common sense and not utilize the embodiments of Dhallan where restriction sites are added to the primers" (*id.* ¶ 32 (emphasis omitted)), Dr. Morton still does not explain how these other methods would be combined with Binladen or Shoemaker.

Nor are we persuaded by the belated attempt in the Reply and Dr. Morton's Second Declaration to bolster Petitioner's initial obviousness challenge by reference to technical advances, e.g., massively parallel sequencing (MPS), that one of ordinary skill in the art would have been aware of "in the years between the filing of *Dhallan* and the earliest claimed priority date" (Reply 8, 9). For example, Exhibit 1010 was introduced briefly in Dr. Nussbaum's Declaration as disclosing "a commercially available kit for production and analysis of indexed libraries from different samples of origin" "designed to be used with Illumina's multiplexed

17

IPR2013-00277
Patent 8,318,430 B2

sequencing platform, the Illumina Genome Analyzer$^{TM}$" (Ex. 1003 ¶ 21). In

her Second Declaration, Dr. Morton asserts:

> It is my opinion that one of ordinary skill in January 2010
> would not only be aware of the use of next generation,
> massively parallel sequencing [*e.g.*, Ex. 1033; Ex. 1036; Ex.
> 1011; Ex. 1045], but would have been aware of the
> commercially-available indexing kit available through Illumina,
> Inc. in 2008 [Ex. 1010] that allowed for sequencing of 96
> different samples on a single flow cell. Thus, not only was
> barcoding or sample indexing known in the art as evidenced by
> both Binladen and Shoemaker, but as early as 2008 Illumina,
> Inc. offered a sample indexing kit that was compatible with the
> Genome Analyzer, the same sequencing system used in
> generating the data reported in the '430 patent. [Ex. 1001 at col.
> 18:52-540].

> It is my opinion that one of ordinary skill in January 2010
> would be motivated to index individual samples and pool them
> for sequencing to maximize sequencing capacity and to
> minimize sequencing cost. For example, the Illumina, Inc.
> product flyer from 2008 [Ex. 1010] states, "[h]arnessing this
> sequencing power in a multiplexed fashion increases
> experimental throughput while reducing time and cost."

Ex. 1042 ¶¶ 42–43 (brackets in original).[3]

---

[3] Exhibit 1010, submitted with the Nussbaum Declaration, Exhibits 1033
and 1036, submitted with the Morton Declaration, and Exhibits 1011 and
1045, submitted with Dr. Morton's Second Declaration, are as follows:

> *Multiplexed Sequencing with the Illumina Genome Analyzer
> System*, Illumina Inc. (2008) (Ex. 1010).

> Rossa W.K. Chiu et al., *Noninvasive Prenatal Diagnosis of
> Fetal Chromosomal Aneuploidy by Massively Parallel Genomic
> Sequencing of DNA in Maternal Plasma*, 105 PNAS 20458–
> 20462 (2008) (Ex. 1033).

> Rossa W.K. Chiu et al., *Noninvasive Pre-natal Diagnosis by
> Single Molecule Counting Technologies*, 25 Trends in Genetics
> 324–331 (2009) (Ex. 1036).

IPR2013-00277
Patent 8,318,430 B2

This testimony, in effect, replaces the tagging and sequencing techniques of Dhallan and Binladen with the Illumina indexing kit and sequencing platform, but neither Petitioner nor Dr. Morton explains why Exhibit 1010 could not have been presented as part of the asserted ground of unpatentability in the first instance with the Petition.[4]  Therefore we accord this aspect of Dr. Morton's testimony no weight.

*5. Conclusion*

Having considered Petitioner's and Patent Owner's positions, as well as their supporting evidence, we determine that Petitioner has not met its burden of showing, by a preponderance of the evidence, that claims 19–30 of the '430 patent are unpatentable as having been obvious over the combination of Shoemaker, Dhallan, and Binladen.

*D. Patent Owner's Motion to Exclude*

Patent Owner, by its Motion to Exclude, seeks to exclude Petitioner's Replacement Exhibit 1002, Replacement Exhibit 1003, Exhibits 1014-1040, portions of Exhibit 1041, Paragraphs 3–46 of Exhibit 1042, Exhibit 1011, Exhibit 1045, and Exhibit 1046.  Paper 29 ("Mot.").

---

H. Christina Fan et al., *Noninvasive Diagnosis of Fetal Aneuploidy by Shotgun Sequencing DNA from Maternal Blood*, 105 PNAS 16266–16271 (2008) (Ex. 1011).

Lo et al.     US 2009/0029377 A1     Jan. 29, 2009     (Ex. 1045)

[4]  "A reply may only respond to arguments raised in the corresponding . . . patent owner response."  37 C.F.R. § 42.23(b).  That is, "[r]eply evidence . . . must be responsive and not merely new evidence that could have been presented earlier to support the movant's motion."  Rules of Practice for Trials before the Patent Trial and Appeal Board, 77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2014).

IPR2013-00277
Patent 8,318,430 B2

As the movant, Patent Owner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R § 42.20(c). For the reasons discussed below, Patent Owner's Motion to Exclude is *denied*.

### 1. Replacement Exs. 1002, 1003, and Substitute Exs. 1014–1040

Patent Owner seeks to exclude the replacement Declarations of Drs. Morton and Nussbaum (Exs. 1002 and 1003), and substitute Exhibits 1014–1040, filed on March 31, 2014. Mot. 2–3.

Patent Owner contends that it "may incur some prejudice" because substitute Exhibits 1014–1040 were originally "buried in the record as attachments to Petitioner's expert declarations" (*id.* at 3), and are now "present[ed] in a new light as separate documents" (*id.*). Substitute exhibits 1014–1040 were included as attachments to original Exhibits 1002 and 1003 (filed on May 10, 2013), but were not in compliance with 37 C.F.R § 42.63(c). Petitioner was authorized to refile the exhibits that were already included and listed in the Declarations of Drs. Morton and Nussbaum (Exs. 1002 and 1003, originally filed on May 10, 2013), to bring the exhibits into compliance with 37 C.F.R § 42.63(c). *See* Paper 21. The substitute exhibits were merely renumbered, and the replacement Declarations amended to reflect the new numbering scheme. We regard the risk of prejudice to Patent Owner as minimal in this instance.

Accordingly, the Motion is denied with respect to the replacement Declarations of Drs. Morton and Nussbaum (Exs. 1002 and 1003), and substitute Exhibits 1014–1040.

IPR2013-00277
Patent 8,318,430 B2

　　*2. Deposition Transcript of Dr. Butte (Ex. 1041); Dr. Morton's Second Declaration (Ex. 1042); Fan (Ex. 1011); (Lo Ex. 1045); (Daines Ex. 1046)*

　　Patent Owner argues that portions of Exhibit 1041 relied on by Petitioner on pages 1, 2, 4, 5, and 14 of its Reply (Paper 26) should be excluded under Federal Rule of Evidence 403[5] because "Petitioner's citations to portions of Ex. 1041 omit portions 'that in fairness ought to be considered at the same time,' and inaccurately characterized the testimony so as to be misleading and unfairly prejudicial to [Patent Owner]."  Mot. 4, 6.

　　Patent Owner also seeks to exclude paragraphs 3–46 of Dr. Morton's Second Declaration.  Essentially, Patent Owner contends

> Dr. Morton's second declaration is replete with attempted remedial testimony related to a *prima facie* case of obviousness that should have been submitted with the Petition.  It is packed with terms such as "person of ordinary skill," "motivation to combine references," "references considered as a whole," "reasonable expectation of success," and the "relevant field." None of these phrases or subjects appear in her first declaration or in the Petition.

*Id.* at 7.

　　Patent Owner further seeks to exclude Exhibits 1011 and 1045 as "new evidence used to belatedly address knowledge of the person of ordinary skill in the art during the relevant time period" and "outside the scope of the Petition."  *Id.* at 4, 13.  Patent Owner seeks to exclude Exhibit 1046 as "a belated identification of challenge."  *Id.* at 13.

---

[5] As stated in 37 C.F.R. § 42.62, the Federal Rules of Evidence generally apply in an *inter partes* review.

21

IPR2013-00277
Patent 8,318,430 B2

Nevertheless, the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign appropriate weight to evidence presented. *Gnosis S.P.A. v. S. Alabama Medical Science Foundation*, Case IPR2013-00118, slip op. at 43 (PTAB June 20, 2014) (Paper 64). *See also Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received."). In an *inter partes* review, we regard it as the better course to have a complete record of the evidence to facilitate public access, as well as appellate review. *See id.* ("If the record on review contains not only all evidence which was clearly admissible, but also all evidence of doubtful admissibility, the court which is called upon to review the case can usually make an end of it, whereas if evidence was excluded which that court regards as having been admissible, a new trial or rehearing cannot be avoided.").

To the extent the arguments made in Petitioner's Reply and Dr. Morton's Second Declaration are responsive to arguments made in Patent Owner's Response and Dr. Butte's Declaration, we have considered the arguments and found them unpersuasive. To the extent the arguments and evidence presented in Petitioner's Reply and Dr. Morton's Second Declaration are not responsive and could have been presented earlier to support Petitioner's challenge, we accord them no weight. Patent Owner's Motion to Exclude is denied.

IPR2013-00277
Patent 8,318,430 B2

## III. CONCLUSION

We conclude that Petitioner has failed to meet its burden of proof, by a preponderance of the evidence, that claims 19-30 of the '430 patent are unpatentable under 35 U.S.C. § 103 as having been obvious over the combination of Shoemaker, Dhallan, and Binladen.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has failed to prove by a preponderance of the evidence that claims 19-30 of U.S. Patent No. 8,318,430 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00277
Patent 8,318,430 B2

For PETITIONER:

Greg Gardella
cpdocketgardella@oblon.com

Scott McKeown
cpdocketmckeown@oblon.com

Kevin Laurence
cpdocketlaurence@oblon.com

Dianna DeVore
DDeVore@ariosadx.com

For PATENT OWNER:

Michael T. Rosato
mrosato@wsgr.com

Maya Skubatch
mskubatch@wsgr.com

Steven Pamelee
sparmelee@wsgr.com

24

Trials@uspto.gov                                    Paper 11
571-272-7822                              Entered: October 25, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ARIOSA DIAGNOSTICS, INC.
Petitioner

v.

VERINATA HEALTH, INC.
Patent Owner
_____

Case IPR2013-00276
Patent 8,318,430 B2

Before LORA M. GREEN, FRANCISCO C. PRATS, and
RAMA G. ELLURU, *Administrative Patent Judges.*

ELLURU, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00276
Patent 8,318,430

Ariosa Diagnostics, Inc. ("Ariosa") filed a petition (Paper 1) ("Pet.")
to institute an *inter partes* review of claims 1-18 of Patent 8,318,430 B2 (the
"'430 patent") pursuant to 35 U.S.C. § 311 *et seq.* Patent Owner, Verinata
Health, Inc. ("Verinata"), filed a preliminary response (Paper 10) to the
petition. We have jurisdiction under 35 U.S.C. § 314. For the reasons that
follow, the Board has determined that Ariosa has shown that there is a
reasonable likelihood that it will prevail on at least one of the challenged
claims, and we grant the petition.

## I. BACKGROUND

The standard for instituting an *inter partes* review is set forth in
35 U.S.C. § 314(a), which states:

> THRESHOLD – The Director may not authorize an inter partes
> review to be instituted unless the Director determines that the
> information presented in the petition filed under section 311
> and any response filed under section 313 shows that there is a
> reasonable likelihood that the petitioner would prevail with
> respect to at least 1 of the claims challenged in the petition.

Ariosa challenges claims 1-18 as unpatentable under 35 U.S.C.
§ 103(a). Pet. 16-56. We grant an *inter partes* review as to claims 1-18
based on the asserted ground that the challenged claims are unpatentable
over the combination of Shoemaker, Dhallan, and Binladen.

The '430 patent, entitled "Methods of Fetal Abnormality Detection,"
issued on November 27, 2012. The application on which the '430 patent
issued is a continuation of an application filed on January 24, 2011, which
in turn claims the benefit of a provisional application filed on January 23,
2010.

Ariosa informs us that the '430 patent is the subject of litigation
captioned *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, Case No. 3:12-

2
**A0055**

Case IPR2013-00276
Patent 8,318,430

cv-05501-S1 (N.D. Cal.).  Pet. 3.  Furthermore, concurrent with the instant petition, Ariosa filed a petition challenging claims 19-30 of the '430 patent, IPR2013-00277.

### A. The '430 Patent (Ex. 1001)

The '430 patent discloses that massively parallel sequencing techniques may be used in the detection of fetal aneuploidy, as fetal DNA often constitutes less than 10% of the DNA in a sample of maternal plasma. Ex. 1001, 1:23-26.  The '430 patent teaches a method for determining the presence or absence of fetal aneuploidy.  *Id.* at 1:41-42.  A cell-free sample that contains both maternal and fetal nucleic acids is obtained, and non-random polynucleotide sequences are enriched selectively.  *Id.* at 1:41-44. The enriched nucleic acids are sequenced and enumerated, with the enumeration serving as the basis for the presence or absence of fetal aneuploidy.  *Id.* at 1:45-48.  The enumeration step comprises counting, in a sample, the number of DNA fragments from a chromosome suspected of being aneuploid and the number of fragments from a non-aneuploid chromosome, that is, a reference chromosome.  Ex. 1001, 17:53-59, Ex. 1002 at ¶30.  The two numbers are compared to determine whether there is an abnormal level of DNA associated with the chromosome suspected of being aneuploid.  *Id.*  The method can be performed for a plurality of maternal blood samples using indexing techniques to distinguish results from different samples. Ex. 1001, 22:10-15.

Case IPR2013-00276
Patent 8,318,430

## B. Exemplary Claims

Claim 1 of the '430 patent is the only challenged independent claim, while claims 2-18 depend from claim 1, either directly or indirectly.  Claim 1 is representative of the challenged claims, and is reproduced below:

> 1. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of  maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:
>
> (a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;
>
> (b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal nonrandom polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples,
>
> wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selectedfrom a reference chromosome, wherein the first chromosome tested for being aneuploid and the reference chromosome are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length,

Case IPR2013-00276
Patent 8,318,430

(c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal nonrandom polynucleotide sequences;

(d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random olynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the reference chromosome;

(e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the reference chromosome; and

(f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the first chromosome and a number of enumerated sequence reads corresponding to the reference chromosome of (e).

## C. The Prior Art

Ariosa relies on the following prior art:

| Quake | 2007/0202525 A1 | Aug. 10, 2007 | (Ex. 1006) |
| Shoemaker | 2008/0090239 A1 | Apr. 17, 2008 | (Ex. 1008) |
| Dhallan | 7,332,277 B2 | Feb. 19, 2008 | (Ex. 1004) |

5

Case IPR2013-00276
Patent 8,318,430

Jonas Binladen et al., *The Use of Coded PCR Primers Enables High-Throughput Sequencing of Multiple Homolog Amplification Products by 454 Parallel Sequencing, PLoS ONE 1-9* (February 2007). (Ex. 1005) ("Binladen")

David W. Craig, et al., *Identification of Genetic Variants Using Barcoded Mutiplexed Sequencing, 5* NAT METHODS 887-893 (October 2008). (Ex. 1007) ("NatMethods")

Further, Ariosa relies upon declaration testimony of its witnesses, Cynthia Casson Morton, Ph.D. (Ex. 1002) and Robert Nussbaum, M.D. (Ex. 1003).

### D. The Asserted Grounds

Ariosa challenges claims 1-18 of the '430 patent on the following grounds:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Quake and Craig | § 103(a) | Claims 1-18 |
| Shoemaker, Dhallan, and Binladen | § 103(a) | Claims 1-18 |
| Dhallan and Binlanden | § 103(a) | Claims 1-18 |

## II. ANALYSIS

### A. Claim Interpretation

Consistent with the statute and legislative history of the America Invents Act (AIA), the Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]."  37 C.F.R. § 42.100(b); *see also Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012).

6

Case IPR2013-00276
Patent 8,318,430

Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Technology, Inc.,* 504 F.3d 1249, 1257 (Fed. Cir. 2007). "Absent claim language carrying a narrow meaning, the PTO should only limit the claim based on the specification . . . when [it] expressly disclaim the broader definition." *In re Bigio,* 381 F.3d 1320, 1325 (Fed Cir. 2004). "Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

For purposes of this decision, we interpret certain claim language as follows:

### 1. *"selectively enriching a plurality of non-random polynucleotide sequences" (Claim 1)*

Ariosa maintains that the term "selectively enriching" encompasses "increasing the concentration of a selected subset of nucleic acids relative to the remainder of the nucleic acids in the sample" and/or "increasing the concentration of a selected molecule in a sample relative to other molecules of the sample." Pet. 13-14 (emphasis deleted).

Verinata argues that, in the context of the claim language and the Specification, the term "selectively enriching" refers to "enrichment of non-random polynucleotide sequences selected to facilitate aneuploidy determination." Prelim. Resp. 7. Verinata contends that Ariosa has not provided a "legitimate reason" for substituting the claim language "non-random polynucleotide sequences" with "a subset of nucleic acids" or "selected molecule." *Id.* at 9. We agree.

Both the claim language and the Specification refer to "non-random

Case IPR2013-00276
Patent 8,318,430

polynucleotide sequences." Claim 1 requires enriching a "plurality of non-random polynucleotide sequences" including "at least 100 different non-random polynucleotide sequences" selected from a first chromosome tested for being aneuploid and from a reference chromosome. In addition, the Specification states that, although the prior art teaches methods of "randomly enriching" nucleic acids, there is a need for enriching "non-random fetal and maternal polynucleotide sequences" to facilitate aneuploidy detection. Ex. 1001, 1:33-37; *see also* Prelim. Resp. 9-10 (citing various portions of Specification). The Specification further discloses methods for selecting the non-random polynucleotide sequences to enrich. For example, "[t]he selection of polynucleotide sequences to enrich can be based on knowledge of *regions of chromosomes* that have a role in aneuploidy." Ex. 1001, 5:61-63 (emphasis added). Thus, we agree that the required "selective enrichment" is of "non-random polynucleotide sequences." Furthermore, the Specification provides that "selectively enriching" includes "performing PCR," *i.e.*, polymerase chain reaction, or "linear amplification," methods which increase the copy number of the selected nucleic acids, Ex. 1001, 2:40-43; Ex. 1002 ¶¶ 9, 10.

Accordingly, we interpret "selectively enriching a plurality of non-random polynucleotide sequences" to mean "increasing the copy number of selected non-random polynucleotide sequences."

*2. "at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome" (Claim 1)*

The parties do not offer a construction for this claim language. The interpretation of this claim language, however, influences our analysis of

8

Case IPR2013-00276
Patent 8,318,430

whether the combination of Quake and Craig renders obvious claims 1-18.

The claim language makes it clear that the "at least 100 different non-random polynucleotide sequences" that are selected from a first chromosome and a reference chromosome are *100 different sequences* from each of a first chromosome and a reference chromosome. The Specification explains that a plurality of sequences that are "*representative of a plurality of [. . . ] regions of a chromosome*" are enriched. Ex. 1001, 3:20-22 (emphasis added), 3:6-7. Furthermore, the number of regions of a chromosome, *i.e.*, the claimed non-random polynucleotide sequences, which can be enriched in a sample, can be at least 1 to 1000. *Id*. at 8:7-11, 8:56-61.

Accordingly, we interpret the claim phrase "at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome" as "100 different sequences selected from each of a reference chromosome and a reference chromosome."

### 3. "sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences" (Claim 1)

Ariosa maintains that the claim phrase "sequence reads" should be interpreted as "including the result of determining the order of nucleotides from sequencing selectively enriched and indexed polynucleotides." Pet. 15 (emphasis deleted). In support, Ariosa refers to the Specification, which according to Ariosa, describes "sequence reads" as the product of sequencing selectively enriched polynucleotides. *Id*. at 14 (citing Ex. 1001, 1:40-48.)

According to Verinata, the term "sequence reads" refers to "those sequences determined by performing massively parallel sequencing of the

Case IPR2013-00276
Patent 8,318,430

pool of selectively enriched non-random polynucleotide sequences selected from a first chromosome being tested for being aneuploid and the reference chromosome, which is different from the first chromosome." Prelim. Resp. 11-12. Verinata, thus, states that "sequence reads" reflect DNA sequence information. *Id*. at 12.

The claim language and Specification make clear that "sequence reads" result from DNA sequencing. Claim 1 requires "performing massively parallel sequencing" of the pooled libraries of enriched and indexed fetal and maternal non-random polynucleotide sequences "to produce sequence reads" corresponding to the enriched sequences and "enumerating sequence reads." *See* steps (d) and (e) of claim 1. As explained in step (f), the presence or absence of a fetal aneuploidy is determined using the "enumerated sequence reads" corresponding to the first chromosome tested for being aneuploidy and the reference chromosome. Likewise, the Specification explains that the claimed method comprises sequencing the enriched non-random polynucleotide sequences and enumerating the sequence reads from the sequencing step to determine the presence or absence of fetal aneuploidy. Ex. 1001, 1: 40-48. Figure 24 illustrates sequence reads mapped on chromosome 21, *i.e.*, SEQ ID NOS: 99-132, and shows the occurrence(s) of selected sequences. *Id*. at 5:38-40.

Based on the claim language and Specification disclosure, we determine that the claimed "sequence reads" correspond to the "occurrence(s) of a selected non-random polynucleotide sequence."

*4. "reference chromosome"*

Ariosa maintains that the claimed "reference chromosome" includes "a chromosome that is not being tested for aneuploidy and which is

10

Case IPR2013-00276
Patent 8,318,430

presumed prior to testing to be diploid." Pet 16 (emphasis deleted). In support, Ariosa states that various portions of the Specification describe "reference chromosomes" as chromosomes that can be used as comparators to a chromosome being tested for aneuploid. *Id*. at 15. Thus, contends Ariosa, a "reference chromosome" must be a chromosome that is not itself being tested for aneuploidy. *Id*. at 16.

Verinata argues that based on the claim language, which recites "wherein the first chromosome tested for being aneuploid and the reference chromosome are different," the only distinction between the chromosomes is that they are different. Prelim. Resp. 12.

We agree with Ariosa that the Specification describes the "reference chromosome" as a comparator to the chromosome being tested for aneuploidy. Ex. 1001, 2:10-11, 13:6-8, 13:62-63, 19:18-19, 20:58-59; Figs. 16 and 17. Ariosa does not provide support, however, from the claim language or from the Specification, for narrowing the interpretation of "reference chromosome" to a chromosome that is presumed prior to testing to be diploid. Indeed, as Verinata acknowledges, dependent claim 10 claims the "reference chromosome" could be chromosome 13, 18, or 21, even though the most common human autosomal aneuploidies are of chromosome 13, 18, and 21. Ex. 1003 ¶ 34. Thus, as Verinata points out, the only distinction the claim language makes between the "first chromosome" and the "reference chromosome" is that they are different.

Accordingly, we interpret "reference chromosome" as "a chromosome that is different from the claimed first chromosome tested."

11

Case IPR2013-00276
Patent 8,318,430

### B. Asserted Grounds of Unpatentability

Ariosa contends that under 35 U.S.C. § 103(a), claims 1-18 are unpatentable over Quake and Craig. Pet. 29-40. We conclude that Ariosa has not established a reasonable likelihood of prevailing on this ground.

### 1. Obviousness of claims 1-18 over the Combination of Quake and Craig

Verinata argues that the combination of Quake and Craig does not teach the claim 1 limitation "wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome." Prelim. Resp. 21-23. Ariosa asserts that limitation is taught by the disclosure of Quake. Pet. 32 (citing Ex. 1006 ¶ 29).

Quake is directed to a method of differential detection of target sequences in a mixture of maternal and fetal genetic material. Ex. 1006 at ¶ 26. Genetic material (*e.g.*, DNA) containing maternal and fetal genetic material is distributed into discrete samples, wherein each sample contains, on average, not more than "one target sequence" per sample. *Id.* at ¶¶ 26, 27, and 59 ("on the order of one copy of the chromosome of interest equivalent per reaction sample"). The genetic material in each sample is detected with a sequence-specific reactant directed to at least one of two target sequences in the genetic material. *Id.* at ¶ 26. Quake discloses, for example, that a probe specific to chromosome 21 is bound to the reaction sample, along with a control probe specific to another chromosome. *Id.* at ¶ 26. Thus, when the individual, discrete samples are analyzed for the genetic abnormality, the chromosome or target sequence to be analyzed will

Case IPR2013-00276
Patent 8,318,430

either be present or absent, and a reaction sample will contain, generally, a single template molecule, two target molecules, or three target molecules. *Id*. at ¶¶ 27, 78.

Quake teaches that a large number of reactions are run, and that the number of discrete samples are chosen according to the results desired. *Id*. at ¶¶ 26, 29. Quake explains that it is preferable to employ large numbers of reactions, preferably between 500 and 100,000, and more preferably between 10,000 and 100,000, in order to improve statistical significance. *Id*. at ¶ 29. As Verinata argues, however, while Quake teaches using a plurality of reaction samples, Quake does not teach analyzing "a plurality of non-random polynucleotide sequences," wherein said plurality comprises at least 100 different non-random polynucleotide sequences from each of a a first chromosome and a reference chromosome. *See* Prelim. Resp. 21-22.

As noted above, we interpret "at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome" as "100 different sequences selected from each of a reference chromosome and a reference chromosome." Quake does not teach enriching a plurality of different polynucleotide sequences, specifically the claimed "at least 100," from each of two chromosomes. Rather, Quake teaches that each reaction sample is analyzed for the presence or absence of "one target sequence" representing each of two chromosomes, the chromosome being tested and another chromosome. Ex. 1006 ¶¶ 26, 27, 29, 55, 85; *see* also Fig. 1A. Quake teaches limiting the number of primer pairs used in PCR amplification to "two primer pairs: one for amplifying a test sequence, and another pair for amplifying a control sequence." *Id.* at

13

Case IPR2013-00276
Patent 8,318,430

¶ 85.

Thus, while Quake teaches that there may be "targets to different regions," on a chromosome, Quake does not specify the number of different targets required by claim 1, *i.e.*, "at least 100 different non-random polynucleotide sequences" or that the plurality of targets are for each of two different chromosomes. *Id*. at ¶ 61. Furthermore, Ariosa does not point to any disclosure from Craig which teaches that limitation. *See, e.g.*, Pet. 32. Accordingly, we determine that the combination of Quake and Craig fails to teach the limitation "wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome."

For the foregoing reasons, we conclude that Ariosa has not demonstrated a reasonable likelihood that it would prevail on the ground that claims 1-18 are unpatentable as obvious over Quake and Craig.

### 2. Obviousness of claims 1-18 over the Combination of Shoemaker, Dhallan, and Binladen

Ariosa contends that the combination of Shoemaker, Dhallan, and Binladen renders obvious claims 1-18. Pet. 40-45. Based on the evidence of record and Ariosa's argument, we are persuaded that there is a reasonable likelihood that Ariosa will prevail in establishing that claims 1-18 would have been obvious over those references. Pet. 40-55. Verinata does not challenge this proposed ground of unpatentability.

Claim 1

*"A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a*

14

Case IPR2013-00276
Patent 8,318,430

> *plurality of different pregnant women, said maternal blood samples*
> *comprising fetal and maternal cell-free genomic DNA, said method*
> *comprising:"*

The combination of references suggests the claimed "method for determining the absence of a fetal aneuploidy," for example, of chromosomes 13, 18, or 21. Ex. 1008 ¶¶ 107, 140. Shoemaker describes methods of detecting such abnormalities in a mixed cell population (*e.g.*, maternal peripheral blood samples). *Id.* at ¶ 71. Dhallan teaches collecting "blood samples" "from a plurality of different pregnant women" as required by claim 1. Ex. 1004, 219:57-63; *see also* Ex. 1005, Abstract, 2:2:7-10. Dhallan teaches further that the serum of the blood of a pregnant female comprises fetal DNA. Ex. 1004 at 5:39-41, 32:22-25.

> *"(a) obtaining a fetal and maternal cell-free genomic DNA sample from*
> *each of the plurality of maternal blood samples;"*

The combination of references teaches the claimed "obtaining a fetal and maternal cell-free genomic DNA sample." Ex. 1004, 32:22-25. Specifically, Dhallan discloses that a template DNA is obtained from the plasma or serum of the blood of a pregnant female, which comprises fetal DNA. *Id.*

> *"(b) selectively enriching a plurality of non-random polynucleotide*
> *sequences of each fetal and maternal cell-free genomic DNA sample of (a)"*

The combination of references teaches the claimed "selectively enriching a plurality of non-random polynucleotide sequences." As noted above, we construe "selectively enriching a plurality of non-random polynucleotide sequences" to mean "increasing the copy number of selected non-random polynucleotide sequences." Dhallan discloses amplifying DNA using any suitable method known in the art, including polymerase chain reaction ("PCR"). Ex. 1004, 47:38-40.

15

**A0068**

Case IPR2013-00276
Patent 8,318,430

"*to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal nonrandom polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples,*"

The combination of references teaches the claimed "generat[ing] a library" from each sample of enriched and "indexed" polynucleotide sequences. For example, Shoemaker teaches labeling one or more regions of genomic DNA from the samples, amplifying highly polymorphic DNA region(s) (*e.g.*, SNPs), and quantifying the labeled DNA region. *Id.* at ¶¶ 13, 119, 147. The method may include labeling each DNA region with a unique tag sequence, which can be used to identify the presence or absence of a DNA polymorphism. *Id.* at ¶ 13. Shoemaker teaches an embodiment wherein the tagged and amplified DNA are pooled and purified prior to further processing. *Id.* at ¶¶ 118, 122. Binladen teaches using a tagged primer applied to each specific DNA template source. Ex. 1005, Abstract, 2:1:22-2:2:3.

"*wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome,*"

The combination of references teaches enriching a plurality of selected polynucleotide sequences "wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from" the claimed "first chromosome" and at least different 100 different non-random polynucleotide sequences selected from the claimed "reference chromosome" as required by claim 1. As noted above, we interpret the claim phrase "at least 100 different non-

16

Case IPR2013-00276
Patent 8,318,430

random polynucleotide sequences selected from a first chromosome tested for being aneuploidy and at least 100 different non-random polynucleotide sequences selected from a reference chromosome" as "100 different sequences selected from each of a reference chromosome and a reference chromosome."

Shoemaker discloses amplifying, for example, 2-100 highly polymorphic, genomic DNA regions (*e.g.*, SNPs) of a target chromosome (*e.g.*, chromosome 13, 18, 21, and/or X). Ex. 1008 ¶ 147. Shoemaker explains further that SNPs for amplification can be selected along control regions of the genome, where aneuploidy is not expected, or because of their association with a particular condition that can be detected in a fetus. *Id.*; see also ¶ 159. Dhallan teaches in a particular embodiment the use of 100 primer sets to amplify 100 loci on a chromosome. *Id.* at 25:1-10, 179:39-180:39.

*"wherein the first chromosome tested for being aneuploid and the reference chromosome are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length,"*

The combination of references teaches enriching sequences from a "first chromosome tested for being aneuploidy" and a different chromosome, *i.e.*, the "reference chromosome," each of which is "from 10 to 1000 nucleotides bases in length" as required by claim 1. Shoemaker describes amplifying tagged nucleic acids including, for example 100, polymorphic DNA regions on a chromosome suspected of trisomy and on a control chromosome. Ex. 1008 ¶ 147; *see also* Ex. 1004, 7:44-52. Furthermore, Shoemaker states that amplification can be used to generate amplicons from

17

Case IPR2013-00276
Patent 8,318,430

10 to 1000 nucleotide base pairs in size.  *Id*. at ¶ 147; *see also* Ex. 1004,
29:6-9.

*"(c) pooling the libraries generated in (b) to produce a pool of enriched and
indexed fetal and maternal non-random polynucleotide sequences;"*

The combination of references teaches the claimed "pooling the

libraries" of enriched polynucleotide sequences.  For example, Shoemaker

states that "genomic DNA regions tagged/amplified are pooled and purified"

prior to further processing, including measuring allele abundance of

genomic DNA regions.  Ex. 1008 ¶ 121, *see also* ¶¶ 118, 122.

*"(d) performing massively parallel sequencing of the pool of enriched and
indexed fetal and maternal non-random polynucleotide sequences of (c) to
produce sequence reads corresponding to enriched and indexed fetal and
maternal non-random polynucleotide sequences of each of the at least 100
different non-random polynucleotide sequences selected from the first
chromosome tested for being aneuploid and sequence reads corresponding
to enriched and indexed fetal and maternal non-random polynucleotide
sequences of each of the at least 100 different non-random polynucleotide
sequences selected from the reference chromosome;"*

The combination of references teaches the claimed "performing

massively performing sequencing" on the pooled enriched and indexed

polynucleotide sequence "to produce sequence reads" corresponding to the

at least 100 different polynucleotide sequences selected from each of the

first chromosome and the reference chromosome.

Shoemaker teaches amplifying DNA regions and analyzing them by

sequencing methods, including by the Illumina Genome Analyzer.  Ex. 1008

¶¶ 15, 157.  Shoemaker describes a machine capable of highly parallel

sequencing that generates "400,000 reads" in a single 4 hour run.  *Id*. at

¶ 127.  Shoemaker describes further measuring allele abundance of genomic

DNA regions.  *Id*. at ¶ 122.  In addition, Dhallan  teaches sequencing alleles

18

Case IPR2013-00276
Patent 8,318,430

of multiple loci on different chromosomes, quantitating their relative amounts, and expressing the amounts as a ratio.  Ex. 1004, 7:9-16.

> *"(e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the reference chromosome; and"*

The combination of references suggests the claimed "enumerating sequence reads" corresponding to enriched and indexed polynucleotide sequence selected each from a first chromosome and a reference chromosome.  Specifically, Shoemaker teaches that locator elements of tagged sequences can be used to sort the sequence reads into "bins" and that the sequence reads from each of the bins are separated into the different genomic DNA region groups.  Ex. 1008 at ¶ 138.  Dhallan explains that "[i]n embodiments, the ratio for alleles at heterozygous loci of interest on a chromosome are summed and compared to the ratio for alleles at heterozygous loci of interest on a different chromosome, where a difference in ratios indicates the presence of a chromosomal abnormality."  Ex. 1004, 7:44-49; *see also* Ex. 1005, Background, 6:2-3-5.

> *"(f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the first chromosome and a number of enumerated sequence reads corresponding to the reference chromosome of (e)."*

The combination of references suggests, for each maternal blood sample, the claimed "determining the presence or absence of a fetal aneuploidy" using "enumerated sequence reads" corresponding to the first chromosome and reference chromosome.  Ex. 1008 ¶ 140.  Shoemaker

19

Case IPR2013-00276
Patent 8,318,430

teaches using allele abundance to detect aneuploidy, for example, of chromosomes 13, 18, and 21. *Id.* Shoemaker explains that the abundance of alleles can be determined by comparing the ratio of maternal to paternal alleles for each amplified genomic region. *Id.* Specifically, Shoemaker teaches:

> For example, if 12 STRs [short tandem repeats] are analyzed, for each bin there are 33 sequence reads for each of the STRs. In a normal fetus, a given STR will have 1:1 ratio of the maternal to paternal alleles with approximately 16 sequence reads corresponding to each allele (normal diallelic). In a trisomic fetus, three doses of an STR marker will be detected either as three alleles with a 1:1:1 ratio (trisomic triallelic) or two alleles with a ratio of 2:1 (trisomic diallelic).

*Id.*; *see also* Ex. 1004, 7:44-49.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Ariosa would prevail on the ground that independent claim 1 is unpatentable as obvious over Shoemaker, Dhallan, and Binladen. We further conclude that there is a reasonable likelihood that Ariosa would prevail in demonstrating that dependent claims 2-18 are unpatentable for the same or similar reasons. Pet. 48-55.

### 3. Obviousness of claims 1-18 over the Combination of Dhallan and Binladen

Given our determination that there is a reasonable likelihood that Ariosa would prevail on the ground that claims 1-18 are unpatentable as obvious over Shoemaker, Dhallan, and Binladen, we exercise our discretion to deny as redundant Ariosa's asserted ground that claims 1-18 are rendered obvious over Dhallan and Binladen.

Case IPR2013-00276
Patent 8,318,430

*C. Conclusion*

We conclude that Ariosa has demonstrated a reasonable likelihood of prevailing on the following grounds of unpatentability asserted in the Petition:

Claims 1-18 under 35 U.S.C. § 103(a) as unpatentable over Shoemaker, Dhallan, and Binladen.

We deny the petition to institute an *inter partes* review of claims 1-18 under 35 U.S.C. § 103(a) as unpatentable over Dhallan, and Binladen as redundant to the above ground.

We conclude that Ariosa has not demonstrated a reasonable likelihood of prevailing on the following grounds of unpatentability asserted in the Petition:

Claims 1-18 under 35 U.S.C. § 103(a) as unpatentable over Quake and Craig.

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim.

III. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted for the following grounds of unpatentability:

Claims 1-18 under 35 U.S.C. § 103(a) as unpatentable over Shoemaker, Dhallan, and Binladen;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '430 patent is hereby instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R.

21

**A0074**

Case IPR2013-00276
Patent 8,318,430

§ 42.4, notice is hereby given of the institution of a trial;

FURTHER ORDERED that the trial is limited to the grounds and claims identified above, and no other grounds are authorized as to these claims as they currently stand; and

FURTHER ORDERED that an initial conference call with the Board is scheduled for 11:00 a.m. Eastern Time on October 25, 2013. The parties are directed to the Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48765-66 (Aug. 14, 2012) for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

Case IPR2013-00276
Patent 8,318,430

PETITIONER:

Greg Gardella
cpdocketgardella@oblon.com

Scott McKeown
cpdocketmckeown@oblon.com

Kevin Laurence
klaurence@oblon.com

PATENT OWNER:

Michael Rosato
mrosato@wsgr.com

Maya Skubatch
mskubatch@wsgr.com

23

Trials@uspto.gov                              Paper 10
571-272-7822                         Entered: October 25, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ARIOSA DIAGNOSTICS, INC.
Petitioner

v.

VERINATA HEALTH, INC.
Patent Owner
_____

Case IPR2013-00277
Patent 8,318,430 B2

Before LORA M. GREEN, FRANCISCO C. PRATS, and
RAMA G. ELLURU, *Administrative Patent Judges.*

ELLURU, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00277
Patent 8,318,430

Ariosa Diagnostics, Inc. ("Ariosa") filed a petition (Paper 1) ("Pet.") to institute an *inter partes* review of claims 19-30 of Patent 8,318,430 B2 (the "'430 patent") pursuant to 35 U.S.C. § 311 *et seq*.  Patent Owner, Verinata Health, Inc. ("Verinata"), filed a preliminary response (Paper 9) to the petition.  We have jurisdiction under 35 U.S.C. § 314.  For the reasons that follow, the Board has determined that Ariosa has shown that there is a reasonable likelihood that it will prevail to at least one of the challenged claims, and we grant the petition.

## I. BACKGROUND

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which states:

> THRESHOLD – The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Ariosa challenges claims 19-30 as unpatentable under 35 U.S.C. § 103(a).  Pet. 16-54.  We grant an *inter partes* review as to claims 19-30 based on the asserted ground that the challenged claims are unpatentable over the combination of Shoemaker, Dhallan, and Binladen.

The '430 patent, entitled "Methods of Fetal Abnormality Detection," issued on November 27, 2012.  The application on which the '430 patent issued is a continuation of an application filed on January 24, 2011, which in turn claims the benefit of a provisional application filed on January 23, 2010.

Ariosa informs us that the '430 patent is the subject of litigation captioned *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, Case No. 3:12-

Case IPR2013-00277
Patent 8,318,430

cv-05501-S1 (N.D. Cal.).  Pet. 3.  Furthermore, concurrent with the instant
petition, Ariosa filed a petition challenging claims 1-18 of the '430 patent,
IPR2013-00276.

### A.  *The '430 Patent (Ex. 1001)*

The '430 patent discloses that massively parallel sequencing
techniques may be used in the detection of fetal aneuploidy, as fetal DNA
often constitutes less than 10% of the DNA in a sample of maternal plasma.
Ex. 1001, 1:23-26.  The '430 patent teaches a method for determining the
presence or absence of fetal aneuploidy.  *Id.* at 1:41-42.  A cell-free sample
that contains both maternal and fetal nucleic acids is obtained, and non-
random polynucleotide sequences are enriched selectively.  *Id.* at 1:41-44.
The enriched nucleic acids are sequenced and enumerated, with the
enumeration serving as the basis for the presence or absence of fetal
aneuploidy.  *Id.* at 1:45-48.  The enumeration step comprises counting, in a
sample, the number of DNA fragments from a chromosome suspected of
being aneuploid and the number of fragments from a non-aneuploid
chromosome, that is, a reference chromosome.  Ex. 1001, 17:53-59, Ex.
1002 at ¶30.  The two numbers are compared to determine whether there is
an abnormal level of DNA associated with the chromosome suspected of
being aneuploid.  *Id.*  The method can be performed for a plurality of
maternal blood samples using indexing techniques to distinguish results
from different samples.  Ex. 1001, 22:10-15.

Case IPR2013-00277
Patent 8,318,430

*B. Exemplary Claims*

Claim 19 of the '430 patent is the only challenged independent claim,

while claims 20-30 depend from claim 19, either directly or indirectly.

Claim 19 is representative of the challenged claims and is reproduced below:

19. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:

(a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;

(b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal nonrandom polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples,

wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region, wherein the at least one chromosome region tested for being aneuploid and the at least one chromosome control region are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length;

(c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

(d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome control region;

(e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome control region; and

(f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the at least one chromosome region tested for being aneuploid and a number of enumerated sequence reads corresponding to the at least one chromosome control region of (e).

### C. The Prior Art

Ariosa relies on the following prior art:

| | | |
|---|---|---|
| Quake | 2007/0202525 A1 | Aug. 10, 2007 (Ex. 1006) |
| Shoemaker | 2008/0090239 A1 | Apr. 17, 2008 (Ex. 1008) |
| Dhallan | 7,332,277 B2 | Feb. 19, 2008 (Ex. 1004) |

Jonas Binladen et al., *The Use of Coded PCR Primers Enables High-Throughput Sequencing of Multiple Homolog Amplification Products by 454 Parallel Sequencing, PLoS ONE 1-9* (February 2007). (Ex. 1005) ("Binladen")

Case IPR2013-00277
Patent 8,318,430

David W. Craig, et al., *Identification of Genetic Variants Using Barcoded Mutiplexed Sequencing, 5* NAT METHODS 887-893 (October 2008). (Ex. 1007) ("NatMethods")

Further, Ariosa relies upon declaration testimony of its witnesses, Cynthia Casson Morton, Ph.D. (Ex. 1002) and Robert Nussbaum, M.D. (Ex. 1003).

### D. The Asserted Grounds

Ariosa challenges claims 19-30 of the '430 patent on the following grounds:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Quake and Craig | § 103(a) | Claims 19-30 |
| Shoemaker, Dhallan, and Binladen | § 103(a) | Claims 19-30 |
| Dhallan and Binladen | § 103(a) | Claims 19-30 |

## II. ANALYSIS

### A. Claim Interpretation

Consistent with the statute and legislative history of the America Invents Act (AIA), the Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *see also Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012).

Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Technology, Inc.,* 504 F.3d 1249, 1257 (Fed. Cir. 2007). "Absent claim

Case IPR2013-00277
Patent 8,318,430

language carrying a narrow meaning, the PTO should only limit the claim

based on the specification . . . when [it] expressly disclaim the broader

definition." *In re Bigio,* 381 F.3d 1320, 1325 (Fed Cir. 2004). "Although an

inventor is indeed free to define the specific terms used to describe his or her

invention, this must be done with reasonable clarity, deliberateness, and

precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

For purposes of this decision, we interpret certain claim language as

follows:

### 1. *"selectively enriching a plurality of non-random polynucleotide sequences" (Claim 1)*

Ariosa maintains that the term "selectively enriching" encompasses

"increasing the concentration of a selected subset of nucleic acids relative to

the remainder of the nucleic acids in the sample" and/or "increasing the

concentration of a selected molecule in a sample relative to other molecules

of the sample." Pet. 12-13 (emphasis deleted).

Verinata argues that, in the context of the claim language and the

Specification, the term "selectively enriching" refers to "enrichment of non-

random polynucleotide sequences selected to facilitate aneuploidy

determination." Prelim. Resp. 8. Verinata contends that Ariosa has not

provided a "legitimate reason" for substituting the claim language "non-

random polynucleotide sequences" with "a subset of nucleic acids" or

"selected molecule." *Id*. at 9. We agree.

Both the claim language and the Specification refer to "non-random

polynucleotide sequences." Claim 19 requires enriching a "plurality of non-

random polynucleotide sequences" including "at least 100 different non-

random polynucleotide sequences" selected from at least one chromosome

region tested for being aneuploid and from at least one chromosome control

7

Case IPR2013-00277
Patent 8,318,430

region.  In addition, the Specification states that, although the prior art teaches methods of "randomly enriching" nucleic acids, there is a need for enriching "non-random fetal and maternal polynucleotide sequences" to facilitate aneuploidy detection.  Ex. 1001, 1:33-37; *see also* Prelim. Resp. 9-10 (citing various portions of Specification).  The Specification further discloses methods for selecting the non-random polynucleotide sequences to enrich.  For example, "[t]he selection of polynucleotide sequences to enrich can be based on knowledge of *regions of chromosomes* that have a role in aneuploidy."  Ex. 1001, 5:61-63 (emphasis added).  Thus, we agree that the required "selective enrichment" is of "non-random polynucleotide sequences."  Furthermore, the Specification provides that "selectively enriching" includes "performing PCR," *i.e.*, polymerase chain reaction, or "linear amplification," methods which increase the copy number of the selected nucleic acids, Ex. 1001, 2:40-43; Ex. 1002 ¶¶ 9, 10.

Accordingly, we interpret "selectively enriching a plurality of non-random polynucleotide sequences" to mean "increasing the copy number of selected non-random polynucleotide sequences."

   *2. "at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region"(Claim 19)*

The parties do not offer a construction for this claim language.  The interpretation of this claim language, however, influences our analysis of whether the combination of Quake and Craig renders obvious claims 19-30.

The claim language makes it clear that the "at least 100 different non-random polynucleotide sequences" that are selected from at least one chromosome region and at least one chromosome control region are *100*

8

Case IPR2013-00277
Patent 8,318,430

*different sequences* from each of a chromosome region and a chromosome
control region.  The Specification explains that a plurality of sequences that
are "*representative of a plurality of [. . . ] regions of a chromosome*" are
enriched.  Ex. 1001, 3:20-22 (emphasis added), 3:6-7.  Furthermore, the
number of regions of a chromosome, *i.e.*, the claimed non-random
polynucleotide sequences, which can be enriched in a sample, can be at least
1 to 1000.  *Id*. at 8:7-11, 8:56-61.

Accordingly, we interpret the claim phrase "at least 100 different non-
random polynucleotide sequences selected from at least one chromosome
region tested for being aneuploid and at least 100 different non-random
polynucleotide sequences selected from at least one chromosome control
region" as "100 different sequences selected from each of a chromosome
region and a chromosome control region."

   *3. "sequence reads corresponding to enriched and indexed fetal and
        maternal non-random polynucleotide sequences" (Claim 19)*

Ariosa maintains that the claim phrase "sequence reads" should be
interpreted as "including the result of determining the order of nucleotides
from sequencing selectively enriched and indexed polynucleotides."  Pet. 15
(emphasis deleted).  In support, Ariosa refers to the Specification, which
according to Ariosa, describes "sequence reads" as the product of
sequencing selectively enriched polynucleotides.  *Id*. at 14 (citing Ex. 1001,
1:40-48).

According to Verinata, the term "sequence reads" refers to "those
sequences determined by performing massively parallel sequencing of the
pool of selectively enriched non-random polynucleotide sequences selected
from the at least one chromosome region tested for being aneuploid and the
at least one chromosome control region, which is different from the at least

9

Case IPR2013-00277
Patent 8,318,430

one chromosome region tested for being aneuploid." Prelim. Resp. 12. Verinata, thus, states that "sequence reads" reflect DNA sequence information. *Id.*

The claim language and Specification make clear that "sequence reads" result from DNA sequencing. Claim 19 requires "performing massively parallel sequencing" of the pooled libraries of enriched and indexed fetal and maternal non-random polynucleotide sequences "to produce sequence reads" corresponding to the enriched sequences and "enumerating sequence reads." *See* steps (d) and (e) of claim 19. As explained in step (f), the presence or absence of a fetal aneuploidy is determined using the "enumerated sequence reads" corresponding to the at least one chromosome region tested for being aneuploid and the at least one chromosome control region. Likewise, the Specification explains that the claimed method comprises sequencing the enriched non-random polynucleotide sequences and enumerating the sequence reads from the sequencing step to determine the presence or absence of fetal aneuploidy. Ex. 1001, 1: 40-48. Figure 24 illustrates sequence reads mapped on chromosome 21, *i.e.*, SEQ ID NOS: 99-132, and shows the occurrence(s) of selected sequences. *Id.* at 5:38-40.

Based on the claim language and Specification disclosure, we determine that the claimed "sequence reads" correspond to the "occurrence(s) of a selected non-random polynucleotide sequence."

*4. "chromosome control region"*

Ariosa maintains that the claimed "chromosome control region" includes "a segment of a chromosome not being tested for aneuploidy and which is presumed prior to testing to be diploid." Pet. 15 (emphasis

10

Case IPR2013-00277
Patent 8,318,430

deleted).  In support, Ariosa states that the various portions of the
Specification describe "chromosome control region" as a segment from a
chromosome that can actually serve as a comparator to a segment of a
chromosome being tested for aneuploidy.  Pet. 15.  Thus, contends Ariosa,
the "chromosome control region" must be a segment from a chromosome
not tested for being aneuploidy.  *Id.*

Verinata argues that based on the claim language, which recites
"wherein the at least one chromosome region tested for being aneuploid and
the at least one chromosome control region are different," the only
distinction between the chromosome control regions is that they are
different.  Prelim. Resp. 13.

We agree with Ariosa that the Specification describes the
"chromosome control region" as a chromosome segment that serves as a
comparator to a segment of chromosome being tested for aneuploidy.
Ex. 1001, 2:10-11, 13:6-8, 13:62-63, 19:18-19, 20:58-59; Figs. 16 and 17.
Ariosa does not provide support, however, from the claim language or from
the Specification for narrowing the interpretation of "chromosome control
region" to a segment of a chromosome which is presumed prior to testing to
be diploid.  Indeed, as Verinata acknowledges, dependent claim 26 claims
the "chromosome control region" can be selected from at least one of
chromosome selected from chromosomes 13, 18, or 21, all of which the
Specification identifies as chromosome control regions that can be tested for
aneuploidy.  Prelim. Resp. 13.  Thus, as Verinata points out, the only
distinction the claim language makes between the "one chromosome region"
and the "chromosome control region" is that they are different.

Case IPR2013-00277
Patent 8,318,430

Accordingly, we interpret "chromosome control region" as "a chromosome region that is different from the claimed one chromosome region tested."

### B. Asserted Grounds of Unpatentability

Ariosa contends that under 35 U.S.C. § 103(a), claims 19-30 are unpatentable over Quake and Craig. Pet. 27-38. We conclude that Ariosa has not established a reasonable likelihood of prevailing on this ground.

### 1. Obviousness of claims 19-30 over the Combination of Quake and Craig

Verinata argues that the combination of Quake and Craig does not teach the claim 19 limitation "wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region." Prelim. Resp. 22-23. Ariosa asserts that that limitation is taught by the disclosure of Quake. Pet. 30 (citing Ex. 1006 ¶¶ 29, 31.)

Quake is directed to a method of differential detection of target sequences in a mixture of maternal and fetal genetic material. Ex. 1006 at ¶ 26. Genetic material (*e.g.*, DNA) containing maternal and fetal genetic material is distributed into discrete samples, wherein each sample contains, on average, not more than "one target sequence" per sample. *Id.* at ¶¶ 26, 27, 59 ("on the order of one copy of the chromosome of interest equivalent per reaction sample"). The genetic material in each sample is detected with a sequence-specific reactant directed to at least one of two target sequences in the genetic material. *Id.* at ¶ 26. Quake discloses, for example, that a probe specific to chromosome 21 is bound to the reaction sample, along with

12

Case IPR2013-00277
Patent 8,318,430

a control probe specific to another chromosome. *Id*. at ¶ 26. Thus, when the individual, discrete samples are analyzed for the genetic abnormality, the chromosome or target sequence to be analyzed will either be present or absent, and a reaction sample will contain, generally, a single template molecule, two target molecules, or three target molecules. *Id*. at ¶¶ 27, 78.

Quake teaches that a large number of reactions are run, and that the number of discrete samples are chosen according to the results desired. *Id*. at ¶¶ 26, 29. Quake explains that it is preferable to employ large numbers of reactions, preferably between 500 and 100,000, and more preferably between 10,000 and 100,000, in order to improve statistical significance. *Id*. at ¶ 29. As Verinata argues, however, while Quake teaches using a plurality of reaction samples, Quake does not teach analyzing "a plurality of non-random polynucleotide sequences," wherein said plurality comprises at least 100 different non-random polynucleotide sequences from each of at least one chromosome region and at least one chromosome control region. *See* Prelim. Resp. 23.

As noted above, we interpret "at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region" as "100 different sequences selected from each of a chromosome region and a chromosome control region." Quake does not teach enriching a plurality of different polynucleotide sequences, specifically the claimed "at least 100," from each of a chromosome region and a chromosome control region. Rather, Quake teaches that each reaction sample is analyzed for the presence or absence of "one target sequence" representing each of two

13

Case IPR2013-00277
Patent 8,318,430

chromosomes, the chromosome being tested and another chromosome.
Ex. 1006 ¶¶ 26, 27, 29, 55, 85; Fig. 1A. Quake teaches limiting the number of primer pairs used in PCR amplification to "two primer pairs: one for amplifying a test sequence, and another pair for amplifying a control sequence." *Id.* at ¶ 85.

Thus, while Quake teaches that there may be "targets to different regions," on a chromosome, Quake does not specify the number of different targets required by claim 19, *i.e.*, "at least 100 different non-random polynucleotide sequences" or that the plurality of targets are for each of two different chromosomes. *Id.* at ¶ 61. Furthermore, Ariosa does not point to any disclosure from Craig which teaches that limitation. *See, e.g.*, Pet. 32. Accordingly, we determine that the combination of Quake and Craig fails to teach the limitation "wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region."

For the foregoing reasons, we conclude that Ariosa has not demonstrated a reasonable likelihood that it would prevail on the ground that claims 19-30 are unpatentable as obvious over Quake and Craig.

### 2. Obviousness of claims 19-30 over the Combination of Shoemaker, Dhallan, and Binladen

Ariosa contends that the combination of Shoemaker, Dhallan, and Binladen renders obvious claims 19-30. Pet. 38-54. Based on the evidence of record and Ariosa's argument, we are persuaded that there is a reasonable likelihood that Ariosa will prevail in establishing that claims 19-30 would

14

Case IPR2013-00277
Patent 8,318,430

have been obvious over those references. Pet. 38-54. Verinata does not

challenge this proposed ground of unpatentability.

<u>Claim 19</u>

*"A method for determining a presence or absence of a fetal aneuploidy in a*
*fetus for each of a plurality of maternal blood samples obtained from a*
*plurality of different pregnant women, said maternal blood samples*
*comprising fetal and maternal cell-free genomic DNA, said method*
*comprising:"*

The combination of references suggests the claimed "method for

determining a presence or absence of a fetal aneuploidy," for example, of

chromosomes 13, 18, or 21. Ex. 1008 ¶¶ 107, 140. Shoemaker describes

methods of detecting such abnormalities in a mixed cell population (*e.g.*,

maternal peripheral blood samples). *Id*. at ¶ 71. Dhallan teaches collecting

"blood samples" "from a plurality of different pregnant women" as required

by claim 19. Ex. 1004, 219:57-63; *see also* Ex. 1005, Abstract, 2:2:7-10.

Dhallan teaches further that the serum of the blood of a pregnant female

comprises fetal DNA. Ex. 1004 at 5:39-41, 32:22-25.

*"(a) obtaining a fetal and maternal cell-free genomic DNA sample from*
*each of the plurality of maternal blood samples";*

The combination of references teaches the claimed "obtaining a fetal

and maternal cell-free genomic DNA sample." Ex. 1004, 32:22-25.

Specifically, Dhallan discloses that a template DNA is obtained from the

plasma or serum of the blood of a pregnant female, which comprises fetal

DNA. *Id*.

*"(b) selectively enriching a plurality of non-random polynucleotide*
*sequences of each fetal and maternal cell-free genomic DNA sample of (a)"*

The combination of references teaches the claimed "selectively

enriching a plurality of non-random polynucleotide sequences." As noted

15

Case IPR2013-00277
Patent 8,318,430

above, we construe "selectively enriching a plurality of non-random polynucleotide sequences" to mean "increasing the copy number of selected non-random polynucleotide sequences." Dhallan discloses amplifying DNA using any suitable method known in the art, including polymerase chain reaction ("PCR"). Ex. 1004, 47:38-40.

> *"to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal nonrandom- polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples,"*

The combination of references teaches the claimed "generat[ing] a library" from each sample of enriched and "indexed" polynucleotide sequences. For example, Shoemaker teaches labeling one or more regions of genomic DNA from the samples, amplifying highly polymorphic DNA region(s) (*e.g.*, SNPs), and quantifying the labeled DNA region. Ex. 1008 at ¶¶ 13, 119, 147. The method may include labeling each DNA region with a unique tag sequence, which can be used to identify the presence or absence of a DNA polymorphism. *Id*. at ¶ 13. Shoemaker teaches an embodiment wherein the tagged and amplified DNA are pooled and purified prior to further processing. *Id*. at ¶¶ 118, 122. Binladen also teaches using a tagged primer applied to each specific DNA template source. Ex. 1005, Abstract, 2:1:22-2:2:3.

> *"wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region,"*

The combination of references teaches enriching a plurality of

16

Case IPR2013-00277
Patent 8,318,430

selected polynucleotide sequences "wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from" the claimed "at least one chromosome" and at least 100 different non-random polynucleotide sequences selected from the claimed "chromosome control region" as required by claim 19. As noted above, we interpret the claim phrase "at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploidy and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region" as "100 different sequences selected from each of a chromosome region and a chromosome control region." Shoemaker discloses amplifying, for example, 2-100, highly polymorphic, genomic DNA regions (*e.g.*, SNPs) of a target chromosome (*e.g.*, chromosome 13, 18, 21, and/or X). Ex. 1008 ¶ 147. Shoemaker further explains that SNPs for amplification also can be selected along control regions of the genome, where aneuploidy is not expected or because of their association with a particular condition that can be detected in a fetus. *Id.*; *see also* ¶ 159. Also, in a particular embodiment, Dhallan teaches the use of 100 primer sets to amplify 100 loci on a chromosome. Ex. 1004 at 25:1-10, 179:39-180:39.

*"wherein the at least one chromosome region tested for being aneuploid and the at least one chromosome control region are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length"*

The combination of references teaches enriching sequences from at least "one chromosome region tested for being aneuploidy" and a different chromosome, *i.e.*, the "chromosome control region," each of which is "from 10 to 1000 nucleotides bases in length" as required by claim 19.

17

Case IPR2013-00277
Patent 8,318,430

Specifically, Shoemaker describes amplifying tagged nucleic acids including, for example, 100 polymorphic DNA regions on a chromosome suspected of trisomy and on a control chromosome. Ex. 1008 ¶ 147; *see also* Ex. 1004, 7:44-52. Shoemaker states further that amplification can be used to generate amplicons from 10 to 1000 nucleotide base pairs in size. *Id*. at ¶ 147; *see also* Ex. 1004, 29:6-9.

*"(c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences"*;

The combination of references teaches the claimed "pooling the libraries" of enriched polynucleotide sequences. For example, Shoemaker states that "genomic DNA regions tagged/amplified are pooled and purified" prior to further processing, including measuring allele abundance of genomic DNA regions. Ex. 1008 ¶ 121, *see also* ¶¶ 118, 122.

*"(d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome control region"*;

The combination of references teaches the claimed "performing massively performing sequencing" on the pooled enriched and indexed polynucleotide sequence "to produce sequence reads" corresponding to the at least 100 different polynucleotide sequences selected from each of the first chromosome and the reference chromosome. Shoemaker teaches amplifying DNA regions and analyzing them by sequencing methods, including by the Illumina Genome Analyzer. Ex. 1008 ¶¶ 15, 157.

Case IPR2013-00277
Patent 8,318,430

Shoemaker describes a machine capable of highly parallel sequencing that generates "400,000 reads" in a single 4 hour- run. *Id*. at ¶ 127. Shoemaker describes further measuring allele abundance of genomic DNA regions. *Id*. at ¶ 122. In addition, Dhallan teaches sequencing alleles of multiple loci on different chromosomes, quantitating their relative amounts, and expressing the amounts as a ratio. Ex. 1004, 7:9-16.

> *"(e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome control region; and"*

The combination of references suggests the claimed "enumerating sequence reads" corresponding to enriched and indexed polynucleotide sequence selected each from a first chromosome and a reference chromosome. Specifically, Shoemaker teaches that locator elements of tagged sequences can be used to sort the sequence reads into "bins" and that the sequence reads from each of the bins are separated into the different genomic DNA region groups. Ex. 1008 at ¶ 138. Dhallan explains that "in embodiments, the ratio for alleles at heterozygous loci of interest on a chromosome are summed and compared to the ratio for alleles at heterozygous loci of interest on a different chromosome, where a difference in ratios indicates the presence of a chromosomal abnormality." Ex. 1004, 7:44-49; *see also* Ex. 1005, Background, 6:2-3-5.

> *"(f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the at least one chromosome region tested for being aneuploid and a number of enumerated sequence reads corresponding to the at least one chromosome control region of (e)."*

A0095

Case IPR2013-00277
Patent 8,318,430

The combination of references suggests, for each maternal blood sample, the claimed "determining the presence or absence of a fetal aneuploidy" using "enumerated sequence reads" corresponding to the first chromosome and reference chromosome. Ex. 1008 ¶ 140. Shoemaker teaches using allele abundance to detect aneuploidy, for example, of chromosomes 13, 18, and 21. *Id.* Shoemaker explains that the abundance of alleles can be determined by comparing the ratio of maternal to paternal alleles for each amplified genomic region. *Id.* Specifically, Shoemaker teaches:

> For example, if 12 STRs [short tandem repeats] are analyzed, for each bin there are 33 sequence reads for each of the STRs. In a normal fetus, a given STR will have 1:1 ratio of the maternal to paternal alleles with approximately 16 sequence reads corresponding to each allele (normal diallelic). In a trisomic fetus, three doses of an STR marker will be detected either as three alleles with a 1:1:1 ratio (trisomic triallelic) or two alleles with a ratio of 2:1 (trisomic diallelic).

*Id.*; *see also* Ex. 1004, 7:44-49.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Ariosa would prevail on the ground that independent claim 19 is unpatentable as obvious over Shoemaker, Dhallan, and Binladen. We further conclude that there is a reasonable likelihood that Ariosa would prevail in demonstrating that dependent claims 20-30 are unpatentable for the same or similar reasons. Pet. 47-53.

### 3. Obviousness of claims 19-30 over the Combination of Dhallan and Binladen

Given our determination that there is a reasonable likelihood that Ariosa would prevail on the ground that claims 19-30 are unpatentable as obvious over Shoemaker, Dhallan, and Binladen, we exercise our discretion

Case IPR2013-00277
Patent 8,318,430

to deny as redundant Ariosa's asserted ground that claims 19-30 are rendered obvious over Dhallan and Binladen.

### C. Conclusion

We conclude that Ariosa has demonstrated a reasonable likelihood of prevailing on the following grounds of unpatentability asserted in the Petition:

Claims 19-30 under 35 U.S.C. § 103(a) as unpatentable over Shoemaker, Dhallan, and Binladen.

We deny the petition to institute an *inter partes* review of claims 19-30 under 35 U.S.C. § 103(a) as unpatentable over Dhallan, and Binladen as redundant to the above ground.

We conclude that Ariosa has not demonstrated a reasonable likelihood of prevailing on the following grounds of unpatentability asserted in the Petition:

Claims 19-30 under 35 U.S.C. § 103(a) as unpatentable over Quake and Craig.

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim.

### III. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted for the following grounds of unpatentability:

Claims 19-30 under 35 U.S.C. § 103(a) as unpatentable over Shoemaker, Dhallan, and Binladen;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '430 patent is hereby instituted commencing on the

Case IPR2013-00277
Patent 8,318,430

entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R.

§ 42.4, notice is hereby given of the institution of a trial;

FURTHER ORDERED that the trial is limited to the grounds and

claims identified above, and no other grounds are authorized as to these

claims as they currently stand; and

FURTHER ORDERED that an initial conference call with the Board

is scheduled for 11:00 a.m. Eastern Time on October 25, 2013.  The parties

are directed to the Office Patent Trial Practice Guide, 77 Fed. Reg. 48756,

48765-66 (Aug. 14, 2012) for guidance in preparing for the initial

conference call, and should come prepared to discuss any proposed changes

to the Scheduling Order entered herewith and any motions the parties

anticipate filing during the trial.

Case IPR2013-00277
Patent 8,318,430

PETITIONER:

Greg Gardella
cpdocketgardella@oblon.com

Scott McKeown
cpdocketmckeown@oblon.com

Kevin Laurence
klaurence@oblon.com

PATENT OWNER:

Michael Rosato
mrosato@wsgr.com

Maya Skubatch
mskubatch@wsgr.com



US008318430B2

(12) **United States Patent**     (10) **Patent No.:**     **US 8,318,430 B2**
Chuu et al.                       (45) **Date of Patent:**    **Nov. 27, 2012**

(54) **METHODS OF FETAL ABNORMALITY DETECTION**

(75) Inventors: **Yue-Jen Chuu**, Cupertino, CA (US); **Richard P. Rava**, Redwood City, CA (US)

(73) Assignee: **Verinata Health, Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/368,035**

(22) Filed: **Feb. 7, 2012**

(65) **Prior Publication Data**

US 2012/0135872 A1    May 31, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 13/012,222, filed on Jan. 24, 2011.

(60) Provisional application No. 61/297,755, filed on Jan. 23, 2010.

(51) **Int. Cl.**
   *C12Q 1/68*     (2006.01)
   *C12P 19/34*    (2006.01)
(52) **U.S. Cl.** ........................................ **435/6.1**; 435/91.2
(58) **Field of Classification Search** ........................ None
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,994,057 A | 11/1999 | Mansfield |
| 6,258,540 B1 | 7/2001 | Lo et al. |
| 6,632,655 B1 | 10/2003 | Mehta et al. |
| 6,927,028 B2 | 8/2005 | Dennis et al. |
| 7,252,946 B2 | 8/2007 | Szasz |
| 7,332,277 B2 | 2/2008 | Dhallan |
| 7,442,506 B2 | 10/2008 | Dhallan |
| 7,582,420 B2 | 9/2009 | Oliphant et al. |
| 7,645,576 B2 | 1/2010 | Lo et al. |
| 7,727,720 B2 | 6/2010 | Dhallan et al. |
| 7,799,531 B2 | 9/2010 | Mitchell et al. |
| 7,838,647 B2 | 11/2010 | Hahn et al. |
| 7,888,017 B2 | 2/2011 | Quake et al. |
| 7,955,794 B2 | 6/2011 | Shen et al. |
| 8,003,354 B2 | 8/2011 | Shen et al. |
| 8,008,018 B2 | 8/2011 | Quake et al. |
| 8,137,912 B2 | 3/2012 | Stoughton et al. |
| 8,168,389 B2 | 5/2012 | Shoemaker et al. |
| 8,195,415 B2 | 6/2012 | Fan et al. |
| 2001/0051341 A1 | 12/2001 | Lo et al. |
| 2002/0142324 A1 | 10/2002 | Wang et al. |
| 2002/0164816 A1 | 11/2002 | Quake |
| 2003/0022207 A1 | 1/2003 | Balasubramanian |
| 2003/0044388 A1 | 3/2003 | Dennis et al. |
| 2003/0194704 A1 | 10/2003 | Penn et al. |
| 2004/0137470 A1 | 7/2004 | Dhallan |
| 2004/0209299 A1 | 10/2004 | Pinter et al. |
| 2005/0196785 A1 | 9/2005 | Quake et al. |
| 2005/0221341 A1 | 10/2005 | Shimkets et al. |
| 2005/0252773 A1 | 11/2005 | McBride et al. |

| | | |
|---|---|---|
| 2006/0046258 A1 | 3/2006 | Lapidus et al. |
| 2006/0257895 A1 | 11/2006 | Pinkel et al. |
| 2006/0286558 A1 | 12/2006 | Novoradovskaya et al. |
| 2007/0134658 A1 | 6/2007 | Bohmer et al. |
| 2007/0202525 A1 | 8/2007 | Quake et al. |
| 2007/0207466 A1 | 9/2007 | Cantor et al. |
| 2007/0275402 A1 | 11/2007 | Lo et al. |
| 2008/0020390 A1 | 1/2008 | Mitchell et al. |
| 2008/0050739 A1 | 2/2008 | Stoughton et al. |
| 2008/0064098 A1 | 3/2008 | Allickson |
| 2008/0070792 A1 * | 3/2008 | Stoughton et al. .................. 506/9 |
| 2008/0071076 A1 | 3/2008 | Hahn et al. |
| 2008/0096216 A1 | 4/2008 | Quake |
| 2008/0138809 A1 | 6/2008 | Kapur et al. |
| 2008/0193927 A1 | 8/2008 | Mann et al. |
| 2008/0220422 A1 | 9/2008 | Shoemaker et al. |
| 2008/0299562 A1 | 12/2008 | Oeth et al. |
| 2009/0029377 A1 | 1/2009 | Lo et al. |
| 2009/0053719 A1 | 2/2009 | Lo et al. |
| 2009/0087847 A1 | 4/2009 | Lo et al. |
| 2009/0170114 A1 | 7/2009 | Quake et al. |
| 2009/0215042 A1 | 8/2009 | Sella-Tavor et al. |
| 2009/0270601 A1 | 10/2009 | Benner et al. |
| 2009/0299645 A1 | 12/2009 | Colby et al. |
| 2009/0307181 A1 | 12/2009 | Colby et al. |
| 2009/0317798 A1 | 12/2009 | Heid et al. |
| 2009/0317817 A1 | 12/2009 | Oeth et al. |
| 2009/0317818 A1 | 12/2009 | Ehrich et al. |
| 2010/0068711 A1 | 3/2010 | Umansky et al. |
| 2010/0093550 A1 | 4/2010 | Stuelpnagel et al. |
| 2010/0093835 A1 | 4/2010 | McSwiggen et al. |
| 2010/0112575 A1 | 5/2010 | Fan et al. |
| 2010/0112590 A1 | 5/2010 | Lo et al. |
| 2010/0136529 A1 | 6/2010 | Shoemaker et al. |
| 2010/0138165 A1 | 6/2010 | Fan et al. |
| 2010/0167954 A1 | 7/2010 | Earnshaw et al. |
| 2010/0184075 A1 | 7/2010 | Cantor et al. |
| 2010/0216151 A1 | 8/2010 | Lapidus et al. |
| 2010/0216153 A1 | 8/2010 | Lapidus et al. |
| 2010/0304978 A1 | 12/2010 | Deng et al. |
| 2010/0311064 A1 | 12/2010 | Oliphant et al. |
| 2011/0027771 A1 | 2/2011 | Deng et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0994963 B1 | 5/2003 |

(Continued)

OTHER PUBLICATIONS

Illumina. Multiplexed Sequencing with the Illumina Genome Analyzer System. Dec. 2, 2008. Illumina Sequecing. 4 pages.*

(Continued)

*Primary Examiner* — Jennifer Dunston
*Assistant Examiner* — Channing S Mahatan
(74) *Attorney, Agent, or Firm* — Wilson Sonsini Goodrich & Rosati

(57) **ABSTRACT**

Methods and kits for selectively enriching non-random polynucleotide sequences are provided. Methods and kits for generating libraries of sequences are provided. Methods of using selectively enriched non-random polynucleotide sequences for detection of fetal aneuploidy are provided.

**30 Claims, 28 Drawing Sheets**

US 8,318,430 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2011/0105353 A1 | 5/2011 | Lo et al. |
| 2011/0117548 A1 | 5/2011 | Mitchell et al. |
| 2011/0177517 A1 | 7/2011 | Rava et al. |
| 2011/0201507 A1 | 8/2011 | Rava et al. |
| 2011/0224087 A1 | 9/2011 | Quake et al. |
| 2011/0230358 A1 | 9/2011 | Rava |
| 2011/0245085 A1 | 10/2011 | Rava et al. |
| 2011/0312503 A1 | 12/2011 | Chuu et al. |
| 2012/0010085 A1 | 1/2012 | Rava et al. |
| 2012/0034603 A1 | 2/2012 | Oliphant et al. |
| 2012/0034685 A1 | 2/2012 | Sparks et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 98/44151 A1 | 10/1998 |
| WO | WO 00/18957 A1 | 4/2000 |
| WO | WO 03/020974 A2 | 3/2003 |
| WO | WO 03/020974 A3 | 9/2003 |
| WO | WO 2004/065629 A1 | 8/2004 |
| WO | WO 2005/118852 A2 | 12/2005 |
| WO | WO 2006/010610 A2 | 2/2006 |
| WO | WO 2005/118852 A3 | 3/2006 |
| WO | WO 2006/010610 A3 | 6/2006 |
| WO | WO 2006/097049 A1 | 9/2006 |
| WO | WO 2007/044091 A2 | 4/2007 |
| WO | WO 2007/075836 A2 | 7/2007 |
| WO | WO 2007/092473 A2 | 8/2007 |
| WO | WO 2007/100911 A2 | 9/2007 |
| WO | WO 2007/044091 A3 | 11/2007 |
| WO | WO 2007/100911 A3 | 11/2007 |
| WO | WO 2007/132166 A2 | 11/2007 |
| WO | WO 2007/132167 A2 | 11/2007 |
| WO | WO 2007/147073 A2 | 12/2007 |
| WO | WO 2007/147074 A2 | 12/2007 |
| WO | WO 2007/147076 A2 | 12/2007 |
| WO | WO 2007/147079 A2 | 12/2007 |
| WO | WO 2007/075836 A3 | 2/2008 |
| WO | WO 2007/132166 A3 | 2/2008 |
| WO | WO 2007/147079 A3 | 3/2008 |
| WO | WO 2007/147076 A3 | 4/2008 |
| WO | WO 2008/045158 A1 | 4/2008 |
| WO | WO 2007/132167 A3 | 5/2008 |
| WO | WO 2007/147073 A3 | 5/2008 |
| WO | WO 2007/147074 A3 | 5/2008 |
| WO | WO 2007/092473 A3 | 11/2008 |
| WO | WO 2009/013492 A1 | 1/2009 |
| WO | WO 2009/013496 A1 | 1/2009 |
| WO | WO 2009/019455 A1 | 2/2009 |
| WO | WO 2009/019455 A2 | 2/2009 |
| WO | WO 2009/019455 A3 | 4/2009 |
| WO | WO 2010/033578 A2 | 3/2010 |
| WO | WO 2010/045617 A2 | 4/2010 |
| WO | WO 2010/033578 A3 | 5/2010 |
| WO | WO 2010/085815 A1 | 7/2010 |
| WO | WO 2011/014741 A1 | 2/2011 |
| WO | WO 2011/051283 A1 | 5/2011 |
| WO | WO 2011/090556 A1 | 7/2011 |
| WO | WO 2011/090557 A1 | 7/2011 |
| WO | WO 2011/090558 A1 | 7/2011 |
| WO | WO 2011/090559 A1 | 7/2011 |
| WO | WO 2011/091046 A1 | 7/2011 |
| WO | WO 2011/091063 A1 | 7/2011 |
| WO | WO 2011/094646 A1 | 8/2011 |
| WO | WO 2011/102998 A1 | 8/2011 |
| WO | WO 2012/019187 A2 | 2/2012 |
| WO | WO 2012/019193 A2 | 2/2012 |
| WO | WO 2012/019198 A2 | 2/2012 |
| WO | WO 2012/019200 A2 | 2/2012 |

## OTHER PUBLICATIONS

Fan et al. Noninvasive diagnosis of fetal aneuploidy by shotgun sequencing DNA from maternal blood. Oct. 21, 2008. Proceedings of the National Academy of Sciences. pp. 16266-16271.*

U.S. Appl. No. 13/191,366, filed Jul. 26, 2011, Rava et al.

U.S. Appl. No. 13/364,809, filed Feb. 2, 2012, Rava et al.

U.S. Appl. No. 13/365,134, filed Feb. 2, 2012, Rava et al.

Bennett, et al. Toward the 1,000 dollars human genome. Pharmacogenomics. 2005; 6(4):373-82.

Fan, et al. Highly parallel genomic assays. Nat Rev Genet. Aug. 2006;7(8):632-44.

Margulies, et al. Genome sequencing in microfabricated high-density picolitre reactors. Nature. 2005; 437:376-80.

Shendure, et al. Next-generation DNA sequencing: Nature. 2008; 26(10):1135-1145.

Yang, et al. Rapid Prenatal Diagnosis of Trisomy 21 by Real-time Quantitative Polymerase Chain Reaction with Amplification of Small Tandem Repeats and S100B in Chromosome 21. Yonsei Medical Journal, 2005, vol. 46, No. 2, 193-197.

Bentley, et al. Accurate whole human genome sequencing using reversible terminator chemistry. Nature. Nov. 6, 2008;456(7218):53-9.

Botezatu, et al. Genetic analysis of DNA excreted in urine: a new approach for detecting specific genomic DNA sequences from cells dying in an organism. Clin Chem. Aug. 2000;46(8 Pt 1):1078-84.

Butler, et al. The development of reduced size STR amplicons as tools for analysis of degraded DNA. J Forensic Sci. Sep. 2003;48(5):1054-64.

Butler. Short tandem repeat typing technologies used in human identity testing. Biotechniques. Oct. 2007;43(4):ii-v.

Chan, et al. Size distributions of maternal and fetal DNA in maternal plasma. Clin Chem. Jan. 2004;50(1):88-92.

Chen, et al. Microsatellite alterations in plasma DNA of small cell lung cancer patients. Nat Med. Sep. 1996;2(9):1033-5.

Chiu, et al. Maternal plasma DNA analysis with massively parallel sequencing by ligation for noninvasive prenatal diagnosis of trisomy 21. Clin Chem. Mar. 2010;56(3):459-63.

Chiu, et al. Non-invasive prenatal assessment of trisomy 21 by multiplexed maternal plasma DNA sequencing: large scale validity study. BMJ. Jan. 11, 2011;342:c7401.

Chiu, et al. Non-invasive prenatal diagnosis by single molecule counting technologies. Trends Genet. Jul. 2009;25(7):324-31.

Chiu, et al. Noninvasive prenatal diagnosis of fetal chromosomal aneuploidy by massively parallel genomic sequencing of DNA in maternal plasma. Proc Natl Acad Sci U S A. Dec. 23, 2008;105(51):20458-63.

Chu, et al. Statistical model for whole genome sequencing and its application to minimally invasive diagnosis of fetal genetic disease. Bioinformatics. May 15, 2009;25(10):1244-50.

Coble, et al. Characterization of new miniSTR loci to aid analysis of degraded DNA. J Forensic Sci. Jan. 2005;50(1):43-53.

Dhallan, et al. A non-invasive test for prenatal diagnosis based on fetal DNA present in maternal blood: a preliminary study. Lancet. Feb. 10, 2007;369(9560):474-81.

Dixon, et al. Analysis of artificially degraded DNA using STRs and SNPs—results of a collaborative European (EDNAP) exercise. Forensic Sci Int. Dec. 1, 2006;164(1):33-44.

Ehrich, et al. Noninvasive detection of fetal trisomy 21 by sequencing of DNA in maternal blood: a study in a clinical setting. Am J Obstet Gynecol. Mar. 2011;204(3):205.e1-11.

Fan, et al. Analysis of the size distributions of fetal and maternal cell-free DNA by paired-end sequencing. Clin Chem. Aug. 2010;56(8):1279-86.

Fan, et al. Detection of aneuploidy with digital polymerase chain reaction. Anal Chem. Oct. 1, 2007;79(19):7576-9.

Fan, et al. In principle method for noninvasive determination of the fetal genome. Nature Precedings: Nature Precedings 10.1038/npre. 2010.5373.1 . 2010.

Fan, et al. Microfluidic digital PCR enables rapid prenatal diagnosis of fetal aneuploidy. Am J Obstet Gynecol. May 2009;200(5):543.e1-7.

Fan, et al. Noninvasive diagnosis of fetal aneuploidy by shotgun sequencing DNA from maternal blood. Proc Natl Acad Sci U S A. Oct. 21, 2008;105(42):16266-71.

Fan, et al. Sensitivity of noninvasive prenatal detection of fetal aneuploidy from maternal plasma using shotgun sequencing is limited only by counting statistics. PLoS One. Mar. 3, 2010;5(5):e10439.

Fan, et al. Whole Genome Molecular Haplotyping of Single Cells. Nat Biotechnol. May. 2011;29(1):51-7.

Ghanta, et al. Non-invasive prenatal detection of trisomy 21 using tandem single nucleotide polymorphisms. PLoS One. Oct. 8, 2010;5(10):e13184.

Grubweiser, et al. A new miniSTR-mulitplex displaying reduced amplicon lengths for the analysis of degraded DNA. Int J Legal Med. Mar. 2006;120(2):115-20.

Hanson, et al. Whole genome amplification strategy for forensic genetic analysis using single or few cell equivalents of genomic DNA. Anal Biochem. Nov. 15, 2005;346(2):246-57.

Harris, et al. Single-molecule DNA sequencing of a viral genome. Science. Apr. 4, 2008;320(5872):106-9.

Harrison, et al. Polymer-stimulated ligation: enhanced ligation of oligo- and polynucleotides by T4 RNA ligase in polymer solutions. Nucleic Acids Res. Nov. 12, 1984;12(21):8235-51.

Hayashi, et al. Regulation of inter- and intramolecular ligation with T4 DNA ligase in the presence of polyethylene glycol. Nucleic Acids Res. Oct. 10, 1986;14(19):761731.

Hill, et al. "Characterization of 26 new miniSTR loci" Poster #44—17th International Symposium on Human Identification, Nashville, TN, Oct. 10-12, 2006.

Huang, et al. Isolation of cell-free DNA from maternal plasma using manual and automated systems. Methods Mol Biol. 2008;444:203-8.

Hung, et al. Detection of circulating fetal nucleic acids: a review of methods and applications. J Clin Pathol. Apr. 2009;62(4):308-13.

Illumina. Preparing samples for CHIP sequencing of DNA. Epub at gref.jhmi.edu/hts/protocols/11257047__ChIP__Sample__Prep.pdf. 2007.

International search report and written opinion dated Feb. 28, 2011 for PCT Application No. US10/58606.

International search report and written opinion dated Mar. 1, 2011 for PCT Application No. US10/58614.

International search report and written opinion dated Apr. 4, 2011 for PCT Application No. US10/58609.

International search report and written opinion dated Apr. 11, 2011 for PCT Application No. US11/21729.

International search report dated May 19, 2011 for PCT/US2010/058612.

International. The International HapMap Project. Nature. 2003; 426:789-96.

Jama, et al. Quantification of Cell-Free Fetal DNA Levels in Maternal Plasma by STR Analysis. ACMG Annual Clinical Genetics Meeting Poster 398; Mar. 24-28, 2010. Available online at http://acmg.omnibooksonline.com/2010/data/papers/398.pdf and http://acmg.omnibooksonline.com/2010/index.html.

Jorgez, et al. Improving enrichment of circulating fetal DNA for genetic testing: size fractionation followed by whole gene amplification. Fetal Diagn Ther. 2009;25(3):314-9.

Ju, et al. Four-color DNA sequencing by synthesis using cleavable fluorescent nucleotide reversible terminators. Proc Natl Acad Sci USA. 2006; 103(52):19635-19640.

Kidd, et al. Developing a SNP panel for forensic identification of individuals. Forensic Sci Int. Dec. 1, 2006;164(1):20-32.

Koide, et al. Fragmentation of cell-free fetal DNA in plasma and urine of pregnant women. Prenat Diagn. Jul. 2005;25(7):604-7.

Kozarewa, et al. Amplification-free Illumina sequencing-library preparation facilitates improved mapping and assembly of GC-biased genomes. Nat Methods. Apr. 2009;6(4):291-5.

Lazinski, et al. Modified protocol for Illumina paired-end library construction. Available online at http://genomics.med.tufts.edu/documents/hiseq__protocol__for__illumina__paired.pdf Accessed Jun. 21, 2011.

Leon, et al. Free DNA in the serum of cancer patients and the effect of therapy. Cancer Res. Mar. 1977;37(3):646-50.

Levy, et al. The Diploid Genome Sequence of an Individual Human. PLoS Biol. 2007 Sep 4;5(10):e254.

Li, et al. Size separation of circulatory DNA in maternal plasma permits ready detection of fetal DNA polymorphisms. Clin Chem. Jun. 2004;50(6):1002-11.

Liao, et al. Targeted massively parallel sequencing of maternal plasma DNA permits efficient and unbiased detection of fetal alleles. Clin Chem. Jan. 2011;57(1):92-101.

Liu, et al. Feasibility study of using fetal DNA in maternal plasma for non-invasive prenatal diagnosis. Acta Obstet Gynecol Scand. 2007;86(5):535-41.

Lo, et al. Digital PCR for the molecular detection of fetal chromosomal aneuploidy. Proc Natl Acad Sci U S A. Aug. 7, 2007;104(32):13116-21.

Lo, et al. Increased fetal DNA concentrations in the plasma of pregnant women carrying fetuses with trisomy 21. Clin Chem. Oct. 1999;45(10):1747-51.

Lo, et al. Maternal plasma DNA sequencing reveals the genome-wide genetic and mutational profile of the fetus. Sci Transl Med. Dec. 8, 2010;2(61):61ra91.

Lo, et al. Presence of fetal DNA in maternal plasma .Lancet. Aug. 16, 1997;350(9076):485-7.

Lo, et al. Quantitative analysis of fetal DNA in maternal plasma and serum: implications for noninvasive prenatal diagnosis. Am J Hum Genet. Apr. 1998;62(4):768-75.

Lo, et al. Rapid clearance of fetal DNA from maternal plasma. Am J Hum Genet. Jan. 1999;64(1):218-24.

Lo, Y. M. Noninvasive prenatal detection of fetal chromosomal aneuploidies by maternal plasma nucleic acid analysis: a review of the current state of the art. BJOG, 2009, vol. 116, 152-157.

Lun, et al. Microfluidics Digital PCR Reveals a Higher than Expected Fraction of Fetal DNA in Maternal Plasma. Clinical Chemistry, 2008, vol. 54, No. 10, 1664-1672.

McKernan, et al. Sequence and structural variation in a human genome uncovered by short-read, massively parallel ligation sequencing using two-base encoding. Genome Res. Sep. 2009;19(9):1527-41.

Metzker. Sequencing technologies—the next generation. Nat Rev Genet. Jan. 2010;11(1):31-46.

Nakamoto, et al. Detection of microsatellite alterations in plasma DNA of malignant mucosal melanoma using whole genome amplification. Bull Tokyo Dent Coll. May 2008;49(2):77-87.

Nicklas, et al. A real-time multiplex SNP melting assay to discriminate individuals. J Forensic Sci. Nov. 2008;53(6):1316-24.

Pakstis, et al. Candidate SNPs for a universal individual identification panel. Hum Genet. May 2007;121(3-4):305-17.

Pakstis, et al. SNPs for a universal individual identification panel. Hum Genet. Mar. 2010;127(3):315-24.

Pathak, et al. Circulating cell-free DNA in plasma/serum of lung cancer patients as a potential screening and prognostic tool. Clin Chem. Oct. 2006;52(10):1833-42.

Pertl, et al. Detection of male and female DNA in maternal plasma by multiplex fluorescent polymerase chain reaction amplification of short tandem repeats. Hum Genet. Jan. 2000;106(1):45-9.

Pheiffer, et al. Polymer-stimulated ligation: enhanced blunt- or cohesive-end ligation of DNA or deoxyribooligonucleotides by T4 DNA ligase in polymer solutions. Nucleic Acids Res. Nov. 25, 1983;11(22):7853-71.

Pushkarev, et al. Single-molecule sequencing of an individual human genome. Nat Biotechnol. Sep. 2009;27(9):847-50.

Quail, et al. A large genome center's improvements to the Illumina sequencing system. Nat Methods. Dec. 2008;5(12):1005-10.

Schwartzenbach, et al. Cell-free tumor DNA in blood plasma as a marker for circulating tumor cells in prostate cancer. Clin Cancer Res. Feb. 1, 2009;15(3):1032-8.

Schwartzenbach, et al. Comparative evaluation of cell-free tumor DNA in blood and disseminated tumor cells in bone marrow of patients with primary breast cancer. Breast Cancer Res. 2009;11(5):R71.

Su, et al. Human urine contains small, 150 to 250 nucleotide-sized, soluble DNA derived from the circulation and may be useful in the detection of colorectal cancer. J Mol Diagn. May 2004;6(2):101-7.

Tong, et al. Noninvasive prenatal detection of trisomy 21 by an epigenetic-genetic chromosome-dosage approach. Clin Chem. Jan. 2010;56(1):90-8.

Vallone, et al. Demonstration of rapid multiplex PCR amplification involving 16 genetic loci. Forensic Sci Int Genet. Dec. 2008;3(1):42-5.

Voelkerding, et al. Digital Fetal Aneuploidy Diagnosis by Next-Generation Sequencing. Clin Chem. Mar. 2010;56(3):336-8.

Voelkerding, et al. Next-generation sequencing: from basic research to diagnostics Clin Chem. Apr. 2009;55(4):641-58.

Wheeler, et al. The complete genome of an individual by massively parallel DNA sequencing. Nature. Apr. 17, 2008;452(7189):872-6.

# US 8,318,430 B2
Page 4

Wright, et al. The use of cell-free fetal nucleic acids in maternal blood for non-invasive prenatal diagnosis. Hum Reprod Update. Jan.-Feb. 2009;15(1):139-51.

Zimmerman, et al. Macromolecular crowding allows blunt-end ligation by DNA ligase from rat liver of *Escheridia coli*. Proc Natl Acad Sci U S A. Oct. 1983;80(19):5852-6.

U.S. Appl. No. 13/333,832, filed Dec. 21, 2011, Rava et al.

U.S. Appl. No. 13/365,240, filed Feb. 2, 2012, Quake et al.

U.S. Appl. No. 13/433,232, filed Mar. 28, 2012, Stoughton et al.

European Patent Office Communication dated Mar. 16, 2012 in EP App. No. 10830938.6 (EP Publication No. 2366031) with pending claims, 9 pages.

European Patent Office Communication dated Mar. 16, 2012 in EP App. No. 10830939.4 (EP Publication No. 2376661) with pending claims, 9 pages.

European Patent Office Communication dated Mar. 19, 2012 in EP App. No. 10825822.9 (EP Publication No. 2370599) with pending claims, 10 pages.

European Supplementary Search Report for EP App. No. 10830938.6 (EP Publication No. 2366031), dated Feb. 22, 2012, 4 pages.

European Supplementary Search Report for EP App. No. 10825822.9 (EP Publication No. 2370599), dated Feb. 22, 2012, 4 pages.

European Supplementary Search Report for EP App. No. 10830939.4 (EP Publication No. 2376661), dated Feb. 22, 2012, 4 pages.

Lo, et al. Non-invasive prenatal diagnosis of fetal chromosomal aneuploidies by maternal plasma nucleic acid analysis. Clinical Chemistry. 2008; 54 (3):461-466.

U.S. Appl. No. 13/452,083, filed Apr. 20, 2012, Fan et al.

Notice of allowance dated Jul. 12, 2012 for U.S. Appl. No. 13/452,083.

Office action dated Jun. 5, 2012 for U.S. Appl. No. 12/393,833.

* cited by examiner



Figure 1

A0104



Figure 2

Figure 3

| Primer | 24107 | 11215 | 11205 | 24101 | 24102 | 24103 | 24111 | 24106 | Non-Pregnant |
|--------|-------|-------|-------|-------|-------|-------|-------|-------|--------------|
| | | | | iD of Plasma DNA | | | | | Genomic DNA |
| 1-150 | 12.48 | 13.87 | 15.27 | 9.49 | 11.47 | 15.13 | 10.94 | 16.44 | 24.31 |
| 3_150 | 15.63 | 9.34 | 10.32 | No Data | 9.11 | 13.43 | 16.39 | 11.58 | 22.97 |
| 4_150 | 14.33 | 7.78 | 8.55 | No Data | 7.18 | 10.17 | 12.18 | 10.12 | 22.52 |
| 6_150 | 9.47 | 9.57 | 7.91 | 6.6 | 9.4 | 10.24 | 10.07 | No Data | 20.57 |
| 5-150 | 4.83 | 3.08 | 3.39 | 3.82 | 4.2 | 3.74 | 9.46 | 8.31 | 12.82 |
| 2_150 | 7.81 | 5.85 | 5.19 | No Data | 4.59 | 6.19 | 11.08 | 9.07 | 8.81 |
| 7_150 | 2.27 | 3.75 | 3.91 | 2.63 | 4.71 | 4.01 | 4.59 | No Data | 8.16 |

ND: Not Detectable
Conc. ng / ul

**Figure 4**



## Figure 5

| Sample ID | Ch21 Primer | Conc. ng / ul |
|---|---|---|
| 1 | 1_150 | 10.94 |
| 1 | 2_150 | 11.08 |
| 1 | 3_150 | 16.39 |
| 1 | 4_150 | 12.18 |
| 1 | 5_150 | 9.46 |
| 2 | 1_150 | 16.44 |
| 2 | 2_150 | 9.07 |
| 2 | 3_150 | 11.58 |
| 2 | 4_150 | 10.12 |
| 2 | 5_150 | 8.31 |
| 3 | 1_150 | 11.72 |
| 3 | 2_150 | 8.66 |
| 3 | 3_150 | 11.32 |
| 3 | 4_150 | 9.93 |
| 3 | 5_150 | 9.69 |

## Figure 6





Figure 7

## Figure 8

| A | | ch1 dPCR counts | ch21 dPCR counts | Ch21 / Ch1 Ratio |
|---|---|---|---|---|
| Ch21_1 / Ch1 | 24111: PCR Enrichment Ch1_1 Ch21_1 Ch21_1 / Ch1_1 | 0 | $463 \times 5 \times 10^3$ | $463 \times 5 \times 10^3$ |
| | | 235 | $311 \times 5 \times 10^5$ | 14.81 |
| | 24111: cf plasma DNA Ch1_1 Ch21_1 | $21 \times 5 \times 10^2$ | 383 | 1.63 |
| Ch21_2 / Ch1 | 24111: PCR Enrichment Ch1_1 Ch21_2 Ch21_2 / Ch1_1 | 0 | $100 \times 5 \times 10^5$ | $100 \times 5 \times 10^5$ |
| | | $10 \times 5 \times 10^2$ | $54 \times 5 \times 10^2$ | 5.4 |
| | 24111: cf plasma DNA Ch1_1 Ch21_2 | 177 | 236 | 1.33 |
| Ch21_5 / Ch1 | 24111: PCR Enrichment Ch1_1 Ch21_5 Ch21_5 / Ch1_1 | 0 | $44 \times 5 \times 10^2$ | $44 \times 5 \times 10^2$ |
| | | $10 \times 5 \times 10^2$ | $90 \times 5 \times 10^3$ | 9 |
| | 24111: cf plasma DNA Ch1_1 Ch21_5 | 212 | 332 | 1.57 |
| Ch21_7 / Ch1 | 24111: PCR Enrichment Ch1_1 Ch21_7 Ch21_7/Ch1_1 | 1 | $6306 \times 10^2$ | $896 \times 10^2$ |
| | | $24 \times 5 \times 10^2$ | $8 \times 5 \times 10^2$ | 0.33 |
| | 24111: cf plasma DNA Ch1_1 Ch21_7 | 207 | 131 | 0.63 |
| Ch1 | 24111: PCR Enrichment Ch1_1 | $7 \times 10^2$ | | |
| | 24111: cf plasma DNA Ch1_1 | 199 | | |
| T21 Cellular DNA | T21 Cellular gDNA PCR Enrichment Ch21_7 / Ch1_1 T21 Cellular gDNA Ch1_1 | $2650 \times 10^3$ | $511 \times 10^3$ | 0.20 |
| | Ch21_7 | $46 \times 2 \times 10^2$ | $50 \times 2 \times 10^2$ | 1.09 |



Figure 8 cont.



Figure 9

Figure 10



Figure 11

Figure 12

| Primer pair 18 | Sequence (5'->3') | Strand on template | Length | Start | Stop | Tm | GC% |
|---|---|---|---|---|---|---|---|
| Forward | TGAAGCCCGGGGAGGTTCCCT | Plus | 20 | 22632815 | 22632834 | 59.16 | 65.00% |
| Reverse | TCCAGGCTGTGTGCCCTCCC | Minus | 20 | 22632954 | 22632935 | 60.47 | 70.00% |
| Internal oligo | | Plus | | | | | |
| Product length | 140 | | | | | | |



Figure 13

Figure 14



## Figure 15

| Ch21 Regions | Primer | ID of Plasma DNA | | | | | Genomic DNA |
|---|---|---|---|---|---|---|---|
| | | 241.07 | 1121S | 1120S | 241.01 | 241.02 | Non-Pregnant |
| Region A (7 Clusters) | A2 | ND | ND | ND | ND | ND | ND |
| | A28 | ND | ND | ND | ND | ND | ND |
| | A7 | 5.87 | 5.21 | 4.83 | 5.09 | 2.97 | 10.54 |
| | A18 | 2.71 | 1.87 | 3.1 | 2.68 | 4.74 | 9.31 |
| | A73 | 4.21 | 3.29 | 3.99 | 2.22 | 1.95 | 7.96 |
| | A25 | 1.44 | ND | ND | 1.4 | ND | 2.49 |
| | A72 | 1.94 | 1.47 | ND | 1.7 | 2.34 | 1.86 |
| Region B (6 Clusters) | B19 | ND | ND | ND | ND | ND | ND |
| | B54 | 15.15 | 6.02 | 15.6 | 11.39 | 10.87 | 25.22 |
| | B16 | 3.83 | 2.57 | No Data | 1.9 | 2.59 | 13.14 |
| | B7 | 4.77 | 2.57 | 3.47 | 17.29 | 3.93 | 4.8 |
| | B32 | ND | 5.61 | 1.47 | ND | ND | 3.24 |
| | B34 | ND | ND | ND | ND | ND | 2.09 |
| Region C (8 Clusters) | C55 | 12.36 | 8.59 | 15.27 | 6.82 | 10.06 | 25.74 |
| | C72 | 8.57 | 5.87 | 10.97 | 7.38 | 8.41 | 16.40 |
| | C74 | 9.09 | 5.61 | 6.74 | 5.52 | 5.69 | 15.51 |
| | C19 | 8.34 | 4.97 | 7.27 | 6.27 | 6.98 | 11.06 |
| | C29 | 11.14 | 4.67 | 6.47 | 6.69 | 6.6 | 7.83 |
| | C1 | 3.87 | 2.17 | 3.59 | 3.62 | 4.48 | 4.69 |
| | C6 | ND | 1.96 | 2.55 | ND | 2.12 | 3.37 |
| | C58 | ND | ND | ND | ND | ND | 0.97 |

ND: Not Detectable    Conc. ng / ul



Figure 16

Figure 17

| Primer | ID cf Plasma DNA | | | | | | | | Genomic DNA |
|---|---|---|---|---|---|---|---|---|---|
| | 24107 | 11215 | 11205 | 24101 | 24102 | 24103 | 24109 | Non-Pregnant |
| Ch1_1_150 | 15.54 | 14.93 | 14.13 | 10.99 | 18.28 | 17.15 | 13.75 | 30.28 |
| Ch1_2_150 | 15.15 | 9.94 | 12.6 | 7.69 | 6.98 | 9.69 | 8.65 | 19.44 |
| Ch2_1_150 | 5.84 | 5.92 | 5.51 | 3.94 | 5.86 | 6.4 | 3.79 | 12.66 |
| Ch2_2_150 | 3.45 | 2.84 | 2.96 | 2.63 | 2.94 | 3.24 | 2.04 | 7.63 |
| Ch3_1_150 | 6.12 | 4.18 | 6.91 | 4.1 | 5.73 | 5.14 | 4.22 | 11.44 |

Conc. ng / ul

Figure 18

| | Chromosome Walk | Sequencing Data |
|---|---|---|
| Ch21 Enrichment | 76% Amplification (16 / 21) | 100% Amplification (7 / 7) |
| Ref Ch1, 2, 3 Enrichment | | 100% Amplification (5 / 5) |

## Figure 19

## Chromosome 21 – 47 Mb

**Combine Sequence Runs**

**Cover 37 Mb regions**
**79% of Ch21**

**Individual / lane**

10M reads / lane X 36 base / read = 360 M base

3000 M base / Genome

Coverage = 0.1 x



| | Start | End |
|---|---|---|
| Sorted 0 | 9757475 | 9999942 |
| Sorted 1 | 10000038 | 19999476 |
| Sorted 2 | 20000278 | 29999849 |
| sorted 3 | 30000379 | 40000015 |
| sorted 4 | 40000033 | 46927127 |



Figure 20

Figure 21





Figure 22A

13,296,000 - 46,944,323

33,648,324 bp

Figure 22B



Figure 23



Figure 24

45,618,701 - 45,702,822

45,651,549 - 45,655,755
(4207 bp)

45,651,908 - 45,652,158
(251 bp)

>chr21:45651908-45651935 (28 base)
AACAGCCCGTGACCCCCAAGAGGGTGCTTG



Figure 25

45,651,908 - 45,652,158
(251 bp)



Figure 26

US 8,318,430 B2

1

# METHODS OF FETAL ABNORMALITY DETECTION

## CROSS-REFERENCE

This application is a continuation of U.S. patent application Ser. No. 13/012,222, filed Jan. 24, 2011, which claims the benefit of U.S. Provisional Application No. 61/297,755, filed Jan. 23, 2010, each of which application is incorporated herein by reference in its entirety.

## SEQUENCE LISTING

The instant application contains a Sequence Listing which has been submitted in ASCII format via EFS-Web and is hereby incorporated by reference in its entirety. Said ASCII copy, created on Jan. 25, 2012, is named 32477692.txt and is 27,793 bytes in size.

## BACKGROUND OF THE INVENTION

Massively parallel sequencing techniques are used for detection of fetal aneuploidy from samples that comprise fetal and maternal nucleic acids. Fetal DNA often constitutes less than 10% of the total DNA in a sample, for example, a maternal cell-free plasma sample. Sequencing a large number of polynucleotides to generate sufficient data for fetal aneuploidy detection can be expensive. Methods for randomly enriching fetal nucleic acids in cell-free maternal sample have been described, including enriching nucleic acids based on size, formaldehyde treatment, methylation status, or hybridization to oligonucleotide arrays. There is a need for a means of selectively enriching non-random fetal and maternal polynucleotide sequences in a way that facilitates aneuploidy detection by massively parallel sequencing techniques and increases the sensitivity of aneuploidy detection.

## SUMMARY OF THE INVENTION

In one aspect, a method for determining the presence or absence of fetal aneuploidy is provided comprising a) selectively enriching non-random polynucleotide sequences of genomic DNA from a cell-free DNA sample; b) sequencing said enriched polynucleotide sequences; c) enumerating sequence reads from said sequencing step; and d) determining the presence or absence of fetal aneuploidy based on said enumerating. In one embodiment, said selectively enriching comprises performing PCR. In another embodiment, said selectively enriching comprises linear amplification. In another embodiment, said selectively enriching comprises enriching at least 1, 5, 10, 50, 100, or 1000 non-random polynucleotide sequences from a first chromosome. In another embodiment, said selectively enriching comprises enriching at least 1, 10, or 100 polynucleotide sequences from one or more regions of a first chromosome, wherein each region is up to 50 kb. In another embodiment, said non-random polynucleotide sequences comprise sequences that are sequenced at a rate of greater than 5-fold than other sequences on the same chromosome. In another embodiment, said non-random polynucleotide sequences each comprise about 50-1000 bases. In another embodiment, said cell-free DNA sample is a maternal sample. In another embodiment, said maternal sample is a maternal blood sample. In another embodiment, said maternal sample comprises fetal and maternal cell-free DNA. In another embodiment, said cell-free DNA is from a plurality of different individuals.

2

In another embodiment, said sequencing comprises Sanger sequencing, sequencing-by-synthesis, or massively parallel sequencing.

In another embodiment, said aneuploidy is trisomy 21, trisomy 18, or trisomy 13. In another embodiment, said aneuploidy is suspected or determined when the number of enumerated sequences is greater than a predetermined amount. In another embodiment, said predetermined amount is based on estimated amount of DNA in said cell-free DNA sample. In another embodiment, said predetermined amount is based on the amount of enumerated sequences from a control region.

In another aspect, a method is provided comprising: a) providing oligonucleotides that specifically hybridize to one or more polynucleotide sequences from a polynucleotide template, wherein said one or more polynucleotide sequences comprise sequences that are sequenced at rate greater than 5-fold than other sequences from the polynucleotide template; b) selectively enriching said one or more polynucleotide sequences; and c) optionally sequencing said enriched one or more polynucleotide sequences.

In another embodiment, each of said oligonucleotides has a substantially similar thermal profile. In another embodiment, said polynucleotide sequences each comprise about 50-1000 bases. In another embodiment, said polynucleotide sequences are from a cell-free DNA sample. In another embodiment, said polynucleotide sequences are from a maternal sample. In another embodiment, said maternal sample is a maternal blood sample. In another embodiment, said maternal sample comprises fetal and maternal cell-free DNA. In another embodiment, said polynucleotide template is a chromosome suspected of being aneuploid. In another embodiment, said polynucleotide template is chromosome 21. In another embodiment, the polynucleotide template is a chromosome not suspected of being aneuploid. In another embodiment, said polynucleotide template is chromosome 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 19, 20, or 22.

In another embodiment, said rate is at least 10 or 50-fold. In another embodiment, there are at least 7, 10, 17, or 27 sequence reads for the sequences that were sequenced at a higher frequency rate. In another embodiment, said selectively enriching comprises performing PCR. In another embodiment, said selectively enriching comprises linear amplification. In another embodiment, said selectively enriching comprises enriching at least 1, 5, 10, 50, 100, or 1000 non-random polynucleotide sequences from a first chromosome. In another embodiment, said selectively enriching comprises enriching at least 1, 10, or 100 polynucleotide sequences from one or more regions of a first chromosome, wherein each region is up to 50 kb. In another embodiment, said sequencing comprises Sanger sequencing, sequencing-by-synthesis, or massively parallel sequencing.

In another embodiment, the method further comprises a step of determining the presence of absence of fetal aneuploidy based on said sequencing

In another aspect, a method for identifying polynucleotide sequences for enrichment in a polynucleotide template is provided comprising: a) sequencing a plurality of polynucleotide sequences from the polynucleotide template; b) enumerating sequenced polynucleotide sequences; and c) identifying one or more sequenced polynucleotide sequences that are sequenced or that have a coverage rate at least 5-fold greater than a second set of polynucleotide sequences.

In one embodiment, said polynucleotide sequences are from a cell-free DNA sample. In another embodiment, said polynucleotide sequences are from a maternal sample. In another embodiment, said sequencing coverage rate is at least 10- or 50-fold. In another embodiment, there are at least 7, 10,

US 8,318,430 B2

3

17, or 27 reads for the polynucleotide sequences that were sequenced at a higher frequency rate.

In another embodiment, said identified polynucleotide sequences are used to determine the presence or absence of fetal aneuploidy.

In another aspect, a kit comprising a set of oligonucleotides that selectively amplify one or more regions of a chromosome is provided, wherein each of said regions is sequenced at a rate of greater than 5-fold than other regions of the chromosome.

In one embodiment, each of said oligonucleotides in the kit is part of an oligonucleotide pair. In another embodiment, said set of oligonucleotides comprises at least 100 oligonucleotides. In another embodiment, an oligonucleotide in each oligonucleotide pair comprises sequence identical to sequence in an oligonucleotide in the other pairs and sequence unique to that individual oligonucleotide.

In another aspect, a method for sequencing cell-free DNA from a maternal sample is provided comprising: a) obtaining a maternal sample comprising cell-free DNA, b) enriching sequences that are representative of a plurality of up to 50 kb regions of a chromosome, or enriching sequences that are sequenced at a rate of at least 5-fold greater than other sequences using an Illumina Genome Analyzer sequencer, and c) sequencing said enriched sequences of cell-free DNA.

In one embodiment, said sequencing comprises sequencing-by-synthesis. In another embodiment, said method further comprises bridge amplification. In another embodiment, said sequencing comprises Sanger sequencing. In another embodiment, said sequencing comprises single molecule sequencing. In another embodiment, said sequencing comprises pyrosequencing. In another embodiment, said sequencing comprises a four-color sequencing-by-ligation scheme. In another embodiment, said sequenced enriched sequences are used to determine the presence or absence of fetal aneuploidy. In another aspect, one or more unique isolated genomic DNA sequences are provided, wherein said genomic DNA sequences comprise regions that are sequenced at a rate greater than 500% than other regions of genomic DNA. In another embodiment, the isolated genomic DNA are sequenced by a method comprising bridge amplification, Sanger sequencing, single molecule sequencing, pyrosequencing, or a four-color sequencing by ligation scheme. In another embodiment, the isolated genomic regions comprise at least 100, 1000, or 10,000 different sequences. In another embodiment, the regions are present at a rate greater than 50-fold, 100-fold, 20-fold. In another embodiment, the sequence is a single amplicon.

In another aspect, a set of one or more oligonucleotides are provided that selectively hybridize to one or more unique genomic DNA sequences, wherein said genomic DNA sequences comprise regions that are sequenced at a rate greater than 500% than other regions of genomic DNA. In one embodiment, the oligonucleotides hybridize to the sequences under mild hybridization conditions. In another embodiment, the oligonucleotides have similar thermal profiles.

In another aspect, a method is provided comprising: a) amplifying one or more polynucleotide sequences with a first set of oligonucleotide pairs; b) amplifying the product of a) with a second set of oligonucleotides pairs; and c) amplifying the product of b) with a third set of oligonucleotide pairs. In one embodiment, the first set of oligonucleotide pairs comprises sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample. In another embodiment, said first set of oligonucleotide pairs comprises sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample and sequence that

4

extends the length of the product. In another embodiment, said polynucleotide sequences are enriched sequences.

In another aspect, a method for labeling enriched polynucleotides in two or more samples that allows identification of which sample the polynucleotide originated is provided, comprising: a) amplifying one or more polynucleotide sequences in two or more samples with a first set of oligonucleotide pairs, wherein the first set of oligonucleotide pairs comprises sequence that distinguishes polynucleotides from one sample from polynucleotides in another sample; b) amplifying the product of a) with a second set of oligonucleotides pairs; and c) amplifying the product of b) with a third set of oligonucleotide pairs.

In another aspect, a kit is provided comprising a) a first set of oligonucleotide primer pairs comprising: sequence that selectively hybridizes to a first set of genomic DNA sequences and sequence in-common amongst each of the first set of oligonucleotide primer pairs, b) a second set of oligonucleotide primer pairs with sequence that selectively hybridizes to the common sequence of the first set of oligonucleotide primer pairs and sequence common to the second set of oligonucleotide primer pairs, and c) a third set of oligonucleotide primer pairs with sequence that selectively hybridizes to the common sequence of the second set of oligonucleotide pairs. In one embodiment, the common region in the first set of primers comprises sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample. In another embodiment, the common region in the first set of primers comprises sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample and sequence that extends the length of the product.

In another aspect, a kit is provided comprising: a first set of primer pairs that selectively amplifies a set of genomic sequences to create a first set of amplification products, a second set of primer pair that selectively amplifies the first set of amplification products, and a third set of primer pairs that selectively amplifies the second set of amplification products.

INCORPORATION BY REFERENCE

All publications, patents, and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication, patent, or patent application was specifically and individually indicated to be incorporated by reference.

BRIEF DESCRIPTION OF THE DRAWINGS

The novel features of the invention are set forth with particularity in the appended claims. A better understanding of the features and advantages of the present invention will be obtained by reference to the following detailed description that sets forth illustrative embodiments, in which the principles of the invention are utilized, and the accompanying drawings of which:

FIG. **1** illustrates a strategy for selecting sequences for enrichment based on "hot spots."

FIG. **2** illustrates a PCR scheme for "hot spot" enrichment.

FIG. **3** illustrates results of amplification of chromosome 21 with different primer pairs.

FIG. **4** illustrates simplex PCR amplification Bioanalyzer results.

FIG. **5** illustrates simplex PCR amplification Bioanalyzer results.

FIG. **6** illustrates multiplex PCR amplification Bioanalyzer results.

5

FIG. **7** illustrates PCR amplification of approximately 60 bp amplicons from chromosome 21.

FIG. **8** illustrates Fluidigm digital PCR analysis evidence of chromosome 21 and 1 amplification.

FIG. **9** illustrates size and concentration of DNA library construction conditions for PCR enrichment of chromosome 21 fragments in 4 different conditions.

FIG. **10** illustrates Illumina GA sequencing analysis. FIG. **10** discloses SEQ ID NOS:9-10 and 96-98, respectively.

FIG. **11** illustrates strategy for design of PCR primers for the "chromosome walk" method of amplification.

FIG. **12** illustrates a primer pair (SEQ ID NOS:42-43, respectively, in order of appearance) designed for use in PCR amplification.

FIG. **13** illustrates relative position of regions A, B, C, and a Down syndrome critical region on a schematic of chromosome 21.

FIG. **14** illustrates PCR amplification results using the "chromosome walk" method of sequence selection.

FIG. **15** illustrates enrichment of regions of chromosome 21 using the "chromosome walk" sequence selection method.

FIG. **16** illustrates enrichment of chromosome 21 sequence and reference chromosome 1, 2, and 3 sequences.

FIG. **17** illustrates enrichment of sequences from reference chromosomes 1, 2, and 3.

FIG. **18** illustrates chromosome amplification rates of sequences selected using the "chromosome walk" method or based on "hot spots."

FIG. **19** illustrates sequence coverage of chromosome 21.

FIG. **20** highlights different regions of sequence coverage mapped to a schematic of chromosome 21.

FIG. **21** illustrates criteria used to select and amplify a "hot spot" region of chromosome 21.

FIG. **22** highlights a Down syndrome critical region on a schematic of sequence reads that map to chromosome 21.

FIG. **23** magnifies regions of sequence read coverage on a schematic of chromosome 21.

FIG. **24** illustrates sequences reads mapped on chromosome 21 (SEQ ID NOS:99-132, respectively, in order of appearance).

FIG. **25** illustrates primers designed for amplifying sequence from a 251 bp segment of chromosome 21 (SEQ ID NO:133).

FIG. **26** illustrates a nested PCR strategy for DNA library construction.

DETAILED DESCRIPTION OF THE INVENTION

Overview

In one aspect, the provided invention includes methods for selecting non-random polynucleotide sequences for enrichment. The non-random sequences can be enriched from a maternal sample for use in detecting a fetal abnormality, for example, fetal aneuploidy. In one embodiment, the selection of non-random polynucleotide sequences for enrichment can be based on the frequency of sequence reads in a database of sequenced samples from one or more subjects. In another embodiment, the selection of polynucleotide sequences for enrichment can be based on the identification in a sample of sequences that can be amplified in one or more regions of a chromosome. The selection of polynucleotide sequences to enrich can be based on knowledge of regions of chromosomes that have a role in aneuploidy. The selective enrichment of sequences can comprise enriching both fetal and maternal polynucleotide sequences.

In another aspect, the provided invention includes methods for determining the presence or absence of a fetal abnormality

6

comprising a step of enriching non-random polynucleotide sequences from a maternal sample. The non-random polynucleotide sequences can be both fetal and maternal polynucleotide sequences.

In another aspect, the provided invention comprises a kit comprising oligonucleotides for use in selectively enriching non-random polynucleotide sequences.

In another aspect, the provided invention includes methods for generating a library of enriched polynucleotide sequences. A library can be generated by the use of one or more amplification steps, which can introduce functional sequences in polynucleotide sequences that have been selectively enriched. For example, the amplification steps can introduce sequences that serve as hybridization sites for oligonucleotides for sequencing, sequences that identify that sample from which the library was generated, and/or sequences that serve to extend the length of the enriched polynucleotide sequences, for example, to facilitate sequencing analysis.

In one aspect, a method for determining the presence or absence of fetal aneuploidy is provided comprising selectively enriching non-random polynucleotide sequences (e.g., genomic DNA) from a cell-free nucleic acid (e.g., DNA or RNA) sample, sequencing said enriched polynucleotide sequences, enumerating sequence reads from said sequencing step, and determining the presence or absence of fetal aneuploidy based on said enumerating.

The selectively enriching step can comprise amplifying nucleic acids. Amplification can comprise performing a polymerase chain reaction (PCR) on a sample of nucleic acids. PCR techniques that can be used include, for example, digital PCR (dPCR), quantitative PCR (qPCR) or real-time PCR (e.g., TaqMan PCR; Applied Biosystems), reverse-transcription PCR (RT-PCR), allele-specific PCR, amplified fragment length polymorphism PCR (AFLP PCR), colony PCR, Hot Start PCR, in situ PCR (ISH PCR), inverse PCR (IPCR), long PCR, multiplex PCR, or nested PCR. Amplification can be linear amplification, wherein the number of copies of a nucleic acid increases at a linear rate in a reaction.

The selectively enriching step can comprise a hybridization step. The hybridization can occur on a solid support.
Selecting Sequences Based on "Hotspots"

Sequencing data can be analyzed to identify polynucleotide sequences to be selectively enriched. Some polynucleotide sequences from a sample comprising nucleic acids (e.g., genomic DNA) can be sequenced at a higher frequency than other polynucleotide sequences. These sequences may be more likely to be enriched by, for example, amplification methods. Identifying and enriching these polynucleotide sequences can reduce the number of nucleic acids that need to be analyzed to determine the presence or absence of fetal aneuploidy. This enrichment can reduce the cost of aneuploidy determination.

In one embodiment, the non-random polynucleotide sequences that are selectively enriched can comprise sequences that are sequenced at a frequency of greater than at least 2-, 3-, 4-, 5-, 6-, 7-, 8-, 9-, 10-, 15-, 20-, 25-, 30-, 40-, 50-, 60-, 70-, 80-, 90-, or 100-fold than other sequences on the same chromosome in a database of sequence information. The polynucleotide sequences that are sequenced at a higher frequency can be referred to as "hot-spots." The non-random polynucleotides that are selectively enriched can be selected from regions of a chromosome known to have a role in a disease, for example, Down syndrome. The sequencing rate data can be derived from a database of enumerated polynucleotide sequences, and the database of enumerated polynucleotide sequences can be generated from one or more samples

US 8,318,430 B2

7

comprising non-maternal samples, maternal samples, or samples from subjects that are pregnant, have been pregnant, or are suspected of being pregnant. The samples can be cell-free nucleic acid (e.g., DNA or RNA) samples. The subjects can be mammals, e.g., human, mouse, horse, cow, dog, or cat. The samples can contain maternal polynucleotide sequences and/or fetal polynucleotide sequences. The enumerated sequences can be derived from random, massively parallel sequencing of samples, e.g., as described in U.S. Patent Application Publication Nos. 20090029377 and 20090087847, or Fan H C et al. (2008) PNAS 105:16266-71, which are herein incorporated by reference in their entireties. Techniques for massively parallel sequencing of samples are described below.

The database can comprise sequence information from samples from at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 30, 40, 50, 60, 70, 80, 90, 100, 200, 300, 400, 500, 600, 700, 800, 900, 1000, 2000, 3000, 5000, 7500, 10,000, 100,000, or 1,000,000 different subjects. The data can be processed to indicate the overlap of individual polynucleotide sequences from the samples from the subjects (FIGS. 22-24). The database can indicate the frequency with which one or more nucleotides at a specific chromosome position is sequenced among the samples. The length of the sequence that can overlap can be at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 125, 150, 175, 200, 225, 250, 275, or 300 bases. The frequency of sequencing of one or more nucleotides at a first position of a chromosome can be compared to the frequency of sequencing of one or more other nucleotides at a second position on the chromosome to determine the fold frequency at which the first position was sequenced relative to the second position. The sequence (polynucleotide sequence or base) that is sequenced at a higher frequency can be sequenced at least 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 35, 40, 45, 50, 60, 70, 80, 90, 100, 200, 300, 400, 500, 600, 700, 800, 900, 1000, 2000, 3000, 5000, 7500, 10,000, 100,000, or 1,000,000 times in one or more samples in the database.

In one embodiment, a method for identifying polynucleotide sequences for enrichment in a polynucleotide template is provided comprising sequencing a plurality of polynucleotide sequences from the polynucleotide template, enumerating sequenced polynucleotide sequences, and identifying one or more sequenced polynucleotide sequences that are sequenced or that have a coverage rate at least 5-fold greater than a second set of polynucleotide sequences.

In another aspect, one or more unique isolated genomic DNA sequences are provided, wherein said genomic DNA sequences comprise regions that are sequenced at a rate greater than 5-fold than other regions of genomic DNA. The isolated genomic sequences can comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 20, 30, 40, 50, 60, 70, 80, 90, 100, 200, 300, 400, 500, 600, 700, 800, 900, 1000, 2000, 3000, 4000, 5000, 6000, 7000, 8000, 9000, or 10,000 different sequences. Each isolated genomic sequence can be a single amplicon.

In another aspect, a set of one or more oligonucleotides that selectively hybridize to the isolated sequences is provided. The oligonucleotides can hybridize to the sequences under mild hybridization conditions. The oligonucleotides can have similar thermal profiles.

In one embodiment, the non-random sequences to be selectively enriched are identified based on the number of times they are sequenced in a database of sequence information, independent of the rate of sequencing of a second set of sequences. For example, the sequences to be selectively

8

enriched can be those that are sequenced at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 35, 40, 45, 50, 60, 70, 80, 90, 100, 200, 300, 400, 500, 600, 700, 800, 900, 1000, 2000, 3000, 5000, 7500, 10,000, 100,000, or 1,000,000 times in one or more samples in the database.

The number of non-random polynucleotide sequences that can be selectively enriched in a sample can be at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 150, 200, 250, 300, 400, 500, 600, 700, 750, 800, 900, or 1000. The size of the non-random polynucleotide sequences to be selectively enriched can comprise about 10-1000, 10-500, 10-260, 10-260, 10-200, 10-200, 50-150, or 50-100 bases or bp, or at least 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 66, 70, 75, 80, 85, 90, 95, 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, 250, 260, 270, 280, 290, 300, 400, 500, 600, 700, 800, 900, or 1000 bases or bp.

The selective enrichment step can comprise designing oligonucleotides (primers) that hybridize specifically to polynucleotide sequences that are sequenced at a higher frequency than other sequences on a chromosome or are sequenced a certain number of times. A program, for example, Basic Local Alignment Search Tool (BLAST), can be used to design oligonucleotides that hybridize to sequence specific to one chromosome or region. The oligonucleotide primers can be manually designed by a user, e.g., using known genome or chromosome sequence template as a guide. A computer can be used to design the oligonucleotides. The oligonucleotides can be designed to avoid hybridizing to sequence with one or more polymorphisms, e.g., single nucleotide polymorphisms (SNPs).

One or more oligonucleotide pairs can be generated to hybridize specifically to one or more polynucleotide sequences; the oligonucleotide pairs can be used in amplification reactions, e.g., a PCR technique described above, to selectively enrich sequences. In one embodiment, the oligonucleotides or oligonucleotide pairs can be provided in a kit. A set of oligonucleotides can be generated wherein each oligonucleotide has a similar thermal profile (e.g., $T_m$). A set of oligonucleotides can comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95 or 100 oligonucleotide pairs. An oligonucleotide pair can be a pair of oligonucleotides that can hybridize to and amplify a sequence in a PCR. Each of the pairs of oligonucleotides can comprise sequence identical to sequence in all the other oligonucleotide pairs and sequence unique to that individual oligonucleotide pair.

In another aspect, a kit comprising a set of oligonucleotides that selectively hybridize and/or used to amplify one or more regions of a chromosome is provided, wherein each of said regions is sequenced at a rate of greater than 5-fold than other regions of the chromosome. The oligonucleotides can have the properties of the oligonucleotides described above.

Selecting Sequences Based on "Chromosome Walk"

In another embodiment, the selective enriching of non-random polynucleotide sequences can comprise identifying for enrichment and/or enriching at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95 or 100 polynucleotide sequences from one or more regions of a first chromosome. The length of a region can be at least, or up to, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 200, 300, 400, 500, 600, 700, 800, 900, 1000, 2000, 3000, 4000, 5000, 6000, 7000, 8000, 9000, or 10,000 kb. The number of regions from which sequences can be enriched can be at least 1, 2, 3, 4, 5, 6, 7, 8, 9, or 10. The selection of polynucleotide

US 8,318,430 B2

9

sequences to be enriched can be independent of the rate at which polynucleotides are sequenced in other samples. The polynucleotide sequences to be enriched can be clustered in a region, wherein the cluster can comprise about 1000-8000 bp, 1000-7000 bp, 1000-6000 bp, 1000-5000 bp, 1000-4000 bp, 1000-3000 bp, 1000-2000 bp, 4000-8000 bp, 5000-8000 bp, 6000-8000 bp, or 7000-8000 bp. There can be at least 1, 2, 3, 4, 5, 6, 7, 8, 9, or 10 clusters per region (e.g., per 50 kb region). The regions can be selected based on knowledge of a role for the region in a disease, for example, Down syndrome. Some polynucleotide sequences selected using this technique can be enriched (e.g., amplified) in practice, whereas some of the polynucleotide sequences selected using this technique may not be enriched (e.g., amplified) in practice. The polynucleotide sequences that are enriched using this identification technique can be used for subsequent enumeration and aneuploidy detection.

Oligonucleotide (primers) can be designed that hybridize specifically to polynucleotide sequences within a region (e.g., 50 kb). The oligonucleotide (primer) design can be automated to select sequences within a region (e.g., 50 kb) for enrichment using assembled chromosome sequence as a template for design. No prior knowledge of the level of sequenced polynucleotide sequences in other samples (e.g., in a database sequence information) is necessary to select the sequences for enrichment. PRIMER-BLAST (from NCBI open/public software) can be used to design oligonucleotides that specifically hybridize to sequences on one chromosome. The oligonucleotides can be designed to avoid hybridizing with sequences that contain one or more polymorphisms, e.g., a single nucleotide polymorphism (SNP). One or more oligonucleotide pairs can be generated to hybridize specifically to one or more polynucleotide sequences; the oligonucleotide pairs can be used in amplification reactions, e.g., using a PCR technique described above. A set of oligonucleotides can be generated wherein each oligonucleotide has a similar thermal profile (e.g., $T_m$). The set of oligonucleotides can comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65, 70, 75, 80, 85, 90, 95 or 100 oligonucleotide pairs. In one embodiment, a kit is provided comprising oligonucleotide pairs that can hybridize to specific polynucleotide sequences within a region (e.g., 50 kb). Each of the pairs of oligonucleotides can comprise sequence identical to sequence in all the other oligonucleotide pairs and sequence unique to that individual oligonucleotide pair.

Sample

The sample from which the non-random polynucleotide sequences are to be selectively enriched can be a maternal sample. Maternal samples that can be used in the methods of the provided invention include, for example, whole blood, serum, plasma, sweat, tears, ear flow, sputum, lymph, bone marrow suspension, lymph, urine, saliva, semen, sweat, vaginal flow, feces, transcervical lavage, cerebrospinal fluid, brain fluid, ascites, milk, or secretions of the respiratory, intestinal and genitourinary tracts. A sample can be from a processed blood sample, for example, a buffy coat sample. A buffy coat sample is an anticoagulated blood sample that forms after density gradient centrifugation of whole blood. A buffy coat sample contains, e.g., maternal nucleated cells, e.g., peripheral blood mononuclear cells (PBMCs). In one embodiment, a sample comprises fetal cells (e.g., fetal nucleated red blood cells (fnRBCs) or trophoblasts) and maternal cells.

A cell-free nucleic acid (e.g., DNA or RNA) sample can be a maternal sample, for example, serum or plasma. Methods for generating serum or plasma and methods for extracting nucleic acids are known in the art. A cell-free sample can

10

comprise fetal and maternal cell-free nucleic acid, for example, DNA or RNA. A cell-free DNA sample can be from a plurality of different subjects. Samples used for generation of a database of sequenced polynucleotides can be cell-free nucleic acid samples.

Sequencing Methods

Applicable nucleic acid sequencing methods that can be used in the methods of the provided invention include, e.g., multi-parallel sequencing, massively parallel sequencing, sequencing-by-synthesis, ultra-deep sequencing, shot-gun sequencing, and Sanger sequencing, e.g., using labeled terminators or primers and gel separation in slab or capillary. These sequencing methods have been described previously. For example, a description of shotgun sequencing can be found in Fan et al. (2008) *PNAS* 105:16266-16271. Sanger sequencing methods are described in Sambrook et al., (2001) Molecular Cloning, Third Edition, Cold Spring Harbor Laboratory Press. Other DNA sequencing techniques can include sequencing-by-synthesis using reversibly terminated labeled nucleotides, pyrosequencing, 454 sequencing, allele specific hybridization to a library of labeled oligonucleotide probes, sequencing by synthesis using allele specific hybridization to a library of labeled clones followed by ligation, real time monitoring of the incorporation of labeled nucleotides during a polymerization step, polony sequencing, and SOLiD sequencing.

Sequencing methods are described in more detail below. A sequencing technology that can be used in the methods of the provided invention is SOLEXA sequencing (Illumina). SOLEXA sequencing is based on the amplification of DNA on a solid surface using fold-back PCR and anchored primers. Genomic DNA is fragmented, and adapters are added to the 5' and 3' ends of the fragments. DNA fragments that are attached to the surface of flow cell channels are extended and bridge amplified. The fragments become double stranded, and the double stranded molecules are denatured. Multiple cycles of the solid-phase amplification followed by denaturation can create several million clusters of approximately 1,000 copies of single-stranded DNA molecules of the same template in each channel of the flow cell. Primers, DNA polymerase and four fluorophore-labeled, reversibly terminating nucleotides are used to perform sequential sequencing. After nucleotide incorporation, a laser is used to excite the fluorophores, and an image is captured and the identity of the first base is recorded. The 3' terminators and fluorophores from each incorporated base are removed and the incorporation, detection and identification steps are repeated.

Another sequencing technique that can be used in the methods of the provided invention includes, for example, Helicos True Single Molecule Sequencing (tSMS) (Harris T. D. et al. (2008) *Science* 320:106-109). In the tSMS technique, a DNA sample is cleaved into strands of approximately 100 to 200 nucleotides, and a polyA sequence is added to the 3' end of each DNA strand. Each strand is labeled by the addition of a fluorescently labeled adenosine nucleotide. The DNA strands are then hybridized to a flow cell, which contains millions of oligo-T capture sites that are immobilized to the flow cell surface. The templates can be at a density of about 100 million templates/cm². The flow cell is then loaded into an instrument, e.g., HeliScope™ sequencer, and a laser illuminates the surface of the flow cell, revealing the position of each template. A CCD camera can map the position of the templates on the flow cell surface. The template fluorescent label is then cleaved and washed away. The sequencing reaction begins by introducing a DNA polymerase and a fluorescently labeled nucleotide. The oligo-T nucleic acid serves as a primer. The polymerase incorporates the labeled nucle-

11

otides to the primer in a template directed manner. The polymerase and unincorporated nucleotides are removed. The templates that have directed incorporation of the fluorescently labeled nucleotide are detected by imaging the flow cell surface. After imaging, a cleavage step removes the fluorescent label, and the process is repeated with other fluorescently labeled nucleotides until the desired read length is achieved. Sequence information is collected with each nucleotide addition step.

Another example of a DNA sequencing technique that can be used in the methods of the provided invention is 454 sequencing (Roche; Margulies, M. et al. (2005) *Nature* 437: 376-380). 454 sequencing involves two steps. In the first step, DNA is sheared into fragments of approximately 300-800 base pairs, and the fragments are blunt-ended. Oligonucleotide adaptors are then ligated to the ends of the fragments. The adaptors serve as primers for amplification and sequencing of the fragments. The fragments can be attached to DNA capture beads, e.g., streptavidin-coated beads using, e.g., Adaptor B, which contains 5'-biotin tag. The fragments attached to the beads are PCR amplified within droplets of an oil-water emulsion. The result is multiple copies of clonally amplified DNA fragments on each bead. In the second step, the beads are captured in wells (pico-liter sized). Pyrosequencing is performed on each DNA fragment in parallel. Addition of one or more nucleotides generates a light signal that is recorded by a CCD camera in a sequencing instrument. The signal strength is proportional to the number of nucleotides incorporated.

Pyrosequencing makes use of pyrophosphate (PPi) which is released upon nucleotide addition. PPi is converted to ATP by ATP sulfurylase in the presence of adenosine 5' phosphosulfate. Luciferase uses ATP to convert luciferin to oxyluciferin, and this reaction generates light that is detected and analyzed.

Another example of a DNA sequencing technique that can be used in the methods of the provided invention is SOLiD technology (Applied Biosystems). In SOLiD sequencing, genomic DNA is sheared into fragments, and adaptors are attached to the 5' and 3' ends of the fragments to generate a fragment library. Alternatively, internal adaptors can be introduced by ligating adaptors to the 5' and 3' ends of the fragments, circularizing the fragments, digesting the circularized fragment to generate an internal adaptor, and attaching adaptors to the 5' and 3' ends of the resulting fragments to generate a mate-paired library. Next, clonal bead populations are prepared in microreactors containing beads, primers, template, and PCR components. Following PCR, the templates are denatured and beads are enriched to separate the beads with extended templates. Templates on the selected beads are subjected to a 3' modification that permits bonding to a glass slide.

The sequence can be determined by sequential hybridization and ligation of partially random oligonucleotides with a central determined base (or pair of bases) that is identified by a specific fluorophore. After a color is recorded, the ligated oligonucleotide is cleaved and removed and the process is then repeated.

Another example of a sequencing technology that can be used in the methods of the provided invention includes the single molecule, real-time (SMRT™) technology of Pacific Biosciences. In SMRT, each of the four DNA bases is attached to one of four different fluorescent dyes. These dyes are phospholinked. A single DNA polymerase is immobilized with a single molecule of template single stranded DNA at the bottom of a zero-mode waveguide (ZMW). A ZMW is a confinement structure which enables observation of incorpo-

12

ration of a single nucleotide by DNA polymerase against the background of fluorescent nucleotides that rapidly diffuse in an out of the ZMW (in microseconds). It takes several milliseconds to incorporate a nucleotide into a growing strand. During this time, the fluorescent label is excited and produces a fluorescent signal, and the fluorescent tag is cleaved off. Detection of the corresponding fluorescence of the dye indicates which base was incorporated. The process is repeated.

Another example of a sequencing technique that can be used is the methods of the provided invention is nanopore sequencing (Soni G V and Meller A. (2007) *Clin Chem* 53:1996-2001). A nanopore is a small hole, of the order of 1 nanometer in diameter Immersion of a nanopore in a conducting fluid and application of a potential across it results in a slight electrical current due to conduction of ions through the nanopore. The amount of current which flows is sensitive to the size of the nanopore. As a DNA molecule passes through a nanopore, each nucleotide on the DNA molecule obstructs the nanopore to a different degree. Thus, the change in the current passing through the nanopore as the DNA molecule passes through the nanopore represents a reading of the DNA sequence.

Another example of a sequencing technique that can be used in the methods of the provided invention involves using a chemical-sensitive field effect transistor (chemFET) array to sequence DNA (e.g., as described in U.S. Patent Application Publication No. 20090026082). In one example of the technique, DNA molecules can be placed into reaction chambers, and the template molecules can be hybridized to a sequencing primer bound to a polymerase. Incorporation of one or more triphosphates into a new nucleic acid strand at the 3' end of the sequencing primer can be detected by a change in current by a chemFET. An array can have multiple chemFET sensors. In another example, single nucleic acids can be attached to beads, and the nucleic acids can be amplified on the bead, and the individual beads can be transferred to individual reaction chambers on a chemFET array, with each chamber having a chemFET sensor, and the nucleic acids can be sequenced.

The sequencing technique used in the methods of the provided invention can generate at least 1000 reads per run, at least 10,000 reads per run, at least 100,000 reads per run, at least 500,000 reads per run, or at least 1,000,000 reads per run.

The sequencing technique used in the methods of the provided invention can generate about 30 bp, about 40 bp, about 50 bp, about 60 bp, about 70 bp, about 80 bp, about 90 bp, about 100 bp, about 110, about 120 bp per read, about 150 bp, about 200 bp, about 250 bp, about 300 bp, about 350 bp, about 400 bp, about 450 bp, about 500 bp, about 550 bp, or about 600 bp per read.

The sequencing technique used in the methods of the provided invention can generate at least 30, 40, 50, 60, 70, 80, 90, 100, 110, 120, 150, 200, 250, 300, 350, 400, 450, 500, 550, or 600 bp per read.

In another aspect, a method for sequencing cell-free DNA from a maternal sample is provided comprising obtaining a maternal sample comprising cell-free DNA, enriching sequences that are representative of one or more 50 kb regions of a chromosome, or enriching sequences that are sequenced at a rate of at least 2-fold greater than other sequences, using an Illumina sequencer (e.g., Illumina Genome Analyzer IIx) and sequencing said enriched sequences of cell-free DNA. Aneuploidy

The non-random sequences to be selectively enriched can include those on a chromosome suspected of being aneuploid in a fetus and/or on a chromosome suspected of being euploid

US 8,318,430 B2

13

14

in a fetus. Polynucleotide sequences from chromosome 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, X, or Y can be selectively enriched. Chromosomes suspected of being aneuploid in a fetus can include chromosome 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, X, or Y. Chromosomes suspected of being euploid in a fetus can include chromosome 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, X, or Y.

The methods of the provided invention can be used to detect aneuploidy. Aneuploidy is a state where there is an abnormal number of chromosome(s), or parts of a chromosome. Aneuploidy can include, for example, monosomy, partial monosomy, trisomy, partial trisomy, tetrasomy, and pentasomy. Examples of aneuploidy that can be detected include Angelman syndrome (15q11.2-q13), cri-du-chat syndrome (5p-), DiGeorge syndrome and Velo-cardiofacial syndrome (22q11.2), Miller-Dieker syndrome (17 p13.3), Prader-Willi syndrome (15q11.2-q13), retinoblastoma (13q14), Smith-Magenis syndrome (17 p11.2), trisomy 13 (Patau syndrome), trisomy 16, trisomy 18 (Edward syndrome), trisomy 21 (Down syndrome), triploidy, Williams syndrome (7q 11.23), and Wolf-Hirschhom syndrome (4p-). Examples of sex chromosome abnormalities that can be detected by methods described herein include, but are not limited to, Kallman syndrome (Xp22.3), steroid sulfate deficiency (STS) (Xp22.3), X-linked ichthyosis (Xp22.3), Klinefelter syndrome (XXY), fragile X syndrome, Turner syndrome, metafemales or trisomy X (XXX syndrome, 47,XXX aneuploidy), and monosomy X.

In addition, the enrichment methods can also be used to detect locus- and allele-specific sequences of interest, for example, autosomal and sex chromosomal point mutations, deletions, insertions, and translocations, which can be associated with disease. Examples of translocations associated with disease include, for example, t(9;22)(q34:q11)—Philadelphia chromosome, CML, ALL; t(2;5)(p23;q35) (anaplastic large cell lymphoma); t(8;14)—Burkitt's lymphoma (c-myc); t(8;21)(q22;q22)—acute myeloblastic leukemia with maturation (AML1-ETO); t(12;21)(p12;q22)—ALL (TEL-AML1); t(12;15)(p13;q25)—(TEL-TrkC); t(9;12) (p24;p13)—CML, ALL (TEL-JAK2); acute myeloid leukemia, congenital fibrosarcoma, secretory breast carcinoma; t(11;14)—Mantle cell lymphoma (cyclin D1); t(11;22)(q24; q11.2-12)—Ewing's sarcoma; t(14;18)(q32;q21)—Follicular lymphoma (Bcl-2); t(15;17)—Acute promyelocytic leukemia; t(1;12)(q21;p13)—Acute myelogenous leukemia; t(17;22)—DFSP; and t(X;18)(p11.2;q11.2)—Synovial sarcoma.

Methods for determining fetal aneuploidy using random sequencing techniques are described, for example, in U.S. Patent Application Publication Nos. 20090029377 and 20090087847, Fan H C et al. (2008) *PNAS* 105:16266-71, and U.S. Provisional Patent Application Nos. 61/296,358 and 61/296,464, which are herein incorporated by reference in their entireties. The methods of fetal aneuploidy determination can be based on the fraction of fetal DNA in a sample. Such methods are described, for example, in U.S. Provisional Patent Application No. 61/296,358.

Aneuploidy can be suspected or determined when the number of enumerated sequences is greater than a predetermined amount. The predetermined amount can be based on estimated amount of DNA in a cell-free DNA sample. The predetermined amount can be based on the amount of enumerated sequences from a control region.

Library Formation

In another aspect, a method is provided for generating a library of selectively enriched non-random polynucleotide sequences comprising a) amplifying one or more polynucleotide sequences with a first set of oligonucleotide pairs, b) amplifying the product of a) with a second set of oligonucleotides pairs; and c) amplifying the product of b) with a third set of oligonucleotide pairs.

The polynucleotide sequences can be those enriched by the methods of the provided invention. The first set of oligonucleotide pairs can comprise sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample. The first set of oligonucleotide pairs can comprise sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample and sequence that extends the length of the product. Bridge amplification in Illumina (SOLEXA) sequencing can be most effective when the sequences are 100-500 bp. Fetal nucleic acid sequences are often less than 250 bp, and sequences of less than 100 bp can be amplified from cell-free samples. Thus, the sequence that extends the length of the product can facilitate SOLEXA sequencing. The polynucleotide sequences can be sequences enriched using the methods described herein.

In another aspect, a method for labeling enriched polynucleotides in two or more samples that allows identification of which sample the polynucleotide originated is provided, comprising: a) amplifying one or more polynucleotide sequences in two or more samples with a first set of oligonucleotide pairs, wherein the first set of oligonucleotide pairs comprises sequence that distinguishes polynucleotides from one sample from polynucleotides in another sample, b) amplifying the product of a) with a second set of oligonucleotides pairs; and c) amplifying the product of b) with a third set of oligonucleotide pairs.

In another aspect, a kit is provided comprising a) a first set of oligonucleotide primer pairs comprising: sequence that selectively hybridizes to a first set of genomic DNA sequences and sequence in-common amongst each of the first set of oligonucleotide primer pairs, b) a second set of oligonucleotide primer pairs with sequence that selectively hybridizes to the common sequence of the first set of oligonucleotide primer pairs and sequence common to the second set of oligonucleotide primer pairs, and c) a third set of oligonucleotide primer pairs with sequence that selectively hybridizes to the common sequence of the second set of oligonucleotide pairs.

The first set of primers can comprise sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample.

The common region in the first set of primers can comprise sequence that distinguishes polynucleotides in one sample from polynucleotides in another sample and that extends the length of the product.

In another aspect, a kit is provided comprising: a first set of primer pairs that selectively amplifies a set of genomic sequences to create a first set of amplification products, a second set of primer pair that selectively amplifies the first set of amplification products, and a third set of primer pairs that selectively amplifies the second set of amplification products.

## EXAMPLES

### Example 1

#### "Hot Spot" Amplification Strategy

FIG. 1 illustrates a strategy for selecting sequences from chromosome 21 for enrichment. In step 100, sequence run data was combined. Total chromosome 21 sequence reads were used (102). These samples can include reads from samples that contain trisomy 21. "Hot" and "cold" regions of

US 8,318,430 B2

15

sequence coverage were mapped on chromosome 21 (**104**). For example, the region examined can be within a 5.8 Mb Down syndrome critical region (DSCR). PCR primers are designed, which can anneal to intergenic DNA or intragenic DNA (**106**). The primers were designed to anneal specifically with chromosome 21. The regions to be amplified can be a hot spot region, or region to which a number of sequence reads map (**108**). The PCR fragments generated can be approximately 200 bp in length. Next, sequencing analysis is performed using BioAnalyzer analysis and/or PCR/probe analysis (**110**).

PCR primers were designed to generate amplicons of approximately 200 bp and 150 bp from cell-free DNA tem-

16

plate, as depicted is shown in FIG. **2**. PCR amplification was performed using both simplex and multiplex reactions. The size of the amplicons was analyzed by Agilent 2100 Bioanalyzer and DNA 1000 kit. Sequences for primer pairs 1_150, 2_150, 3_150, 4_150, 5_150, 6_150, and 7_150 regions amplification, used in generating the data in FIGS. **2**, **3**, **4**, and **5**, are shown in Table 1.

Primer sequences for 1_200, 2_200, 3_200, 4_200, 5_200, and 6_200 regions amplification, for FIGS. **2**, **4**, and **6**, are illustrated in Table 2.

TABLE 1

Sequences for primer pairs 1_150, 2_150, 3_150, 4_150, 5_150, 6_150, and 7_150 (SEQ ID NOS: 1-14, respectively, in order of appearance).

| Chromosome Location | Primer Name | Primer Sequence | PCR Size (bp) |
|---|---|---|---|
| (1) Chr21: 45, 651, 908-45, 652, 158 | 1_150_45652158_F | CCCCAAGAGGTGCTTGTAGT | 155 |
| | 1_150_45652158_R | GCCATGGTGGAGTGTAGGAG | |
| (2) Chr21: 46, 153, 568-46, 153, 825 | 2_150_46153825_F | CTGAAGTGCTGCCAACACAC | 153 |
| | 2_150_46153825_R | TGATCTTGGAGCCTCCTTTG | |
| (3) Ch21: 46, 048, 091-46, 048, 339 | 3_150_46, 048, 339_F | AGCTTCTCCAGGACCCAGAT | 151 |
| | 3_150_46, 048, 339_R | CATTCATGGGAAGGGACTCA | |
| 4) Chr21: 46, 013, 033-46, 013, 258 | 4_150_46, 013, 258_F | CCATTGCACTGGTGTGCTT | 155 |
| | 4_150_46, 013, 258_R | GAGACGAGGGGACGATAGC | |
| (5) Chr21: 40,372, 444-40, 372, 655 | 5_150_40, 372, 655_F | TGCCATCGTAGTTCAGCGTA | 152 |
| | 5_150_40, 372, 655_R | TTGGACCACAGCTCAGAGG | |
| (6) Chr21: 41, 470, 712-41, 470, 747 | 6_41, 470, 712-150_F | AAAGTGTGCTTGCTCCAAGG | 152 |
| | 6_41, 470, 712-150_R | GGCAAAACACAGCCCAATAG | |
| (7) Chr21 | Ch21_APP150_F | CCTAGTGCGGGAAAAGACAC | 145 |
| | Ch21_APP150_R | TTCTCTCCCTTGCTCATTGC | |

TABLE 2

Sequences for primer pairs 1_200, 2_200, 3_200, 4_200, 5_200, and 6_200 (SEQ ID NOS: 15-26, respectively, in order of appearance).

| Chromosome Location | Primer Name | Primer Sequence | PCR Size (bp) |
|---|---|---|---|
| (1) Chr21: 45, 651, 908-45, 652, 158 | 1_45651908-45652158_F | GAGTCAGAGTGGAGCTGAGGA | 199 |
| | 1_45651908-45652158_R | GGAGGTCCTAGTGGTGAGCA | |
| (2) Chr21: 46, 153, 568-46, 153, 825 | 2_46153568-46153825_F | TGTGGGAAGTCAGGACACAC | 205 |
| | 2_46153568-46153825_R | GATCTTGGAGCCTCCTTTGC | |
| (3) Chr21: 46, 048, 091-46, 048, 339 | 3_46, 048, 091-46, 048, 339_F | GTGACAGCCTGGAACATGG | 203 |
| | 3_46, 048, 091-46, 048, 339_R | CAAGGCACCTGCACTAAGGT | |
| (4) Chr21: 46, 013, 033-46, 013, 258 | 4_46, 013, 033-46, 013, 258_F | TGCCTCCTGCTACTTTTACCC | 204 |
| | 4_46, 013, 033-46, 013, 258_R | AGACGGAACAGGCAGAGGT | |
| (5) Chr21: 40, 372, 444-40, 372, 655 | 5_40372444-40372655_F | CAAGACACAAGCAGGAGAGC | 196 |
| | 5_40372444-40372655_R | CAGTTTGGACCACAGCTCAG | |

US 8,318,430 B2

| 17 | | 18 |

TABLE 2-continued

Sequences for primer pairs 1_200, 2_200, 3_200, 4_200, 5_200, and 6_200
(SEQ ID NOS: 15-26, respectively, in order of appearance).

| Chromosome Location | Primer Name | Primer Sequence | PCR Size (bp) |
|---|---|---|---|
| (6) Chr21: 41, 470, 710-41, 471, 028 | 6_41470710_200F | AAAGTGTGCTTGCTCCAAGG | 194 |
| | 6_41470710-200R | TGGAACAAGCCTCCATTTTC | |

TABLE 3

Primer sequences for 1_150_60 and 2_150_60 region PCR amplification (FIG. 7);
same primer plus probe sequences for FIG. 8 (SEQ ID NOS: 27-41, respectively,
in order of appearance).

| Chromosome Location | Primer Name | Primer Sequence | PCR Size (bp) |
|---|---|---|---|
| (1) Chr21: 45, 651, 908-45, 652, 158 | 1_150_60_45652158_F | GAGGTGCTTGTAGTCAGTGCTTCA | 64 |
| | 1_150_60_45652158_R | CCCGGTGACACAGTCCTCTT | |
| | 1_150_60_45652158_P | AGTCAGAGTGGAGCTGAG | |
| (2) Chr21: 46, 153, 568-460, 153, 825 | 2_60_150_46153825_F | TGCTGCCAACACACGTGTCT | 60 |
| | 2_60_150_46153825_R | CAGGGCTGTTGCTCATGGA | |
| | 2_60_150_46153825_P | TCCCCTAGGATATCATC | |
| (5) Chr21: 40, 372, 444-40, 372, 655 | 5_60_150_40372655_F | CCCGCATCTGCAGCTCAT | 65 |
| | 5_60_150_40372655_R | TCTCTCCAAGTCCTACATCCTGTATG | |
| | 5_60_150_40372655_P | CCAGGTGGCTTCC | |
| Ch21 | 7_Amyloid_21_F | GGG AGC TGG TAC AGA AAT GAC TTC | ref. 1 |
| | 7_Amyloid_21_R | TTG CTC ATT GCG CTG ACA A | |
| | 7_Amyloid_21_P | AGC CAT CCT TCC CGG GCC TAG G | |
| Ch1 | ch1_1_F | GTTCGGCTTTCACCAGTCT | ref. 1 |
| | ch1_1_R | CTCCATAGCTCTCCCCACT | |
| | ch1_1_P | CGCCCTGCCATGTGGAA | |

Ref. 1 in Table 3 refers to Fan H C et al. (2008) *PNAS* 105: 16266-16271, which is herein incorporated by reference in its entirety. FIG. **3** illustrates amounts of nucleic acids that were detected for different samples of cell-free plasma DNA using different primers. FIG. **4** illustrates simplex PCR Amplification Bioanalyzer results, some of which correspond to the data in FIG. **3**.

FIG. **5** illustrates results of PCR amplification of chromosome 21 in singleplex reactions. FIG. **6** illustrates Bioanalyzer results for multiplex PCR amplifications of chromosome 21. FIG. **7** illustrates Bioanalyzer results for PCR amplifications of approximately 60 bp amplicons. Table 3 illustrates primer sequences for 1_150_60 and 2_150_60 region PCR amplification.

FIG. **8**A illustrates enrichment of chromosome 1 and 21 sequence. Four different sequences from chromosome 21 were amplified, as well a region from chromosome 1. Numbers of molecules were counted by dPCR. The ratio of the different sequences of chromosome 21 to chromosome 1 sequences from samples that underwent enrichment was calculated. Also provided are the ratio of chromosome 21 to 1 sequences from non-enriched (cf plasma DNA) samples. Also, genomic DNA was extracted from a cultured T21 cell line (Down Syndrome in origin) as positive control to show that dPCR primer/probe can amplify the ch21. The T21 cell line was ordered from ATCC and cultured in the lab: ATCC number: CCL-54; Organism: Homo sapiens; Morphology: fibroblast; Disease: Down syndrome; Gender: male; Ethnicity: Caucasian.

FIG. **8**B illustrates a comparison of chromosome 1 and 21 counts pre-amplification (left side). Shown on the right side of the chart is the state following enrichment for ch21_5 using 5_60_150 primers (Table 3); amplified sequences were probed with chromosome 1-VIC and chromosome 21-FAM probes (Table 3). Only Ch21_5 sequence was amplified. FIG. **8**C illustrates the size of an enriched fragment, ch21_5, using 5_60_150 primers (Table 3).

A DNA library was generated with 24103_5_150 PCR fragment using Illumina ChIP-Seq Sample Preparation kit in 4 different conditions. The size and concentration of the generated DNA library was analyzed using Bioanalyzer shown in FIG. **9**.

This DNA library was sequenced using an Illumina GA Sequencer and the sequences was analyzed with Illumina Pipeline software. The output sequencing reads were aligned to a human reference sequence. The correct and unique aligned sequences were then scored, of which 20% and 12% are exactly the same sequences of forward and reverse primer sequences and adjacent flanking sequences, respectively, as shown in the FIG. **10**.

Example 2

Chromosome Walk Strategy for Sequence Enrichment

FIG. **11** illustrates an overview of the chromosome walk strategy for sequence enrichment. A 5.8 Mbp Down syn-

US 8,318,430 B2

**19**

drome critical region was selected (**1100**). PRIMER-BLAST (**1102**) was used to design 100 PCR primers (**1104**) in 50,000 bp regions. Unique sequences on chromosome 21 were sought to generate approximately 140-150 bp fragments. Primers were selected from different clusters in different regions on chromosome 21 (**1106**) and synthesized and arranged in 96 well plates (**1108**).

FIG. **12** illustrates a primer pair that was designed, indicating length, annealing position on chromosome 21, melting temperature ($T_m$), and percent GC content. FIG. **13** illustrates the positions of three 50 kbp regions in a Down syndrome critical region on chromosome 21. FIG. **14** illustrates Bioanalyzer results of PCR amplification of different sequences from clusters A, B, and C in regions A, B, and C on chromosome 21. FIG. **15** illustrates amplification results from different clusters in regions A, B, and C of chromosome 21, one primer pair/cluster.

FIG. **16** illustrates PCR amplification of chromosome 21 and reference chromosome 1 sequences. Ch21_A25, ch21_B16, and ch21_C58 are sequences selected using chromosome walk strategy. Ch1_1, ch1_2, ch2_1, ch2_2, ch3_1, ch3_2 are sequences selected using "hot spot" strategy. The sequences of primers used to generate data in FIGS. **15** and **16** are in Table 4.

TABLE 4

Primer sequences used to generate data in FIGS. 15, 16, and 17 (SEQ ID NOS: 42-95, respectively, in order of appearance).

| | |
|---|---|
| A18_F_22632000 | TGAAGCCCGGGAGGTTCCCT |
| A18_R_22632000 | TCCAGGCTGTGTGCCCTCCC |
| A2_F_22632000 | GCCAGGCTGCAGGAAGGAGG |
| A2_R_22632000 | GTTAGGGGAGGGCACGCAGC |
| A28_F_22632000 | CCAGCACCACACACCAGCCC |
| A28_R_22632000 | GCAGAAAGCTCAGCCTGGCCC |
| A72_F_22632000 | TCCAGTCCTGCACCCTCTCCC |
| A72_R_22632000 | GGTGGCTCGGGGCTCCTCAT |
| A7_F_22632000 | CAGTGTCCCCACGCACTCACG |
| A7_R_22632000 | TCCAGCACCTCCAGCCTCCC |
| A73_F_22632000 | CTGTGGTCAGCAGTCGCACGC |
| A73_R_22632000 | TCCCCTTGGCCTGCCATCGT |
| A25_F_22632000 | GGACCATGGCAACGGCCTCC |
| A25_R_22632000 | TCCAACAGGCGGTGTCAAGCC |
| B16_F_22681999 | GCCAAGCCTGCCTTGTGGGA |
| B16_R_22681999 | GGTGCCCTCCCTCACGATGC |
| B19_F_22681999 | GTGGGCACTTCAGAGCTGGGC |
| B19_R_22681999 | GTGGGATGTGCCCTCGTGCC |
| B54_F_22681999 | CCCGCCTTGTTGGGTACAGGC |
| B54_R_22681999 | GAGCGGGGAGCAGGATGGGT |
| B34_F_22681999 | TCCCAGAATGCCACGCCCTG |
| B34_R_22681999 | GAGGTGTGTGCTGAGGGGCG |
| B32_F_22681999 | ACTCTGTCCCGTGCCCTTGCT |

**20**

TABLE 4-continued

Primer sequences used to generate data in FIGS. 15, 16, and 17 (SEQ ID NOS: 42-95, respectively, in order of appearance).

| | | |
|---|---|---|
| B32_R_22681999 | CAAGGCGCCCTTGACTGGCA | |
| B7_F_22681999 | ATGCCATGCCCAACGCCACT | |
| B7_R_22681999 | CTGTGGCCTCAGCTGCTCGG | |
| C1_F_28410001 | CTGTGGGCCGCTCTCCCTCT | |
| C1_R_28410001 | CCTCCGGTAGGGCCAAGGCT | |
| C58_F_28410001 | TGACCTGTGGGCCGCTCTCC | |
| C58_R_28410001 | CCTCCGGTAGGGCCAAGGCT | |
| C6_F_28410001 | CAGCCCTGTGAGGCATGGGC | |
| C6_R_28410001 | AGTGAGAGGAGCGGCTGCCA | |
| C74_F_28410001 | GGGGCTGGTGGAGCTGGTGA | |
| C74_R_28410001 | TGGAGCCCCACATCCTGCGT | |
| C19_F_28410001 | TGTTCCCCGTGCCTGGCTCT | |
| C19_R_28410001 | TGGGGCCCATCCTGGGGTTC | |
| C29_F_28410001 | TGATGGCACGTGTTGCCCCG | |
| C29_R_28410001 | ACCGTGGCTGACCCCTCCTC | |
| C72_F_28410001 | CGCCGGGACACAGGAAGCAC | |
| C72_R_28410001 | CCCTGGTGAGGAGCCGGGAG | |
| C55_F_28410001 | GCCAGGGAAGGACTGCGGTG | |
| C55_R_28410001 | CAGCCAGGGCAGGACTCGGA | |
| Ch1_1_150_F | GAGGTCTGGTTCGGCTTTC | ref. 1 |
| Ch1_1_150_R | CAGAGCTGGGAGGGGATGAG | ref. 1 |
| ch1_2_150_F | TGCAACAGCTTCGTTGGTAG | |
| ch1_2_150_R | TAGGTCCAGCAGGAAGTTGG | |
| ch2_1_150_F | GTCGGAGAAGATCCGTGAGA | |
| ch2_1_150_R | CCAGGCATCAATGTCATCAG | |
| ch2_2_150_F | TGTCAACCAGACGTTCCAAA | |
| ch2_2_150_R | TAACACAGCTGGTGCCTGAG | |
| ch3_1_150_F | ATTCCCCCTTAACCACTTGC | |
| ch3_1_150_R | GAGGGTGTCTCGCTTGGTC | |
| ch3_2_150_F | GCTGAGTAGGAAAATGGGAGGT | |
| ch3_2_150_R | CTGCAGTCAGGGAGCAGAGT | |

FIG. **17** illustrates PCR amplification of reference chromosomes 1, 2, and 3. Primer sequences used to generate data are shown in Table 4.

FIG. **18** illustrates a comparison of amplification success rate using the "chromosome walk" method and the "hot spot" sequence selection method. 76% (16/21) amplifications of chromosome 21 were successful using the "chromosome walk" method to select sequences. 100% (7/7) sequences selected based on "hot spots" on chromosome 21 amplified.

US 8,318,430 B2

21

100% (5/5) sequences selected based on "hot spots" on chromosomes 1, 2, and/or 3 amplified.

### Example 3

#### Selection of Hotspot Region for Amplification

Sequences for enrichment can be chosen on the basis of being in a "hotspot," a region of relatively high sequence coverage. FIG. 19 illustrates that sequence runs from multiple samples were combined to give 79% coverage of chromosome 21. The bottom chart illustrates Illumina pipeline output files containing multiple files and each given start and end chromosome positions; therefore the sequencing reads cover 37 M region (46,927,127 last position–9,757,475 1st position–~37 M). FIG. 20 shows a schematic of chromosome 21 to which sequence reads have been mapped. Some regions have more sequence coverage than other regions. FIG. 21 illustrates an example of a process that was used to select a specific region of 251 base pairs for amplification. Sequence within 13,296,000-46,944,323 (illustrated in FIG. 20) was selected for amplification. FIGS. 22A and B illustrate the relative position for a Down syndrome critical region (35,892,000-41,720,000) on chromosome 21. Magnified views of the sequence reads mapped to chromosome 21 are shown in FIG. 23. FIG. 24 illustrates reads that map to a 4207 bp region on chromosome 21 and a 251 bp region within that 4207 bp region. The Y axis is the number of sequence reads at a chromosome position. FIG. 25 illustrates a primer pair that was designed to anneal to sequence with the 251 bp region.

### Example 4

#### Nested PCR for DNA Library Construction

FIG. 26 illustrates methods for generating library of enriched sequences. In the scheme shown in FIG. 26A, a three step PCR amplification process is used to generate a library of enriched nucleic acids where the fragments have sequence incorporated that can be used for annealing to primers for subsequent sequencing. A first pair of primers is used to amplify enriched sequences. These primers have sequence that anneals to a second set of primers that is used to amplify products of the first reaction. The second set of primers can have sequence that can anneal to sequencing primers. A third set of primers anneals to sequence from the first set of primers and is used to further amplify the products. The third set of primers also introduces sequence onto the fragments that can anneal to sequencing primers.

The PCR scheme in FIG. 26B illustrates a means for indexing sequences. The enriched fragments from each sample (e.g., individual maternal cell-free samples) can have sequence incorporated that identifies the fragment as originating from that sample. This indexing allows multiple samples to be pooled without loss of information with respect to which sample a fragment originated. The three step PCR proceeds as shown in FIG. 26A with indexing sequence being incorporated in primers used in the first amplification step. The indexing sequence can be in primers used for the 1st, 2nd, or 3rd amplification step.

The PCR scheme in FIG. 26C differs in that sequence is incorporated that serves to extend the length of enriched fragments. Fetal DNA in maternal cell-free samples is often less than 200 bp in size. Some amplifications enrich fragments that are, e.g., 60 bp in size. However, sequence reactions using, e.g., Illumina sequencing technology are more efficient when fragments are at least 100 bp in length. Thus, the PCR indexing scheme can be modified, e.g., as shown in FIG. 26C, to amplify fragments with sequence in the 1st, 2nd, or 3rd step that serves to lengthen the fragments in the library.

While preferred embodiments of the present invention have been shown and described herein, it will be obvious to those skilled in the art that such embodiments are provided by way of example only. Numerous variations, changes, and substitutions will now occur to those skilled in the art without departing from the invention. It should be understood that various alternatives to the embodiments of the invention described herein may be employed in practicing the invention. It is intended that the following claims define the scope of the invention and that methods and structures within the scope of these claims and their equivalents be covered thereby.

---

```
                        SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 133

<210> SEQ ID NO 1
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 1

ccccaagagg tgcttgtagt                                                   20


<210> SEQ ID NO 2
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 2
```

**A0142**

US 8,318,430 B2

| 23 | 24 |
|---|---|

-continued

```
gccatggtgg agtgtaggag                                              20


<210> SEQ ID NO 3
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 3

ctgaagtgct gccaacacac                                              20


<210> SEQ ID NO 4
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 4

tgatcttgga gcctcctttg                                              20


<210> SEQ ID NO 5
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 5

agcttctcca ggacccagat                                              20


<210> SEQ ID NO 6
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 6

cattcatggg aagggactca                                              20


<210> SEQ ID NO 7
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 7

ccattgcact ggtgtgctt                                               19


<210> SEQ ID NO 8
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 8

gagacgaggg gacgatagc                                               19
```

US 8,318,430 B2

| 25 | 26 |

-continued

```
<210> SEQ ID NO 9
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 9

tgccatcgta gttcagcgta                                              20


<210> SEQ ID NO 10
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 10

ttggaccaca gctcagagg                                               19


<210> SEQ ID NO 11
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 11

aaagtgtgct tgctccaagg                                              20


<210> SEQ ID NO 12
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 12

ggcaaaacac agcccaatag                                              20


<210> SEQ ID NO 13
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 13

cctagtgcgg gaaaagacac                                              20


<210> SEQ ID NO 14
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 14

ttctctccct tgctcattgc                                              20


<210> SEQ ID NO 15
```

US 8,318,430 B2

27            28

-continued

```
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 15

gagtcagagt ggagctgagg a                                              21


<210> SEQ ID NO 16
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 16

ggaggtccta gtggtgagca                                               20


<210> SEQ ID NO 17
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 17

tgtgggaagt caggacacac                                               20


<210> SEQ ID NO 18
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 18

gatcttggag cctcctttgc                                               20


<210> SEQ ID NO 19
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 19

gtgacagcct ggaacatgg                                                19


<210> SEQ ID NO 20
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 20

caaggcacct gcactaaggt                                               20


<210> SEQ ID NO 21
<211> LENGTH: 21
<212> TYPE: DNA
```

US 8,318,430 B2

29                                                                                        30

-continued

```
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 21

tgcctcctgc tacttttacc c                                              21


<210> SEQ ID NO 22
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 22

agacggaaca ggcagaggt                                                19


<210> SEQ ID NO 23
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 23

caagacacaa gcaggagagc                                               20


<210> SEQ ID NO 24
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 24

cagtttggac cacagctcag                                               20


<210> SEQ ID NO 25
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 25

aaagtgtgct tgctccaagg                                               20


<210> SEQ ID NO 26
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 26

tggaacaagc ctccattttc                                               20


<210> SEQ ID NO 27
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
```

US 8,318,430 B2

31                                                                                                                  32

-continued

```
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 27

gaggtgcttg tagtcagtgc ttca                                              24


<210> SEQ ID NO 28
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 28

cccggtgaca cagtcctctt                                                   20


<210> SEQ ID NO 29
<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 29

agtcagagtg gagctgag                                                     18


<210> SEQ ID NO 30
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 30

tgctgccaac acacgtgtct                                                   20


<210> SEQ ID NO 31
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 31

cagggctgtt gctcatgga                                                    19


<210> SEQ ID NO 32
<211> LENGTH: 17
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 32

tcccctagga tatcatc                                                      17


<210> SEQ ID NO 33
<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer
```

US 8,318,430 B2

33                                                                                                    34

-continued

```
<400> SEQUENCE: 33

cccgcatctg cagctcat                                              18


<210> SEQ ID NO 34
<211> LENGTH: 26
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 34

tctctccaag tcctacatcc tgtatg                                     26


<210> SEQ ID NO 35
<211> LENGTH: 13
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 35

ccaggtggct tcc                                                   13


<210> SEQ ID NO 36
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 36

gggagctggt acagaaatga cttc                                       24


<210> SEQ ID NO 37
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 37

ttgctcattg cgctgacaa                                             19


<210> SEQ ID NO 38
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 38

agccatcctt cccgggccta gg                                         22


<210> SEQ ID NO 39
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 39
```

**A0148**

US 8,318,430 B2

35
36

-continued

```
gttcggcttt caccagtct                                          19


<210> SEQ ID NO 40
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 40

ctccatagct ctccccact                                          19


<210> SEQ ID NO 41
<211> LENGTH: 17
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 41

cgccctgcca tgtggaa                                            17


<210> SEQ ID NO 42
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 42

tgaagcccgg gaggttccct                                         20


<210> SEQ ID NO 43
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 43

tccaggctgt gtgccctccc                                         20


<210> SEQ ID NO 44
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 44

gccaggctgc aggaaggagg                                         20


<210> SEQ ID NO 45
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 45

gttaggggag ggcacgcagc                                         20
```

US 8,318,430 B2

37                                                      38

-continued

```
<210> SEQ ID NO 46
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 46

ccagcaccac acaccagccc                                           20


<210> SEQ ID NO 47
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 47

gcagaaagct cagcctggcc c                                         21


<210> SEQ ID NO 48
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 48

tccagtcctg caccctctcc c                                         21


<210> SEQ ID NO 49
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 49

ggtggctcgg ggctcctcat                                           20


<210> SEQ ID NO 50
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 50

cagtgtcccc acgcactcac g                                         21


<210> SEQ ID NO 51
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 51

tccagcacct ccagcctccc                                           20
```

-continued

```
<210> SEQ ID NO 52
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 52

ctgtggtcag cagtcgcacg c                                              21


<210> SEQ ID NO 53
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 53

tccccttggc ctgccatcgt                                                20


<210> SEQ ID NO 54
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 54

ggaccatggc aacggcctcc                                                20


<210> SEQ ID NO 55
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 55

tccaacaggc ggtgtcaagc c                                              21


<210> SEQ ID NO 56
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 56

gccaagcctg ccttgtggga                                                20


<210> SEQ ID NO 57
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 57

ggtgccctcc ctcacgatgc                                                20


<210> SEQ ID NO 58
<211> LENGTH: 21
```

US 8,318,430 B2

41                                                                          42

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 58

gtgggcactt cagagctggg c                                              21


<210> SEQ ID NO 59
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 59

gtgggatgtg ccctcgtgcc                                                20


<210> SEQ ID NO 60
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 60

cccgccttgt tgggtacgag c                                              21


<210> SEQ ID NO 61
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 61

gagcggggag caggatgggt                                                20


<210> SEQ ID NO 62
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 62

tcccagaatg ccacgccctg                                                20


<210> SEQ ID NO 63
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 63

gaggtgtgtg ctgaggggcg                                                20


<210> SEQ ID NO 64
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
```

US 8,318,430 B2

| 43 | | 44 |

-continued

```
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 64

actctgtccc gtgcccttgc t                                           21


<210> SEQ ID NO 65
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 65

caaggcgccc ttgactggca                                             20


<210> SEQ ID NO 66
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 66

atgccatgcc caacgccact                                             20


<210> SEQ ID NO 67
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 67

ctgtggcctc agctgctcgg                                             20


<210> SEQ ID NO 68
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 68

ctgtgggccg ctctccctct                                             20


<210> SEQ ID NO 69
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 69

cctccggtag ggccaaggct                                             20


<210> SEQ ID NO 70
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
```

US 8,318,430 B2

45                                                                              46

-continued

        primer

<400> SEQUENCE: 70

tgacctgtgg gccgctctcc                                                    20

<210> SEQ ID NO 71
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
        primer

<400> SEQUENCE: 71

cctccggtag ggccaaggct                                                    20

<210> SEQ ID NO 72
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
        primer

<400> SEQUENCE: 72

cagccctgtg aggcatgggc                                                    20

<210> SEQ ID NO 73
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
        primer

<400> SEQUENCE: 73

agtgagagga gcggctgcca                                                    20

<210> SEQ ID NO 74
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
        primer

<400> SEQUENCE: 74

ggggctggtg gagctggtga                                                    20

<210> SEQ ID NO 75
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
        primer

<400> SEQUENCE: 75

tggagcccca catcctgcgt                                                    20

<210> SEQ ID NO 76
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
        primer

US 8,318,430 B2

47                                                                                          48

-continued

```
<400> SEQUENCE: 76

tgttccccgt gcctggctct                                          20


<210> SEQ ID NO 77
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 77

tggggcccat cctggggttc                                          20


<210> SEQ ID NO 78
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 78

tgatggcacg tgttgccccg                                          20


<210> SEQ ID NO 79
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 79

accgtggctg acccctcctc                                          20


<210> SEQ ID NO 80
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 80

cgccgggaca caggaagcac                                          20


<210> SEQ ID NO 81
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 81

ccctggtgag gagccgggag                                          20


<210> SEQ ID NO 82
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 82
```

US 8,318,430 B2

<table>
<tr><td>49</td><td></td><td>50</td></tr>
</table>

-continued

gccagggaag gactgcggtg                                          20


<210> SEQ ID NO 83
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 83

cagccagggc aggactcgga                                          20


<210> SEQ ID NO 84
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 84

gaggtctggt tcggctttc                                           19


<210> SEQ ID NO 85
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 85

cagagctggg agggatgag                                           19


<210> SEQ ID NO 86
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 86

tgcaacagct tcgttggtag                                          20


<210> SEQ ID NO 87
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 87

taggtccagc aggaagttgg                                          20


<210> SEQ ID NO 88
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 88

gtcggagaag atccgtgaga                                          20

US 8,318,430 B2

51                                                                    52

-continued

```
<210> SEQ ID NO 89
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 89

ccaggcatca atgtcatcag                                                  20


<210> SEQ ID NO 90
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 90

tgtcaaccag acgttccaaa                                                  20


<210> SEQ ID NO 91
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 91

taacacagct ggtgcctgag                                                  20


<210> SEQ ID NO 92
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 92

attccccctt aaccacttgc                                                  20


<210> SEQ ID NO 93
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 93

gagggtgtct cgcttggtc                                                   19


<210> SEQ ID NO 94
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 94

gctgagtagg aaatgggagg t                                                21


<210> SEQ ID NO 95
```

US 8,318,430 B2

53 54

-continued

```
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 95

ctgcagtcag ggagcagagt                                              20


<210> SEQ ID NO 96
<211> LENGTH: 212
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 96

caagacacaa gcaggagagc cacaaagcca gccagcttac tgccatcgta gttcagcgta    60

gcgaagttgg cctgcttctc cgcgcagccc gcactgttgc acacccgcat ctgcagctca   120

taccaggtgg cttcctgcag gtcatacagg atgtaggact tggagagaga ggtcctctga   180

gctgtggtcc aaactgtggt cccaaagggc ct                                212


<210> SEQ ID NO 97
<211> LENGTH: 36
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 97

tgccatcgta gttcagcgta gcgaagttgg cctgct                            36


<210> SEQ ID NO 98
<211> LENGTH: 36
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 98

ttggaccaca gctcagagga cctctctctc caagtc                            36


<210> SEQ ID NO 99
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 99

gtagtcagtg cttcagagtc agagtgga                                     28


<210> SEQ ID NO 100
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 100

cccccaagag gtgcttgtag tcagtgct                                     28


<210> SEQ ID NO 101
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 101

cgtgaccccc aagaggtgct tgtagtca                                     28


<210> SEQ ID NO 102
<211> LENGTH: 28
```

**A0158**

US 8,318,430 B2

55                                                                                                              56

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 102

aacagccgtg accccaara ggtgcttg                                    28


<210> SEQ ID NO 103
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 103

ccatggccac gccaggagcc tggtctca                                   28


<210> SEQ ID NO 104
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 104

ccatggccac gccaggagcc tggtctca                                   28


<210> SEQ ID NO 105
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 105

caccggggca gctgctgatg cccatggc                                   28


<210> SEQ ID NO 106
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 106

aggaagagga ctgtgtcacc ggggcagt                                   28


<210> SEQ ID NO 107
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 107

gaggaagagg actgtgttac cggggcag                                   28


<210> SEQ ID NO 108
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 108

gagctgagga agaggactgt gtcaccgg                                   28


<210> SEQ ID NO 109
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 109

gagtcagagt ggagctgagg aagaggac                                   28


<210> SEQ ID NO 110
<211> LENGTH: 28
```

US 8,318,430 B2

57                                                              58

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 110

gatgcccatg gccacgccag gagcctgg                                28


<210> SEQ ID NO 111
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 111

gatgcccatg gccacgccag gagcctgg                                28


<210> SEQ ID NO 112
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 112

ctgatgccca tggccacgcc aggagcct                                28


<210> SEQ ID NO 113
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 113

gtcaccgggg cagttgctga tgcccatg                                28


<210> SEQ ID NO 114
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 114

gccaggagcc tggtctcatg agtctcct                                28


<210> SEQ ID NO 115
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 115

caccatggca tcaagctcta cccctgcc                                28


<210> SEQ ID NO 116
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 116

caccatggca tcaagctcta cccctgcc                                28


<210> SEQ ID NO 117
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 117

ccaccatggc atcaagctct acccctgc                                28


<210> SEQ ID NO 118
<211> LENGTH: 28
```

US 8,318,430 B2

59                                                                              60

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 118

cactccacca tggcatcaag ctctaccc                                       28


<210> SEQ ID NO 119
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 119

cctacactcc accatggcat caagctct                                       28


<210> SEQ ID NO 120
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 120

cctacactcc accatggcat caagctct                                       28


<210> SEQ ID NO 121
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 121

agtctccttg tctctgagcc tctcctac                                       28


<210> SEQ ID NO 122
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 122

tccaccatgg catcaagctc taccctg                                        28


<210> SEQ ID NO 123
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 123

tctcctacac tccaccatgg catcaagc                                       28


<210> SEQ ID NO 124
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 124

ccactaggac ctcctcctgt ct                                             22


<210> SEQ ID NO 125
<211> LENGTH: 26
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 125

ctcaccacta ggacctcctc ctgtct                                         26


<210> SEQ ID NO 126
<211> LENGTH: 28
```

**A0161**

US 8,318,430 B2

61                                                                                                            62

-continued

```
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 126

cctgcccctg ctcaccacta ggacctcc                                              28


<210> SEQ ID NO 127
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 127

tctgcccctg ctcaccacta ggacctcc                                              28


<210> SEQ ID NO 128
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 128

atgcatgtcc tgccctgct caccacta                                               28


<210> SEQ ID NO 129
<211> LENGTH: 10
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 129

cctcctgtct                                                                  10


<210> SEQ ID NO 130
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 130

cagcccccag aagatgcatg tcctgccc                                              28


<210> SEQ ID NO 131
<211> LENGTH: 26
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 131

ctcaccacta ggacctcctc ctgtct                                                26


<210> SEQ ID NO 132
<211> LENGTH: 28
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 132

aacagccgtg acccccaaga ggtgcttg                                              28


<210> SEQ ID NO 133
<211> LENGTH: 251
<212> TYPE: DNA
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 133

aacagccgtg acccccaaga ggtgcttgta gtcagtgctt cagatgcaga gtggagctga          60

ggaagaggac tgtgtcaccg gggcagttgc tgatgcccat ggccacgcca ggagcctggt         120

ctcatgagtc tccttgtctc tgagcctctc ctacactcca ccatggcatc aagctctacc         180
```

US 8,318,430 B2

63 64

-continued

```
cctgcctccc tgcagccccc agaagatgca tgtcctgccc ctgctcacca ctaggacctc   240

ctcctgtctg g                                                          251
```

What is claimed is:

1. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:

(a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;

(b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples,

wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from a first chromosome tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from a reference chromosome, wherein the first chromosome tested for being aneuploid and the reference chromosome are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length,

(c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

(d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the reference chromosome;

(e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the reference chromosome; and

(f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the first chromosome and a number of enumerated sequence reads corresponding to the reference chromosome of (e).

2. The method of claim 1, wherein for each of the plurality of maternal blood samples determining the presence or absence of a fetal aneuploidy comprises comparing the number of enumerated sequence reads corresponding to the first chromosome tested for being aneuploid with the number of enumerated sequence reads corresponding to the reference chromosome.

3. The method of claim 1, wherein said plurality of non-random polynucleotide sequences comprises at least 300 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and at least 300 different non-random polynucleotide sequences selected from the reference chromosome.

4. The method of claim 3, wherein said plurality of non-random polynucleotide sequences comprises at least 500 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and at least 500 different non-random polynucleotide sequences selected from the reference chromosome.

5. The method of claim 1, wherein each of said plurality of non-random polynucleotide sequences is from 10 to 500 nucleotide bases in length.

6. The method of claim 1, wherein each of said plurality of non-random polynucleotide sequences is from 50 to 150 nucleotide bases in length.

7. The method of claim 1, wherein said first chromosome tested for being aneuploid is selected from the group consisting of chromosome 13, chromosome 18, chromosome 21, chromosome X, and chromosome Y.

8. The method of claim 7, wherein said fetal aneuploidy comprises fetal aneuploidy of a chromosome selected from the group consisting of chromosome 13, chromosome 18, chromosome 21, chromosome X, and chromosome Y.

9. The method of claim 8, wherein said fetal aneuploidy is selected from the group consisting of trisomy 21, trisomy 18, trisomy 13, and monosomy X.

10. The method of claim 1, wherein said reference chromosome is selected from the group consisting of chromosome 1, chromosome 2, chromosome 3, chromosome 13, chromosome 18, and chromosome 21.

11. The method of claim 1, wherein said fetal aneuploidy comprises monosomy, trisomy, tetrasomy, or pentasomy of the first chromosome.

12. The method of claim 1, wherein said selectively enriching of (b) comprises performing polymerase chain reaction (PCR) amplification.

13. The method of claim 12, wherein for each fetal and maternal cell-free genomic DNA sample PCR amplification comprises hybridizing at least two oligonucleotides to each of the at least 100 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and each of the at least 100 different non-random polynucleotide sequences selected from the reference chromosome.

14. The method of claim 13, wherein said oligonucleotides do not hybridize to non-random polynucleotide sequences comprising one or more polymorphisms.

15. The method of claim 13, wherein each of said oligonucleotides has a substantially similar melting temperature.

US 8,318,430 B2

65

**16**. The method of claim **1**, wherein said massively parallel sequencing generates at least 30 nucleotide bases per sequence read.

**17**. The method of claim **1**, wherein said fetal aneuploidy comprises partial monosomy or partial trisomy.

**18**. The method of claim **1**, wherein said plurality of non-random polynucleotide sequences comprises no more than 1000 different non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and no more than 1000 different non-random polynucleotide sequences selected from the reference chromosome.

**19**. A method for determining a presence or absence of a fetal aneuploidy in a fetus for each of a plurality of maternal blood samples obtained from a plurality of different pregnant women, said maternal blood samples comprising fetal and maternal cell-free genomic DNA, said method comprising:

  (a) obtaining a fetal and maternal cell-free genomic DNA sample from each of the plurality of maternal blood samples;

  (b) selectively enriching a plurality of non-random polynucleotide sequences of each fetal and maternal cell-free genomic DNA sample of (a) to generate a library derived from each fetal and maternal cell-free genomic DNA sample of enriched and indexed fetal and maternal non-random polynucleotide sequences, wherein each library of enriched and indexed fetal and maternal non-random polynucleotide sequences includes an indexing nucleotide sequence which identifies a maternal blood sample of the plurality of maternal blood samples,

  wherein said plurality of non-random polynucleotide sequences comprises at least 100 different non-random polynucleotide sequences selected from at least one chromosome region tested for being aneuploid and at least 100 different non-random polynucleotide sequences selected from at least one chromosome control region, wherein the at least one chromosome region tested for being aneuploid and the at least one chromosome control region are different, and wherein each of said plurality of non-random polynucleotide sequences is from 10 to 1000 nucleotide bases in length;

  (c) pooling the libraries generated in (b) to produce a pool of enriched and indexed fetal and maternal non-random polynucleotide sequences;

  (d) performing massively parallel sequencing of the pool of enriched and indexed fetal and maternal non-random polynucleotide sequences of (c) to produce sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences of each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome control region;

  (e) based on the indexing nucleotide sequence, for each of the plurality of maternal blood samples, enumerating sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the at least one chromosome control region; and

66

  (f) for each of the plurality of maternal blood samples, determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads corresponding to the at least one chromosome region tested for being aneuploid and a number of enumerated sequence reads corresponding to the at least one chromosome control region of (e).

**20**. The method of claim **19**, wherein for each of the plurality of maternal blood samples determining the presence or absence of a fetal aneuploidy comprises comparing the number of enumerated sequence reads corresponding to the at least one chromosome region tested for being aneuploid with the number of enumerated sequence reads corresponding to the at least one chromosome control region.

**21**. The method of claim **19**, wherein said plurality of non-random polynucleotide sequences comprises at least 300 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and at least 300 different non-random polynucleotide sequences selected from the at least one chromosome control region.

**22**. The method of claim **19**, wherein each of said plurality of non-random polynucleotide sequences is from 10 to 500 nucleotide bases in length.

**23**. The method of claim **19**, wherein the at least one chromosome region tested for being aneuploid is selected from at least one chromosome selected from the group consisting of chromosome 13, chromosome 18, chromosome 21, chromosome X, and chromosome Y.

**24**. The method of claim **23**, wherein said fetal aneuploidy comprises fetal aneuploidy of a chromosome selected from the group consisting of chromosome 13, chromosome 18, chromosome 21, chromosome X, and chromosome Y.

**25**. The method of claim **24**, wherein said fetal aneuploidy is selected from the group consisting of trisomy 21, trisomy 18, trisomy 13, and monosomy X.

**26**. The method of claim **19**, wherein the at least one chromosome control region is selected from at least one chromosome selected from the group consisting of chromosome 1, chromosome 2, chromosome 3, chromosome 13, chromosome 18, and chromosome 21.

**27**. The method of claim **19**, wherein said fetal aneuploidy comprises monosomy, trisomy, tetrasomy, or pentasomy of at least one chromosome.

**28**. The method of claim **19**, wherein said selectively enriching of (b) comprises performing polymerase chain reaction (PCR) amplification.

**29**. The method of claim **28**, wherein for each fetal and maternal cell-free genomic DNA sample PCR amplification comprises hybridizing at least two oligonucleotides to each of the at least 100 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and each of the 100 different non-random polynucleotide sequences selected from the at least one chromosome control region.

**30**. The method of claim **19**, wherein said plurality of non-random polynucleotide sequences comprises no more than 1000 different non-random polynucleotide sequences selected from the at least one chromosome region tested for being aneuploid and no more than 1000 different non-random polynucleotide sequences selected from the at least one chromosome control region.

\* \* \* \* \*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

*Ariosa Diagnostics v. Verinata Health, Inc.,* 2015-1215, -1226

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by DURIE TANGRI LLP, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **March 9, 2015** counsel has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Edward R. Reines
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000
edward.reines@weil.com
derek.walter@weil.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

March 9, 2015

/s/ John C. Kruesi, Jr.
John C, Kruesi, Jr.
Counsel Press

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)(B)

Counsel for Ariosa Diagnostics, Inc. certifies that the body of this brief,

beginning with the "Statement of Related Cases" on page 1 and ending with the

last line of the "Conclusion" on page 41, contains 9,386 words, as calculated by the

Microsoft Word program, in compliance with Rule 32(a)(7)(B) of the Federal

Rules of Appellate Procedure.

/s/ Mark A. Lemley
Mark A. Lemley
Counsel for Ariosa Diagnostics, Inc.